```
1                    IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF NEW MEXICO

3    F. MICHAEL HART, Guardian ad
     Litem for JOSE JARAMILLO,
4    an incapacitated person,

5                    Plaintiff,

6         vs.                                 CV-11-0267 MCA

7    CORRECTIONS CORPORATION OF
     AMERICA, a Foreign Corporation,
8    CIBOLA COUNTY CORRECTIONAL CENTER,
     WALT WELLS, WARDEN, and RODDIE
9    RUSHING, WARDEN,

10                   Defendants.

11

12                   TRANSCRIPT OF PROCEEDINGS
                        DAUBERT HEARINGS
13          BEFORE THE HONORABLE M. CHRISTINA ARMIJO
                  CHIEF UNITED STATES DISTRICT JUDGE
14          FRIDAY, NOVEMBER 22, 2013, 10:08 A.M
                    ALBUQUERQUE, NEW MEXICO
15

16   FOR THE PLAINTIFF:

17        CURTIS AND LUCERO LAW FIRM
          Attorneys at Law
18        301 Gold Avenue, Southwest, Suite 201
          Albuquerque, New Mexico  87102
19        BY:  MS. LISA K. CURTIS

20   FOR THE DEFENDANTS:

21        STRUCK WIENEKE & LOVE
          Attorneys at Law
22        3100 West Ray Road, Suite 300
          Chandler, Arizona  85226
23        BY:  MS. CHRISTINA G. RETTS

24
          Proceedings recorded by mechanical stenography,
25   transcript produced by computer.
```

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1     Reported by:

2          JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
           United States Court Reporter
3          333 Lomas Boulevard, Northwest
           Albuquerque, New Mexico  87102
4          Phone:  (505)348-2209

5

6                        I N D E X

7                                                    PAGE

8     PRELIMINARY MATTERS                              4

9     OPENING STATEMENT RE DR. PANDYA BY MS. CURTIS    9

10    OPENING STATEMENT RE DR. PANDYA BY MS. RETTS    57

11    OPENING STATEMENT RE DR. YOUNG BY MS. CURTIS    99

12    OPENING STATEMENT RE DR. YOUNG BY MS. RETTS    110

13    WITNESSES:

14      NAUSHIRA PANDYA, M.D. (Appearing Telephonically)

15        Direct Examination by Ms. Curtis            18

16        Cross-Examination by Ms. Retts              59

17        Redirect Examination by Ms. Curtis          83

18        Questions by the Court                      93

19      LOWELL SUNG-YI YOUNG, M.D. (Appearing Telephonically)

20        Direct Examination by Ms. Curtis           104

21        Cross-Examination by Ms. Retts             114

22        Redirect Examination by Ms. Curtis         122

23        Questions by the Court                     125

24        Further Examination by Ms. Curtis          126

25        Further Questions by the Court             127

                    JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                         333 Lomas Boulevard, Northwest
                         Albuquerque, New Mexico  87102

1                          I N D E X (Continued)

2                                                            PAGE

3    CLOSING ARGUMENT BY MS. CURTIS                          128

4    CLOSING ARGUMENT BY MS. RETTS                           131

5    FURTHER CLOSING ARGUMENT BY MS. CURTIS                  135

6    FURTHER CLOSING ARGUMENT BY MS. RETTS                   137

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1               DAUBERT HEARINGS

2          (Court in session at 10:08 a.m.)

3          CRD CAROL BEVEL:  All rise.  Hear ye, hear ye,

4    hear ye.  The United States District Court for the District

5    of New Mexico is now in session, the Honorable M. Christina

6    Armijo, Chief United States District Judge, presiding.

7               God save these United States and this Honorable

8    Court.

9               THE COURT:  You may be seated.  Good morning,

10   counsel.  You may be seated.

11              Thank you for your patience here.  We're starting

12   a couple minutes late, but I always say it depends on which

13   clock we're looking at, because the one here at the

14   computer tells me we're on time, but the one up there says

15   we're a little late.  So good morning.

16              MS. RETTS:  Good morning.

17              THE COURT:  All right.

18              Let me formally call the case of Hart v.

19   Corrections Corporation of America, et al.  This is on the

20   Court's Criminal Docket, 11-CV-267.

21              And if I might, please, have appearances from

22   counsel?

23              MS. CURTIS:  Good morning, Judge.  Lisa Curtis

24   for the plaintiff.  I'd like to make sure that the Court is

25   aware that Mr. Hart may be coming in during the course of

```
 1      the hearing.  He actually spoke right after me at a

 2      seminar.

 3                  THE COURT:  Is there a seminar this morning?

 4                  MS. CURTIS:  There is.

 5                  THE COURT:  Over at the State Bar?

 6                  MS. CURTIS:  Actually, over at the UNM Continuing

 7      Ed, on professionalism.  And so I spoke this morning, and

 8      he came right after me, and as soon as he's done, he's

 9      going to come over.

10                  THE COURT:  That's an important topic.

11                  MS. CURTIS:  Yes.

12                  THE COURT:  All right.

13                  MS. CURTIS:  Thank you.

14                  THE COURT:  That's fine.

15                  MS. RETTS:  Good morning, Your Honor.  Christina

16      Retts for the defendants.

17                  THE COURT:  How are you this morning?

18                  MS. RETTS:  Good.  Thank you, Your Honor.

19                  THE COURT:  All right.  Just give me one moment

20      here.

21                  I'm suffering from some allergies.  You'll have

22      to excuse me.  And it seems to get worse when I'm in the

23      courtroom.  I think I'm slightly allergic to the carpet

24      fibers, so you will hear me sneeze a few times.  I

25      apologize for that.
```

1            All right.  We are here for two hearings that

2    have been noted as Daubert hearings in this case, and I

3    appreciate your working with my CRD for the scheduling of

4    this.  I will note that we're here in November.  In the

5    last month or so we had an issue with the sequestration,

6    as you know.  The courts were closed, and the court-

7    affiliated stakeholders were not able to contribute, so

8    there was a down-side to much of our delay to function here

9    as a court.

10            I don't know if you knew this.  Half the building

11    lost power for a period of about two and a half weeks,

12    including this room here, and so those of us who could were

13    shifted over to the west side of the building, including

14    the Chief's chambers, which had no lights, and it was a

15    perfect storm.

16            So there were reasons why we couldn't accommodate

17    scheduling requests, but we're back on track here.  And we

18    do have some flashlights saved up, too, just in case.

19    Everyone here, Julie and Carol, understand what we went

20    through for a couple of weeks, two and a half weeks.  But I

21    appreciate your patience here.  All right.

22            The first motion here is plaintiff's motion, a

23    Daubert motion to exclude the expert testimony of Naushira

24    Pandya, M.D.  This is on the Court's docket as Docket

25    Number 126.

```
 1              And this is the plaintiff's motion, so let me
 2      address that to you, Ms. Curtis.
 3              MS. CURTIS:  Yes, Your Honor.
 4              THE COURT:  And if you need to utilize the
 5      technology, just let us know.  That's not a problem.  Carol
 6      can assist you with that.
 7              And if you'd take the podium, we can commence
 8      here.
 9              MS. CURTIS:  Thank you, Judge.  I did ask your
10      deputy, if I needed to use it, and she said to give her the
11      signal.
12              THE COURT:  Yes, absolutely.  That why we have it
13      here.
14              MS. CURTIS:  Great.  Judge, if I may, I just have
15      a logistical question for you.
16              THE COURT:  Okay.
17              MS. CURTIS:  Obviously, Dr. Pandya is on the
18      telephone line.
19              THE COURT:  Yes.
20              MS. CURTIS:  I would like to know at what stage,
21      and whether the Court would like to question her; if I may
22      question her during my time here at the podium; or how the
23      Court would like to conduct that?
24              THE COURT:  Have you talked to opposing counsel
25      about that, how you want to handle this?
```

```
1                    MS. CURTIS:  No, we have not spoken about it.

2                    THE COURT:  Why don't you confer for a minute on

3         that.

4                    MS. CURTIS:  Yes, ma'am.

5                    THE COURT:  And I'm going to put the doctor on

6         mute here for just a minute.

7                    (Witness' telephone put on mute.)

8                    THE COURT:  How do you pronounce the doctor's

9         name?

10                   MS. CURTIS:  I'm guessing, Judge, so I'm a bad

11        person to ask.

12                   MS. RETTS:  Dr. Pandya.

13                   THE COURT:  Dr. Pandya?

14                   MS. RETTS:  Yes.

15                   THE COURT:  Okay.  All right.

16                   (Witness' telephone taken off mute.)

17                   THE COURT:  Dr. Pandya, this is Judge Armijo.

18        Are you on the line?

19                   THE WITNESS:  I'm fine, thank you.  How are you?

20                   THE COURT:  I'm all right.  Thank you for your

21        patience here.

22                   THE WITNESS:  No problem.

23                   THE COURT:  Let me know if you cannot hear -- I'm

24        sure you can hear me because the mike is near the

25        Polycom -- but especially if you can't hear the attorneys
```

```
 1    who are over at the podium.  All right?

 2                 THE WITNESS:  Sure.  Will do.

 3                 THE COURT:  All right.  Ms. Curtis, how do you

 4    wish to proceed here?

 5                 MS. CURTIS:  Yes, Your Honor.  Opposing counsel

 6    and I have conferred, and I'm going to make a short

 7    argument; followed by some questioning of Dr. Pandya; and

 8    then an application of the questions and answers that we've

 9    heard during that examination; to a short argument; and

10    then I'll turn it over to opposing counsel.

11                 THE COURT:  That sounds pretty good.  Let's

12    proceed, then.

13                 MS. CURTIS:  Yes, Your Honor.

14                 We have filed a Daubert motion concerning Dr.

15    Pandya for several reasons, Your Honor.  The Daubert

16    process is important because in the old days we used to

17    deal with experts just on the fly, during trial, and it was

18    very difficult to have a full examination at that time,

19    without the Court being able to really consider their

20    qualifications and bases for their testimony.

21                 And so the Daubert function of the Court, as

22    gatekeeper, really allows us to go into what would be a lot

23    more detailed than we would be allowed to do at trial.

24                 There are precursor cases that we've cited in our

25    briefing, Graham v. Wyeth and Wilkins v. University of
```

1      Houston in particular, that talk about requiring particular

2      field experience.  And what I mean by that is that the area

3      that's going to be testified on as an expert is something

4      that not only fits into the case, but into the expertise of

5      this particular witness.

6              These cases are still relevant.  And, in fact,

7      progeny from Daubert show that not everyone who is an

8      expert is necessarily an expert in the area that they wish

9      to testify on.  Frankly, we are probably all experts on

10     some level in some area.  That doesn't necessarily mean

11     that we can give an expert opinion.

12             Atlantic Richfield v. Farm Credit Bank, which is

13     a 2000 Tenth Circuit case, talks about the second area that

14     I would like to discuss, which has to do with the evidence

15     being not only relevant, but reliable, and that the

16     reliability is the most important function of both the

17     qualification aspect of an expert's testimony, but also the

18     bases.

19             Because, again, out in the real world, not trial,

20     everyone has an opinion.

21             But in order for an expert to testify under 702,

22     they've got to have a reliable basis, which is literally

23     the foundation for every piece of evidence that comes

24     before a jury.  It's the indicia of reliability that is so

25     important.

1               The question here is, while Dr. Pandya, as a

2        geriatrician -- that was her actual designation, Judge.

3        And I might ask if the Court could turn on the --

4               THE COURT:  Do you want us to swear in Dr. Pandya

5        at this time?

6               MS. CURTIS:  Yes.  That would be helpful.

7               THE COURT:  Yes.  Doctor, would you please raise

8        your right hand?

9               THE WITNESS:  Yes.

10              COURTROOM DEPUTY CAROL BEVEL:  Do you solemnly

11       swear that your testimony in this matter shall be the

12       truth, the whole truth, and nothing but the truth, so help

13       you God?

14              THE WITNESS:  I do.

15              COURTROOM DEPUTY CAROL BEVEL:  Would you please

16       state your name and spell your last name for the record.

17              THE WITNESS:  Naushira Pandya, P-A-N-D-Y-A.

18              THE COURT:  Thank you, Doctor.  All right.  Ms.

19       Curtis?

20              MS. CURTIS:  Yes.  Your Honor, as you can see --

21       I hope that you can see it.

22              THE COURT:  Carol, I'm not seeing it on my

23       monitor.  Wait a minute.  Just give us a moment here.

24              MS. CURTIS:  Absolutely.

25              THE COURT:  You may proceed.

1              MS. CURTIS:  Thank you, Your Honor.

2              As you can see, Your Honor, Dr. Pandya is a

3    geriatrician.  She works in the Department of Geriatrics

4    and is the director of the Geriatrics Education Center at

5    an osteopathic medical school in Florida.

6              As Your Honor will recall, Jose Jaramillo was

7    52 years old.  He does not qualify as an elder that would

8    be seen by a geriatrician.  That is not an issue in the

9    case.

10             And while I'm sure that Dr. Pandya is an expert

11   in that area, it's not applicable for purposes of expert

12   testimony in this case.

13             THE COURT:  Just for my own information, what is

14   the age where someone would be considered a suitable

15   patient for someone trained in geriatrics?

16             MS. CURTIS:  I think rather than -- I'm sure

17   there's an expert sitting on the phone, and I will ask that

18   question, Your Honor.

19             THE COURT:  Doctor, it's not particularly

20   relevant but is there a cut-off, age-wise?  Or is it more

21   condition?

22             THE WITNESS:  The answer is that there is

23   generally geriatricians who will see patients who are 65

24   and older and have officially reached Medicare age.  Some

25   geriatricians are starting to see patients who are in their

1   seventies because many people are fairly healthy until that

2   time.

3           But geriatricians also see younger patients who

4   have chronic physical limitations or chronic mental

5   illness, because physiologically they are older.  They

6   have the same medical problems as that of an older

7   counterpart.

8           So there's no cut-off.  Geriatricians see people

9   with multiple chronic illnesses and physical and

10  psychological problems.

11          THE COURT:  All right.  Thank you.

12          MS. CURTIS:  Yes, Your Honor.

13          So the issue about gerontology, which you have

14  adequately explored, about a typical geriatrician, the age

15  of the patient that they are seeing is someone over the age

16  of 65.

17          The second issue, and really the most significant

18  issue, is the bases for the testimony that is stated in the

19  report that the Court has, for the opinions that Dr. Pandya

20  says that she is going to give in trial.

21          The references that are on the back page of Dr.

22  Pandya's report list five references, and I will do more to

23  explore these with Dr. Pandya.  But just to give the Court,

24  frankly, and the witness, a heads-up what the issues are,

25  is that the reference number 1, Diabetes Care Supplement,

1    literally has no data that applies to life expectancy.

2          The second reference, which is a journal

3    concerning a study that was done on traumatic brain injury,

4    on the second page of that study, as I will discuss with

5    the witness, literally excludes Jose Jaramillo or anyone

6    like him from the study population, such that traumatic

7    brain injury, which is normally what we think of as one of

8    our soldiers coming back from Iraq or Afghanistan following

9    some kind of bomb blast, having a traumatic brain injury,

10   is not a like population.

11         And as the Court will see and I will speak to the

12   witness about, there is no transferable information such

13   that could be a reliable bases for an opinion.

14          The third reference is -- it was extremely hard

15   to find because it has no citation attached to it.  I have

16   a very dedicated nurse who found a symposium by that name,

17   that contained only an abstract from the study that is

18   listed in reference number 2.  So it is the same reference,

19   2 and 3, except that 3 is only an abstract that was given

20   at a symposium.

21         Reference number 4 is not a journal.  There is

22   no such journal called Neurohabel 2010.  The author,

23   Strauss -- there is a Neurorehab, and to the extent that

24   we are able to figure this out, there is a Neurorehab

25   Journal.

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1            However, Dr. Strauss contributed two letters to

2    the editor of that journal only, one in 2004 and one in

3    2010.  The Strauss letters to the editor are not

4    peer-reviewed and, for that reason, are not a reliable

5    basis.

6            A letter to the editor is never a reliable basis

7    for any expert opinion.  It doesn't meet the qualifications

8    of Daubert or any of its progeny.

9            And so there is nothing in 2010, for Dr. Strauss

10   anyway.

11           The Neurorehab 2004, Number 19, is where we found

12   the Strauss letter to the editor, so I believe that's what

13   it is.

14           Then the Williams Textbook of Endocrinology does

15   not have a 2010 edition, as is referenced in exhibit -- I'm

16   sorry -- reference number 5.  It has a 2011 edition, which

17   we looked, and there are two sections -- and the entire

18   textbook is enormous.  There is no particular reference to

19   any section in it as a basis.

20           But in the 2011 version there are two sections

21   devoted to diabetes, neither of which include any data on

22   life expectancy.

23           And so because this expert, while the designation

24   that was given to us by the defendants does not say that

25   she is a life expectancy expert, once we got her report,

1       that appears to be her issue.

2               She has literally no reliable basis upon which to

3       give any opinion concerning life expectancy.

4               And so without a reliable basis for the opinion,

5       she must be struck as an expert.

6               And, Your Honor, with that, I would, if the Court

7       would allow me, I would like to start my examination of Dr.

8       Pandya.

9               THE COURT:  That's fine.

10              MS. CURTIS:  Thank you.

11              THE COURT:  Let me just inquire.  Do you wish to

12      make any brief opening remarks, counsel?

13              MS. RETTS:  Your Honor, we had agreed to sort of

14      a process where Ms. Curtis would go first, and then I will

15      follow her.

16              THE COURT:  That's fine.

17              MS. RETTS:  The only thing I might note, that

18      might assist the Court in listening right now, is that Dr.

19      Pandya actually has two opinions.  One of the opinions has

20      not been challenged at all, and that is relative to the

21      diabetic care given to Mr. Jaramillo.  So that is not at

22      issue at all.

23              THE COURT:  Okay.

24              MS. RETTS:  So just to be clear that it's not

25      requesting to strike her in the entirety.  I understand

1    this to be just the life expectancy.

2              THE COURT:  All right.  You may proceed, Ms.

3    Curtis.

4              MS. CURTIS:  Your Honor, I think it's important

5    that we address the issue that opposing counsel just

6    raised.  And that is not true.  Dr. Pandya has been -- the

7    request is to strike her in her entirety because diabetic

8    care is not at issue.

9              He was receiving diabetic care in the facility.

10   There is no question as to whether the diabetic care was

11   appropriate or not.

12             There's also no request for compensation for

13   diabetic care now.

14             THE COURT:  Is that going to factor into any part

15   of your case, then?

16             MS. CURTIS:  No, other than the reality that he

17   was diagnosed with diabetes in the facility in June of

18   2007.

19             THE COURT:  And that's background information.

20             MS. CURTIS:  Right, which is agreed.

21             THE COURT:  So, Ms. Retts, is this second opinion

22   relevant in any way to your defense?

23             MS. RETTS:  Yes, it is relevant, particularly to

24   some of the systemic issues that the plaintiffs are trying

25   to allege relative to the medical department.  As you may

1    recall, they're trying to introduce post-incident audits,

2    other audits relative to patients who are not Mr.

3    Jaramillo.

4           It is his medical condition that is at issue in

5    this litigation.  The diabetic opinions of Dr. Pandya show

6    that his care was extremely well managed, which also goes

7    to an understanding of the risk factors he possessed for

8    contracting pneumonia.

9           THE COURT:  Okay.  So we have a disagreement,

10   then, on this.  The Court understands.  So let us proceed.

11          MS. CURTIS:  Thank you.

12          THE COURT:  Okay.

13          MS. CURTIS:  Again, Your Honor, just so you know,

14   we're not challenging the diabetic care.  We say it's fine.

15   So I would -- I don't know that there is a disagreement, at

16   least with regard to that issue.

17          NAUSHIRA PANDYA, M.D. (Appearing Telephonically),

18          after having been first duly sworn under oath,

19          was questioned and testified telephonically as

20          follows:

21                       DIRECT EXAMINATION

22   BY MS. CURTIS:

23   Q.  Dr. Pandya, my name is Lisa Curtis, and I represent the

24   plaintiff in this case.

25   A.  (WITNESS TESTIFYING TELEPHONICALLY)  Yes.

1    Q.  I'm going to ask you a few questions.

2    A.  Okay.

3    Q.  Dr. Pandya, could you please explain to us what your

4    regular job is, please?

5    A.  Yes.  I am a professor and chair of the Department of

6    Geriatrics, and I also direct the Geriatrics Education

7    Center, which is a federally funded grant to promote

8    geriatrics education, and there are about 45 in the

9    country.

10          And my job is divided.  About 50 percent is

11    clinical practice and 50 percent teaching.  And throughout

12    my career, I've taken care of very sick people, both in the

13    outpatient, but largely in the long-term care or nursing

14    home setting, and they have been of various ages, from

15    early twenties to over 100 years old, with this similar

16    problem as this unfortunate gentleman.

17          So in my -- I am medical director of two nursing

18    homes for myself and my group of three other geriatricians

19    who also provide care for patients.  And I see patients in

20    the geriatrics clinic and do a few consults in the local

21    hospital, geriatrics consults.

22          So my job is divided, probably half and half,

23    among -- between teaching and administration, and the rest

24    of the 50 percent is actual hands-on patient care.

25    Q.  And so, Dr. Pandya, a geriatrician normally treats

1    elders, correct?

2    A.  Not always.  As I clarified, there are some people who

3    are so medically complex, such as this gentleman, who have

4    multiple devices, who are not able to take care of

5    themselves, who are totally dependent on others for

6    care.  They are physiologically older.  Their chronological

7    age may be one thing, but physiologically they are much

8    older.

9              So geriatricians are often involved in the care

10   of younger people, as I mentioned earlier, with chronic

11   mental or physical debility.  You know, the young patient

12   with the head injury would be a perfect example, and adults

13   or children who have cerebral palsy, who are very

14   debilitated.

15             So a geriatrician's skills are often called upon

16   to take care of younger patients who have the same needs,

17   debilitative.

18   Q.  Dr. Pandya, I would respectfully object that that is

19   not a responsive answer and is in fact narrative.

20             MS. CURTIS:  And I'll just preserve that

21   objection, Judge.

22   A.  That is also --

23   Q.  No.  Excuse me, Dr. Pandya.  Just a moment.

24             THE COURT:  Doctor, just respond to the question.

25   All right?

1               THE WITNESS:  Oh, okay.

2     Q.  All right.  So the regular job of a geriatrician is to

3     treat patients over the age of 65, correct?

4     A.  Generally speaking.

5     Q.  All right.  And the patient population that you

6     normally see is a population over the age of 65, correct?

7     A.  The patient population I see, because of the unique

8     differences of our clinic and nursing home, actually

9     varies.  I have patients with cerebral palsy in their

10    twenties, up to elderly patients in their -- over 100 years

11    old.  So it varies, depending on their needs.

12    Q.  But your normal patient is over the age of 65, correct?

13    A.  Generally, yes.

14    Q.  All right.  And so a younger man -- that is, a person

15    under the age of 65 -- who is seen for treatment, that has

16    sepsis, would normally not see you; they would see an

17    infectious disease physician, correct?

18    A.  They would see me if they were in a nursing home.  They

19    would definitely see me.

20    Q.  Doctor, let me try that question one more time just to

21    make sure you heard me.  A younger man, under the age of

22    65, who is being treated for sepsis that caused brain

23    damage, would normally not see you; they would see an

24    infectious disease physician, correct?

25    A.  In the hospital setting -- if I may just clarify the

1     question?  When you say -- you know, because patients get

2     transferred to so many different care settings; you know,

3     to hospitals, to rehabs, to nursing homes, to back to the

4     hospital.  So it would depend on what setting you meant.

5     Q.  A young man with sepsis.  Let's deal with it this way.

6     If a person, a young man under the age of 65 -- under the

7     age of 65 -- has sepsis, the person that a hospitalist will

8     call in to see that patient is an infectious disease

9     physician, correct?

10    A.  That's correct.

11    Q.  All right.

12    A.  In the hospital, yes, indeed.

13    Q.  And, in fact, a patient that has severe permanent brain

14    damage is going to see, typically, a neurologist rather

15    than a gerontologist, correct?

16    A.  If I can just explain one thing?  The gerontologist is

17    usually a scientist or an academic who studies aging;

18    whereas, a geriatrician is somebody who is a trained

19    physician with further subspecialty training in geriatrics,

20    who takes care of older adults.

21    Q.  I appreciate the --

22    A.  So the --

23    Q.  I appreciate -- let me restate that question, with that

24    understanding.

25    A.  Yeah.


                    JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                         333 Lomas Boulevard, Northwest
                         Albuquerque, New Mexico  87102

1     Q.  All right.  So you would prefer, as a clinical

2     physician, to be referred to as a geriatrician --

3     A.  That's correct, yes.

4     Q.  -- or a gerontologist?

5     A.  And that is the correct terminology.

6     Q.  All right.  Thank you.

7               THE COURT:  Counsel, just excuse me one minute.

8     This is not going to disturb your process.  We just need to

9     do something here.

10              MS. CURTIS:  Absolutely.

11              THE COURT:  This is not going to take me off

12    focus, so just go ahead and continue.

13              MS. CURTIS:  Thank you.

14    Q.  (By Ms. Curtis)  Doctor, so as a geriatrician, and

15    considering that particular specialty, you recognize that

16    Jose Jaramillo has no geriatrician involved in his care,

17    and never has?

18    A.  May I answer that question?

19    Q.  Yes, please.

20    A.  Okay.

21    Q.  Did you hear it?

22    A.  I think that he was in the nursing home for several

23    occasions, many, and his permanent residence has been in a

24    nursing home.  So, of course, I don't know all the

25    physicians who took care of him, but nursing homes are

1     staffed by physicians who are either primary care

2     physicians who have knowledge or interest in geriatrics,

3     such as family physicians, internists, but they are also

4     staffed by geriatricians.

5              And, in fact, in 2013 this is actually one of the

6     key sites where geriatricians are employed, either as the

7     medical directors and attending physicians in nursing

8     homes.

9              But I cannot say, you know, because I don't know

10    the qualifications of the physicians that took care of this

11    gentleman.

12    Q.   Let me ask the question this way, Dr. Pandya:  If I

13    were to tell you that every physician that has taken care

14    of Jose Jaramillo in the nursing home has been a primary

15    care physician, not a geriatrician, you would have nothing

16    to dispute that, correct?

17    A.   No.  That does happen in many settings.  It just

18    depends upon the availability of physicians with expertise

19    and, you know, interest in participating in nursing home

20    care.

21    Q.   I'm not speaking of all the people in the nursing home.

22    I'm just talking about Jose Jaramillo.

23    A.   Okay.

24    Q.   That his care is only from primary care physicians and

25    the consultants that that primary care physician chooses,

1   none of which have been geriatricians.  Are you familiar

2   with that?

3   A.  Yes, I'm familiar with that situation, certainly.

4   Q.  All right.  You understand that Jose Jaramillo, at 52

5   years old, with diabetes and a feeding tube and severe

6   brain damage, cannot be compared to an 80-year-old man with

7   diabetes and a feeding tube, with severe brain damage?

8   A.  If I could qualify that?  Mr. Jaramillo, although

9   chronologically is 52 years old, physiologically he is not

10  52 years old.  He has had far more than his share of

11  medical problems and insults than a normal 52-year-old

12  would.

13        He is not a 52-year-old, in terms of he needs

14  gastrostomy feeding.  He cannot do any of his activities

15  of daily living, nor can he do instrumental activities

16  of daily living.  He has a colostomy.  He has gone into

17  renal failure.  He has had sepsis, pneumonia, pressure

18  sores.

19        He is physiologically much older than a

20  52-year-old patient.

21  Q.  Dr. Pandya, respectfully, I would have to move to

22  strike that answer.  The question I asked you specifically

23  was:  A 52-year-old man with diabetes and a feeding tube

24  cannot be compared to an 80-year-old man with diabetes and

25  a feeding tube, correct?

```
1    A.  Not exactly word-for-word to an 80-year-old.  I was

2    just trying to say that he is physiologically much older

3    than a 52-year-old.

4    Q.  You have never seen Mr. Jaramillo, correct?

5    A.  No.  I have seen pictures of him in the medical records

6    that I was asked to review.

7    Q.  So you've never examined Mr. Jaramillo?

8    A.  No.  But I've read in detail the nursing notes, you

9    know, the therapy notes, describing what he can and cannot

10   do for himself.

11   Q.  I would like to go through a couple of issues just from

12   a factual standpoint, and then we'll go to the references

13   that I talked about a few moments ago.

14           From a factual standpoint, there is no proof

15   anywhere that Mr. Jaramillo had diabetes one day before

16   June 20, 2007, correct?

17   A.  Let me review my records for a minute.  So, yes, there

18   is, because in June, I noticed, when he had an intake

19   screen, he reported he had no disabilities, and he said he

20   didn't have diabetes.

21           But when his -- a few days later, on June 20,

22   when his blood sugar was checked, it was 547.  And he had

23   had a 20-pound weight loss, which he reported.  And not

24   only that, his hemoglobin A1c, which reflects the average

25   glucose control, over the past three months was 14 percent,
```

1    which is astronomically high.

2              So he did have diabetes before June 20, 2007, and

3    he probably had it undiagnosed for several years.

4              And I'm basing this statement on the United

5    Kingdom Prospective Diabetes Study, which was a large study

6    to look and see, did good control matter in people with

7    Type II diabetes.  And they looked at a subsection of

8    patients, just to study their physiologic insulin-producing

9    capacity.

10             And from that, and it's well accepted by every

11   endocrinologist and physician and the literature, they

12   found that in that patient population they studied in

13   detail, at the time of diagnosis, 50 percent of them had

14   complications.  At the time of diagnosis, they already had

15   diabetic complications, and they had 50 percent of their

16   pancreatic reserve.

17             So when you look at that data, when you

18   extrapolate the graph backwards, when did they have 100

19   percent of their pancreatic function, it went back eight to

20   ten years prior to diagnosis.

21             So I state Mr. Jaramillo had diabetes several

22   years before he presented.

23             MS. CURTIS:  All right.  Again, I must object and

24   move to strike your answer.

25   Q.  The question I asked specifically is:  Dr. Pandya,

1    there is no proof in the record whatsoever that Dr. --

2    excuse me -- that Mr. Jaramillo had diabetes one day before

3    June 20, 2007?

4    A.  I'm sorry.  There is proof, because his hemoglobin A1c

5    was 14 percent.  That does not happen overnight.  It takes

6    months to develop an A1c of 14 percent.

7    Q.  All right.  So --

8             THE COURT:  The objection is overruled, by the

9    way.  Counsel, let's proceed.

10             MS. CURTIS:  Yes.

11   Q.  So the best -- the only piece of evidence that you have

12   that Jose had diabetes for any short period of time prior

13   to June 20, 2007, is what his A1c lab found; is that

14   correct?

15   A.  Yes.

16   Q.  All right.  You recognize that Mr. Jaramillo is not

17   obese in any way, shape, or form for several years,

18   correct?

19   A.  I have noted that in June 2007 his body mass index was

20   32 kilograms/m2, which does make him obese.

21   Q.  No, Dr. Pandya.  For the last many years, it is clear

22   that Jose Jaramillo is not obese in any way, shape, or

23   form?

24             THE COURT:  Can you be more specific, counsel?

25             MS. CURTIS:  Yes.


                JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                     333 Lomas Boulevard, Northwest
                     Albuquerque, New Mexico  87102

1    Q.  From the time of his brain damage -- and let's start

2    with the records, all the records that you reviewed from

3    the nursing home that he's in -- it's clear that for the

4    last four years, at least, that Mr. Jaramillo is not obese,

5    correct?

6    A.  I'm sorry.  I don't have any notes of what his body

7    mass index has been recently, so I can't answer that

8    accurately.

9    Q.  All right.  So you don't know one way or the other

10   whether Mr. Jaramillo is currently obese?

11   A.  Currently, no, I do not.

12   Q.  Do you recommend -- excuse me.  You recognize, as a

13   geriatrician, that no doctor is going to come to you for a

14   consult on a patient like Mr. Jaramillo, who has pneumonia?

15   That would be either an infectious disease doctor or a

16   pulmonologist, correct?

17   A.  No.  We treat patients with pneumonia all the time.

18   Not everybody with pneumonia needs to see a specialist.

19   And that varies around the country.  But geriatricians

20   treat patients with pneumonia all the time, whether it's,

21   you know, so-called walking pneumonia in the outpatient

22   setting, in the hospital, or in the nursing home.

23          They do not all need to see a pulmonologist or,

24   you know, an infectious disease physician or so forth.

25   Q.  The question I asked you was:  No doctor is going to

1      come to you for a consult on a patient with pneumonia?

2      If a doctor needed a consult, they would consult either

3      an infectious disease physician or a pulmonologist,

4      correct?

5      A.  Yes.  Specifically if this was for pneumonia, yes,

6      that's right.  I think I misunderstood and responded that

7      geriatricians, you know, treat patients with pneumonia all

8      the time.  So that was my perception.

9               MS. CURTIS:  Object and move to strike the last

10     answer.

11              THE COURT:  Overruled.

12     Q.  Dr. Pandya, no doctor is going to come to you for a

13     consult on the treatment of venous thrombotic disease?

14     That consult would be to a vascular surgeon or a

15     cardiologist, correct?

16     A.  If I may say, respectfully, generally most physicians

17     treat this quite comfortably.  They do not consult unless

18     the person had a pulmonary embolism, which actually this

19     gentleman did.  But just for, you know, venous

20     thromboembolism, or deep vein thrombosis, most physicians

21     are quite capable of treating that condition without

22     consulting anybody.

23     Q.  Doctor, the question I asked you is:  No doctor is

24     going to come to you, as a geriatrician, as a consult to

25     treat venous thrombotic disease; that consult would be to a

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1    vascular surgeon or a cardiologist, correct?

2    A.  No, they wouldn't consult a geriatrician specifically

3    for that, no.

4    Q.  And if a patient has C. diff. infection, cellulitis,

5    osteomyelitis, no doctor is going to consult the

6    geriatrician for those illnesses?  Again, those consults

7    would be either to infectious disease or to an orthopedic

8    physician, correct?

9         MS. RETTS:  Your Honor, I would object to the

10   relevance of this line of questioning as to whether another

11   doctor would require a consult of a geriatrician, is not

12   the relevant inquiry.  It's, rather, whether the

13   geriatrician would be qualified to actually treat the

14   patient.

15        Dr. Pandya has answered some of the questions.

16   And in that case, her qualifications and experience and

17   ability to offer testimony in this case, compared to

18   whether some hypothetical doctor for some hypothetical

19   patient might request that she consult on a case, versus

20   whether she is qualified to treat that type of person.

21        THE COURT:  The Court is inclined to agree.

22   Where are you going with this line of questioning?  What

23   are you trying to establish?

24        MS. CURTIS:  Yes, Your Honor.  The complications

25   that Dr. Pandya has stated in her report that actually

1    reduce life expectancy, potentially, for diabetic patients

2    are conditions that are typically treated by other

3    specialists, not by a geriatrician.  And that was my --

4    that very much was my point, taking those particular areas

5    that I've just referenced out of Dr. Pandya's report.

6           THE WITNESS:  May I say something?

7           THE COURT:  Well, yes, in just a moment.  Then I

8    think you need to focus the question specifically on the

9    statements in her reports that relate to that.  I think

10   that the objection has some merit here.

11          So I'll let you rephrase your question.

12          And just be responsive to the questions, Doctor.

13   If not, Ms. Retts will, I'm sure, provide you an

14   opportunity to clarify.

15          THE WITNESS:  Of course.  Thank you.

16          THE COURT:  All right.

17          MS. CURTIS:  Thank you.

18   Q.  (By Ms. Curtis)  Let me see if I can be very specific.

19   As a geriatrician, Dr. Pandya, a traumatic brain injury

20   patient is not a patient that you would normally treat for

21   the complications from their TBI?  That would be more

22   commonly treated by a trauma surgeon, a neurologist, or a

23   neurosurgeon, correct?

24   A.  The acute complications from a traumatic brain injury,

25   that is correct, if it was in the very early stages and

1      acute setting.

2      Q.   Let's talk very specifically about your references,

3      Dr. Pandya.

4      A.   Yes.

5      Q.   Do you recognize -- do you have a copy of your

6      references?

7      A.   Yes, I do.

8      Q.   The list before you?

9      A.   I do.

10     Q.   All right.  So the summary of revisions for 2007,

11     Clinical Practice Recommendations, which is a Diabetes Care

12     Supplement from January of 2007 --

13     A.   Yes.

14     Q.   -- that you have cited as reference number 1, you

15     recognize, of course, that nothing in your reference

16     number 1 gives a life expectancy calculation for a

17     diabetic, correct?

18     A.   That is correct.  That reference was merely to support

19     my assessment of the diabetes care that this patient

20     received and that it was adequate and within the clinical

21     practice recommendations.  That was merely to -- that was

22     the only reason I entered this reference in the report.

23          MS. CURTIS:  Your Honor, I would move to strike

24     the second part of that and ask the Court once again to

25     instruct the witness that Ms. Retts will have an

1        opportunity to examine her.

2                The question solely that I asked is whether

3        reference number 1, I said:  It does not contain any data

4        concerning life expectancy?

5                THE COURT:  And she acknowledged that that was

6        correct.  She explained that that was merely to support her

7        assessment of the diabetes care that this patient received.

8        I'm going to permit that to stand.

9                But, you know, we're dealing with an expert in an

10       area that's generally unfamiliar to you, to me, and I think

11       that in a circumstance like this, that a medical expert

12       does have a right to be able to explain their responses,

13       and I'm going to permit that leeway.

14               Ultimately, obviously, you can challenge that if

15       you wish, and ask different questions, different forms of

16       questions.  But I think it's reasonable to permit an expert

17       to have the opportunity to explain an answer.

18               All right.  Let's continue.

19               MS. CURTIS:  Yes, Your Honor.

20       Q.  (By Ms. Curtis)  Let's talk about reference number 2,

21       which is Mortality Over Four Decades After Traumatic Brain

22       Injury Rehabilitation:  A Retrospective Cohort Study.  You

23       are familiar with that reference, Dr. Pandya?

24       A.  Yes.

25       Q.  All right.  Do you have a copy of the reference?

1    A.  No, I'm afraid I don't have a copy of the reference;

2    just my summary statement and my report.  I don't have

3    that.

4    Q.  All right.  Let's clear up one thing quickly before I

5    go to the reference, itself.  Reference 3 is from a

6    symposium; is that correct?

7    A.  Yes, I believe so.  It was from the Federal Interagency

8    Conference.

9            THE COURT REPORTER:  I'm sorry?  The Federal

10   Interagency --

11           THE COURT:  Interagency?  Is that what you said?

12   A.  It says "Federal Interagency Conference," according to

13   what I found, "On Traumatic Brain Injury."

14   Q.  All right.  So all of that reference number 3 is a

15   restatement of the reference at reference 2?

16   A.  Uh-huh.

17   Q.  And it has only an abstract of that study, correct?

18   A.  Yes.

19   Q.  All right.  So let's talk about the article under the

20   "Methods" section of reference 2.  You recognize that the

21   method that was used for the study is, in fact, and has to

22   be set out in the publication of the study findings,

23   correct?

24   A.  Yes.  The methods have to be explained.

25   Q.  Doctor --

1                    THE COURT:  Doctor, say that again.

2                    THE WITNESS:  I said, the methods do have to be

3        explained, if I understood the question right.

4                    THE COURT:  All right.

5        Q.  Yes.  And so you recall, of course, that under

6        "Methods," that all the data was from the Craig Hospital in

7        Colorado?

8        A.  Uh-huh.

9        Q.  I'm sorry.  You need to answer verbally.

10       A.  Oh.  Yes.

11       Q.  Thank you.  And that the Craig Hospital specializes

12       exclusively in the treatment of spinal cord injury and

13       traumatic brain injury?

14       A.  That's correct.  Well, this was a specialty hospital,

15       yes.

16       Q.  But its treatment is limited to spinal cord injury

17       patients and traumatic brain injury patients only?

18       A.  Yes.  But if I may say, after the infection was

19       treated in this patient, he was left with brain injury

20       and debility that will be very similar to a traumatic

21       brain injury patient because of his, you know, vegetative

22       state, his pneumonia, feeding tube, pressure ulcers,

23       infections.

24                    Post-infection, he had the same extensive chronic

25       morbidity.

1    Q.  Dr. Pandya, that was not the finding of the physicians

2    that actually did the study, was it?

3    A.  No.  I'm just saying that a traumatic brain injury

4    patient would be very similar to a patient such as Mr.

5    Jaramillo, with severe neurological injury and brain

6    injury, secondary infection.

7    Q.  Well, again, the study authors for this particular

8    study -- actually, I'm just going to put up a copy of the

9    "Methods," which is the second page of the study, so that

10   everybody can follow along with us.

11        It has to say which patients are excluded from

12   the study, as well, correct?

13   A.  Yes.  Yes, that's correct.

14   Q.  And so in this particular study, in fact most of the

15   cases that were excluded were found to be brain injury from

16   a non-traumatic origin.  Do you know those patients to have

17   been excluded specifically from this study?

18   A.  Yes, that's correct.

19   Q.  All right.  So the study that you're citing as the

20   basis for your opinion specifically excludes people like

21   Jose Jaramillo?

22   A.  Yes.  Because at that time, there was actually very

23   little research done on life expectancy with patients with

24   meningitis.

25        But if I could explain something?  Because when I

1    knew I was going to be questioned, I did a little bit more

2    looking, to see if I had missed something.  And is it

3    permissible that I can tell you about a study I found that

4    was specific for pneumococcal meningitis?

5              MS. CURTIS:  Your Honor, I --

6              THE COURT:  I'll permit that, counsel.

7    A.   Okay.  So this is just on a quick review yesterday.

8    Actually, I found two studies by author Bohr, B-O-H-R, in

9    Journal of Infection.  It's a Danish study.  One was in

10   July of 1983.

11             And they looked at the fatality rates in patients

12   with meningitis.  And those with pneumococcal meningitis

13   had the highest fatality rate of 8.7 percent.  Those with

14   Haemophilus influenza meningitis had 3.7 percent.  And

15   those with meningococcal meningitis was 0.4 percent.  And

16   this was -- the people were patients directed specific to

17   an infectious disease ward.  But the authors noted that the

18   fatality rate was 17 to 20 percent if they were transferred

19   from other institutions, you know, referred from other

20   parts of the country.

21             And then in 1985, in the March issue of Journal

22   of Infection, Bohr is the primary author, and he looked at

23   causes or factors associated with fatalities, specifically

24   pneumococcal meningitis.  He was looking for prognostic

25   factors, and he reviewed 164 cases.

1           And what they found was fatality was associated

2     with increased age, and they don't specify what age;

3     concomitant pneumonia; also level of consciousness;

4     transfer from another hospital; female sex; age between 16

5     to 50; and positive bacterial cultures of the blood or

6     cerebral spinal fluid.

7           So I did -- I was not able to find this at the

8     time I, you know, did my report, but I thought I should

9     just, you know, be a little bit more inquisitive since this

10    was an important question.  So I researched this, and this

11    is what I found.

12          THE COURT:  I'm going to strike the answer.  Upon

13    further reflection here, the question asked by the attorney

14    was very specific.  It was -- let me just reference it here

15    at 10:55:56.

16          "QUESTION:  And so in this particular study, in

17           fact most of the cases that were excluded were

18           found to be brain injury from a non-traumatic

19           origin.  Do you know those patients to have

20           been excluded specifically from this study?

21           ANSWER:  Yes, that's correct.

22           QUESTION:  All right.  So the study that

23           you're citing as the basis for your opinion

24           specifically excludes people like Jose

25           Jaramillo?"

1              And the response was:

2                  "ANSWER:  Yes.  Because at that time, there was

3                    actually very little research done on life

4                    expectancy with patients with meningitis."

5              And I'm going to strike the remainder of her

6       answer after that part.  Let's continue.

7       Q.  (By Ms. Curtis)  Doctor, you recognize also that the

8       authors of the traumatic brain injury study stated very

9       specifically in their conclusion that these findings need

10      to be considered with caution, given the limitations noted

11      with this type of investigation using a relatively select

12      sample of persons receiving in-patient rehabilitation at a

13      single facility.  Correct?

14      A.  Yes, that is correct.

15      Q.  And specifically, the findings from the traumatic brain

16      injury study done by Cynthia Harrison-Felix, Ph.D., exclude

17      Jose Jaramillo?

18      A.  Yes, that is correct.

19      Q.  Reference number 4, Neurohabel 2010, Number 19,

20      Strauss, et al., do you recognize there is no journal

21      called "Neurohabel"?

22      A.  Yes.  I think I spelled this wrong.  When I was looking

23      back at my notes, I believe I spelled that wrong, yes.  Of

24      course it will be Neurorehabilitation.

25      Q.  You recognize that there was no study done in 2010 by

1    Dr. Strauss in even neurorehabilitation?

2    A.  I would have to verify that.  I know I spelled the

3    journal wrong.  I would have to verify whether Strauss --

4    whether this study was published at all in 2010.

5    Q.  Well, in fact --

6    A.  Or if that was my error.

7    Q.  Excuse me.  I didn't mean to interrupt you.  Were you

8    referring, although it doesn't say in reference number 4,

9    to David Strauss?  Do you know?

10   A.  I'm looking at authors.  I don't know, and I would need

11   some time to research this.

12   Q.  I only have, under the rules that we're required to

13   follow, the ability to test your opinion based on your

14   bases.  And so I've done my best to try to find if there

15   is a Dr. Strauss of any kind that has done anything in

16   neurorehabilitation, and all I can find is two letters to

17   the editor.

18          Were you referencing letters to the editor as

19   bases for your opinion?

20   A.  Yes, I was.

21   Q.  You recognize that letters to the editor by a physician

22   are not peer-reviewed and do not, in fact, contain study

23   data from the author?

24   A.  Well, in this, there also is David Strauss I was able

25   to find, and they present their actual data in the body of

1    the letter.

2    Q.  But a letter is not a publication.  In the medical

3    field, Dr. Pandya, a letter is not a study that has been

4    accepted for publication by a peer-reviewed journal,

5    correct?

6    A.  Well, a letter with data.  Because sometimes

7    investigators have a very small study, and they present it

8    as a letter to the editor with the data, and it usually

9    presents the commentary or counterpoints to another study.

10             So this particular study by Strauss actually had

11   life expectancy, with age and level of severity of

12   disability.  They actually put data into the letter.

13   Q.  But you understand that has not been accepted for

14   publication as a study?

15   A.  No, it's not accepted as a study.  Yes.  Yes, it is a

16   letter to the editor.

17   Q.  Which is literally the opinion of one person?

18   A.  Yes, although sometimes the letter can be a group of

19   people, such as this letter had several authors in there.

20   Q.  Well, that's interesting you should say that, because

21   both the letters I found list Dr. Robert Shavelle.  Do you

22   know that?

23   A.  I'm looking at the -- I know -- I found what I was

24   quoting, and it was -- it has three authors in here.

25   Q.  Well, you and I are looking at something different,

1    because I have more authors than that.  Let me just ask you

2    a specific question.

3    A.  Yes.

4    Q.  Do you know that Dr. -- or Robert Shavelle, Ph.D., has

5    been struck on Daubert motions in this federal court, in

6    our state courts, and in courts all over the country from

7    being able to testify concerning his findings on life

8    expectancy?

9                 THE COURT:  Hold on just a minute before you

10   answer the question.  Counsel?

11                MS. RETTS:  I object, Your Honor, on the basis

12   that there hasn't been any foundation laid that Dr.

13   Shavelle was actually one of the authors of the letter that

14   Dr. Pandya is referencing, so Dr. Shavelle and him being

15   struck in other cases isn't relevant until a foundation has

16   been laid.

17                THE COURT:  Sustained.

18   Q.  (By Ms. Curtis)  All right.  I guess the problem that

19   I'm having, Dr. Pandya, and maybe you can help me with

20   this, is I'm guessing what your references are.  All right?

21   And so I cannot find a reference that matches reference

22   number 4.  Do you have one?

23   A.  Yes.  I have found what I was looking at, and it is --

24   let me just check.  It is in Neurorehabilitation.  It's

25   Volume 19, Pages 257 to 258.  So it's a letter.


                    JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                          333 Lomas Boulevard, Northwest
                          Albuquerque, New Mexico  87102

1    Q.  Dr. Pandya, you omitted something from that citation,

2    didn't you?

3    A.  I'm sorry?

4    Q.  You omitted something from that citation that you just

5    read to the Judge, didn't you?

6    A.  Well, no.  I see the authors here, Strauss, D.J.;

7    Shavelle is an author; DeVivo; Harrison-Felix; Whiteneck.

8    And it is entitled "Life Expectancy After Traumatic Brain

9    Injury."

10           So this is what I've just found, and I know that

11    this -- I believe this is what I was looking at, but I gave

12    an erroneous -- you know, I didn't cite it properly in my

13    report.

14    Q.  The question I just asked you is that you omitted

15    something from the citation you just read to the Judge

16    about the article, correct?

17    A.  I'm sorry.  Could you be explicit?  I am --

18    Q.  The actual citation is Neurorehabilitation 19 (2004)?

19    A.  Yes.  Uh-huh.

20    Q.  And what you listed for us was 2010, right?

21    A.  Yes, and that was my error.

22    Q.  All right.  And this is, again, a letter to the editor,

23    and it has to do with traumatic brain injury?

24    A.  Yes.

25    Q.  And we've already discussed that.  The question that I

1    believe I was trying to address with counsel, that you

2    answered a few moments ago, is that you recognize -- and

3    let me just put it up on the screen -- that Dr. Robert

4    Shavelle was actually on that letter?

5    A.  Yes, I see that.  Uh-huh.

6    Q.  So the question I asked earlier, that was objected to

7    by counsel from a foundation standpoint, is:  Do you

8    recognize that Robert Shavelle, Ph.D., has been excluded

9    from testifying in this federal court, in our state courts,

10   and in courts all over the country specifically concerning

11   these life expectancy findings?

12   A.  No, I did not know that.  I had no idea about that.

13   Q.  Number 5, the Williams Textbook.

14          THE COURT:  And while you're starting your

15   questioning, may I take a look at what you were just

16   referring to, the number 4?

17          MS. CURTIS:  Yes.

18          THE COURT:  Thank you.

19          MS. CURTIS:  Your Honor, if I may approach?

20          THE COURT:  All right.  Thank you.  Go ahead.

21          MS. CURTIS:  Yes, Your Honor.

22   Q.  (By Ms. Curtis)  And then going to Williams Textbook of

23   Endocrinology, that is your fifth reference, the 2010

24   edition?

25   A.  Yes.

1   Q.  And, in fact, Doctor, there is no 2010 edition of

2   Williams Textbook of Endocrinology, correct?  There's a

3   2011?

4   A.  Yes.  I already said it was 2011.  And I think I put

5   that because I -- this was an error in just typing that.

6   I verified that.  And you are absolutely correct, it's the

7   2011.

8           And the purpose of the reference was really to

9   show -- just to support the diabetes care aspect of this

10  patient.  Of course, this endocrinology textbook would not,

11  you know, talk about prognosis and brain injury.

12  Q.  Dr. Pandya, the Textbook of Endocrinology is much

13  larger than just the diabetes issues?

14  A.  Yes, of course.

15  Q.  All right.  And could you just tell the Court, please,

16  what is endocrinology?

17  A.  Yes.  It's the treatment -- both diagnosis, management,

18  and treatment of hormonal disorders.  So it can range from

19  pituitary disease; thyroid disease; diabetes; could include

20  pancreatic and adrenal disease; sex hormone function; to

21  ovarian or testicular problems; sexual dysfunction.

22           So it is a very broad field.

23  Q.  All right.  So Chapters 33 and 31 of the 2011 edition

24  are the two sections that address diabetes in that

25  textbook.  Do you know this?

1    A.  Yes.

2    Q.  All right.  And that there is nothing in either one of

3    the sections, 31 or 33, and the 250 pages or so that that

4    encompasses, that have any data concerning life expectancy,

5    correct?

6    A.  No, that's correct.  As I said, this is really to

7    support the care of the diabetes.

8    Q.  You are familiar with the American Diabetes

9    Association, correct?

10   A.  Yes.

11   Q.  And you do recognize that the American Diabetes

12   Association states very specifically that all diabetics

13   should in fact be vaccinated with pneumococcal vaccine?

14   A.  That's correct.

15            MS. RETTS:  Your Honor?

16            THE COURT:  Hold on, Doctor.  Yes?

17            MS. RETTS:  I would object to relevance.  Dr.

18   Pandya is not offering any testimony on standard of care in

19   vaccination, and this Daubert hearing has absolutely

20   nothing to do with that issue.

21            THE COURT:  Counsel?

22            MS. CURTIS:  Your Honor, Dr. Pandya, in her

23   actual designation, literally has no areas adopted.  Her

24   report, which she has testified well outside of, has

25   included new references.  She says she is an expert in the

1    area of geriatrics.  I believe that's probably true.  She

2    is an expert in the area of endocrinology and is making

3    many, many opinions concerning diabetes and life

4    expectancy.

5          Your Honor, just by way of proffer, the influenza

6    and pneumococcal immunization in diabetes, by the American

7    Diabetes Association, talks about how effective

8    implementation of immunization can reduce the cost of human

9    suffering and health care expenses in people with diabetes,

10   which is exactly what counsel has stated this witness is

11   going to testify about; and that in fact she is here to

12   testify about life expectancy in diabetics, where this

13   directly deals with immunization reducing not only the cost

14   of suffering for a person like Mr. Jaramillo.

15         And so for that reason, as well as the health

16   care expenditures in people with diabetes, which is a

17   very important aspect of this case, that if she is going

18   to testify, we should be allowed to bring that part of it

19   in.

20         THE COURT:  All right.  I'm going to, Doctor, put

21   you on hold for just a minute so I can confer with the

22   attorneys here.  All right?

23         THE WITNESS:  Thank you.

24         THE COURT:  So just stay on the line.

25

```
 1                (Witness' telephone put on mute.)

 2                THE COURT:  I've got her on mute.  Let's talk

 3      about specifically your use of this witness, counsel.

 4                MS. RETTS:  We have three expert witnesses in

 5      this case, Your Honor.  Dr. Thomas has been hired to

 6      specifically address the issue of pneumococcal vaccination

 7      and whether it should have been given in this patient

 8      related to a correctional health setting and the standard

 9      of care in a correctional health setting.

10                THE COURT:  Understood.

11                MS. RETTS:  Dr. Pandya will only be giving

12      testimony specific to the diabetic care; not the

13      vaccination portion of it, the diabetes only.

14                THE COURT:  How do you isolate that, or do you

15      isolate that, from the overall care to a patient in this

16      condition as Mr. Jaramillo?

17                MS. RETTS:  I believe that it can be isolated

18      because she is looking at specific and tailored opinions

19      relative to the management of his sugars, the management of

20      his diabetes in general, versus preventative care; so a

21      difference between preventative care in a correctional

22      setting and an actual management of the chronic illness in

23      a correctional setting.

24                THE COURT:  So what are you going to ask her, if

25      you have her on the stand, on this topic?  What are you
```

1    specifically going to elicit from the doctor, given the

2    opportunity?

3              MS. RETTS:  If the treatment of Mr. Jaramillo's

4    chronic condition from a management of the diabetic

5    condition, the sugars, the blood sugar levels, that area

6    was consistent within the standard of care.  Dr. Thomas

7    will be addressing the vaccination issue and has looked

8    specifically to that.  She did not look at that in

9    connection with her report.

10             THE COURT:  What's she going to say?

11             MS. RETTS:  That it was.

12             THE COURT:  All right.  Now, Ms. Curtis?

13             MS. CURTIS:  Yes, Your Honor.  I literally

14   have -- first of all, that particular statement that

15   counsel just made, I have no contrary statement.  The issue

16   has to do with managing diabetes in a correctional

17   institution very much requires pneumococcal immunization.

18   I mean, you cannot separate those two.

19             And so for her to give an opinion and say that in

20   fact his diabetes was appropriately managed, I should be

21   able to impeach with the statement that frankly she just

22   gave, and that for a diabetic in any setting.  All right?

23             There is also a separate item, which was my next

24   section, which is the American Diabetes Association

25   statement on management of diabetes in a correctional

1        setting, that it requires that he be vaccinated as part of

2        his treatment as a diabetic; and very specifically for

3        exactly the reason why he's in the condition he is; and

4        that his chance for mortality or very serious morbidity is

5        so much higher because he's a diabetic.

6                That's why the CDC says all diabetics need to be

7        vaccinated, because diabetics handle pneumococcal disease

8        differently.

9                THE COURT:  All right.  Ms. Retts?

10               MS. RETTS:  Which is exactly why we have a

11       correctional expert in medicine in that specific expertise.

12       I'm having a hard time understanding the fit with the

13       Daubert hearing, if Ms. Curtis wants to cross-examine Dr.

14       Pandya on various subjects that's different than the

15       challenge that she has mounted in this Daubert hearing,

16       which is a very limited challenge, to specifically only the

17       life expectancy.

18               And we may not even call Dr. Pandya as an expert

19       if she is not challenging the diabetic care and dependent

20       upon the Court's other rulings relative to some issues in

21       dispute, including things like the post-incident audits,

22       medical care of other inmates.

23               To basically show a systemic, kind of over-

24       reaching allegation of bad care within this facility, we

25       would bring in Dr. Pandya to say that his specific diabetic

1     condition was managed appropriately, to rebut that kind of

2     bad act evidence that's floating out there.

3              That may not be necessary, depending upon some of

4     the Court's rulings.

5              THE COURT:  All right.  I'm going to hold in

6     abeyance a decision here, in consideration of the

7     objection.  I'm going to let the witness answer these

8     questions.  I just want to hear it out here.

9              Let's continue.

10             (Witness' telephone taken off mute.)

11             THE COURT:  All right.  Let us continue.  Are you

12    still there, Doctor?

13             THE WITNESS:  Yes, I'm here.

14             THE COURT:  All right.

15             MS. CURTIS:  Thank you.

16    Q.  (By Ms. Curtis)  Dr. Pandya, are you a member of the

17    American Diabetes Association?

18    A.  No, I'm not.  I have participated, though, in writing a

19    consensus statement for diabetes in older adults.  I was

20    invited to do that.  And I've participated in some

21    conferences.

22    Q.  All right.  Do you review their journal called Diabetes

23    Care?

24    A.  From time to time, because I'm also a board certified

25    endocrinologist.

1    Q.  All right.  And I believe your answer a few moments ago

2    was that you recognize that individuals with diabetes are

3    to be vaccinated with the pneumococcal vaccine, according

4    to the CDC?

5    A.  Yes.

6    Q.  And the -- I want to make sure I get this correct --

7    the Advisory Committee on Immunization Practices, which is

8    a CDC committee?  Do you recognize that?

9    A.  Yes.

10   Q.  And that the reason that the -- oh, it's also the

11   American College of Physicians, the American Academy of

12   Pediatrics, the American Academy of Family Physicians

13   believe that vaccinating individuals at high risk, like a

14   diabetic, with pneumococcal disease, is important.  Do you

15   recognize that?

16   A.  Yes.

17   Q.  All right.

18   A.  Yes.

19   Q.  And that the effective implementation of immunization

20   like pneumococcal vaccine can reduce the cost of human

21   suffering and health care expenditures in people with

22   diabetes?

23   A.  That's a very broad statement, but I do believe in the

24   fact that pneumococcal vaccine is important, and I practice

25   that.

1     Q.   And that it's an important part of preventative

2     services --

3     A.   Yes.

4     Q.   -- for many chronic diseases such as diabetes?

5     A.   Yes, indeed.

6     Q.   Do you recognize that failure to immunize a person with

7     diabetes with pneumococcal vaccine, should that diabetic

8     end up with invasive pneumococcal disease, they have a much

9     higher likelihood of significant mortality or morbidity?

10    A.   Yes.  That would make sense because diabetic patients,

11    especially the poorly controlled, have a compromised immune

12    system.

13    Q.   And I believe there's actually a very specific issue

14    that diabetics generally have appropriate humoral immune

15    responses to vaccination, so vaccination works well for

16    them?

17    A.   Yes.  It's always been, you know, debated how well

18    pneumococcal vaccine works.  Not 100 percent of people, you

19    know, develop antibodies when they're vaccinated.  And

20    older people tend to not develop antibodies as well as

21    younger people.  But in general, it is still -- the

22    benefits are thought to outweigh the risks.

23    Q.   All right.  Do you recognize that the American Diabetes

24    Association also has a statement for diabetes management in

25    correctional institutions?

1      A.   Yes.

2      Q.   All right.   And that it is the opinion of the American

3      Diabetes Association that people with diabetes should

4      receive the same care that meets national standards, and

5      that being incarcerated does not change these standards in

6      any way?

7      A.   Yes, I believe that.

8      Q.   As a person with diabetes, Dr. Pandya, you recognize

9      that it's worse for Jose Jaramillo to be bedridden in a

10     hospital, with severe brain damage, than a person that did

11     not have diabetes?

12     A.   I'm sorry.   Could you be specific when you say -- I'm

13     not sure if I got this question.

14     Q.   Sure.   And that's perfectly fine.   Feel free to ask me

15     to clarify.

16             One of the issues for diabetics is that it's

17     important for them to be able to exercise, right?

18     A.   Yes.

19     Q.   And you recognize that Mr. Jaramillo cannot do that?

20     A.   Yes, indeed.

21     Q.   Because of his brain damage; is that correct?

22     A.   Yes, indeed.

23     Q.   Do you know what the national life expectancy tables

24     are, that are produced by the federal government, Dr.

25     Pandya?

 1    A.  I do not know them extremely well.  I have looked

 2    specifically into, you know, the literature that looks at

 3    life expectancy in people with diabetes, but not the

 4    national life expectancy tables.

 5              I have looked in the past at life expectancy in

 6    people with diabetes, and from the National Health and

 7    Nutrition Survey it's clear that for people with diabetes,

 8    it's about eight years shorter, eight to ten, than people

 9    without diabetes.

10    Q.  Well, Doctor, you did not reference any of those

11    articles in your report, concerning --

12    A.  No, I did not.

13    Q.  Just a moment.  Excuse me.

14    A.  But I did, I wrote that as a comment.

15              THE COURT:  Doctor.  Doctor.  Just a moment.

16    Just answer the question.  Do not interrupt.  I'm going to

17    recognize the attorney now.

18    Q.  Doctor, you did not reference any study, in your

19    references or your report, concerning decreased life

20    expectancy of diabetics, correct?

21    A.  That's correct.

22    Q.  Do you know how life expectancy is arrived at by the

23    actuarials that compute life expectancy for the national

24    life expectancy tables?

25    A.  No, I don't have that expertise.

1     Q.  Do you know how the New Mexico statutory life

2     expectancy tables are arrived at?

3     A.  No, I do not.

4             MS. CURTIS:  Your Honor, I have no further

5     questions of this witness.  If it would be all right with

6     the Court, I would pass the witness to defense counsel now

7     and ask only that I might have a short rebuttal at the

8     end.

9             THE COURT:  Okay.  Just give me one moment here.

10            (Witness' telephone put on mute.)

11            THE COURT:  I put her on mute.  Do you need a

12    break any time here?  Do we need a five-minute break?

13            THE COURT REPORTER:  Maybe in half an hour?

14            THE COURT:  All right.

15            (Witness' telephone taken off mute.)

16            THE COURT:  All right.  Let us proceed here.  Ms.

17    Retts?

18            MS. RETTS:  Thank you, Your Honor.

19            The issue of Mr. Jaramillo's diabetes and

20    co-morbidities and the medical implications of those things

21    is something that Dr. Pandya is qualified in, based upon

22    her training, her experience, her vast array of knowledge

23    in this area including multiple peer-reviewed publications,

24    presentations, and work in the area of diabetes, as well as

25    in working with those in a long-term care setting.

1          Life expectancy is important to two aspects of

2    this case, both the life care plan and the hedonic damages;

3    the life care plan, where it has been projected that Mr.

4    Jaramillo will live to 81 years, and the hedonic damages

5    where we have to look at "but for" the injury, what would

6    Mr. Jaramillo's life have been like if he had not

7    contracted pneumococcal meningitis.

8          This is important where we bring in life

9    expectancy of diabetics, because his life expectancy would

10   necessarily be reduced regardless if he had been injured at

11   all.

12         So that's something that the jury should

13   consider.  And, in fact, in the jury instructions, the

14   specific instruction indicates that the jury can look at

15   the life expectancy tables but can also consider the

16   health, the habits, and other relevant factors of an

17   individual.

18         Here, what is particularly important is the

19   health of Mr. Jaramillo.

20         And Dr. Pandya has expertise and training that

21   will be helpful and important to the jury to hear, for them

22   to assess the health situations he faces today and how

23   those impact him; the complications he is likely to suffer

24   from; and how that can affect his life expectancy.

25         Dr. Pandya's expertise is better suited than an

1    actuary because she has actually taken into account the

2    specifics of Mr. Jaramillo, looking at his voluminous

3    medical records, the complications that he has personally

4    experienced, and her experience in treating those types of

5    situations, and how that impacts on life expectancy, how

6    she has seen that manifest itself in the various roles that

7    she has had across her medical career, including multiple

8    appointments as nursing home director, and through her

9    research.

10           Your Honor, I would like to highlight with Dr.

11   Pandya, through her testimony now, some of her experience.

12                    CROSS-EXAMINATION

13   BY MS. RETTS:

14   Q.  Dr. Pandya, can you hear me?

15   A.  Yes, I can.

16   Q.  Can you tell us what medical board certifications you

17   hold?

18   A.  Yes.  I'm board certified in internal medicine,

19   geriatrics, and endocrinology.  And I'm also a certified

20   medical director, certified by the American Medical

21   Directors Association.  That is added training.  It's not a

22   board certification, just to clarify.

23   Q.  And in your capacity as a geriatrician, have you

24   treated patients similar to Mr. Jaramillo?

25   A.  More than I care to remember.

1     Q.  In your capacity as an endocrinologist, have you

2     treated patients similar to Mr. Jaramillo?

3     A.  Yes, indeed.

4     Q.  Are you licensed in the state of New Mexico?

5     A.  I was.  I lived in New Mexico for a year, between 2002

6     and 2003.  But I moved to Florida, so I'm not licensed.  I

7     worked in Albuquerque for a year.

8     Q.  And when you worked in Albuquerque, where did you

9     work?

10    A.  I worked at the then-Lovelace Health System, as an

11    internist.  And they recognized my expertise in geriatrics,

12    so I soon became sort of a geriatrics clinic.  All the

13    older adults were referred to me, and the nursing home

14    practice, which was not all that efficiently managed by the

15    internists, was then assigned to me.

16         So I coordinated the nursing home care, the care

17    of the patients that, you know, belonged to the Lovelace

18    Health System.

19    Q.  When you worked within the Lovelace Health System, did

20    you treat patients who had similar conditions to Mr.

21    Jaramillo?

22    A.  Yes.

23         THE COURT:  When you say "similar conditions,"

24    what are you referring to, counsel?  There are a lot of

25    conditions here.

```
 1              MS. RETTS:  I intend to go through those

 2     specifically.

 3              THE COURT:  All right.

 4     Q.  Dr. Pandya, with regard to the specific conditions that

 5     Mr. Jaramillo has, have you treated patients who have had a

 6     prior course of meningitis?

 7     A.  Yes.

 8     Q.  Have you treated patients who have had diabetes?

 9     A.  Yes, very commonly.

10     Q.  Have you treated patients who have specifically had

11     pneumococcal meningitis?

12     A.  Not in the acute stages, because I think they would

13     usually be in an intensive care unit.

14     Q.  Have you treated patients who have had pneumococcal

15     meningitis after the acute stages of that illness?

16     A.  Yes.

17     Q.  Have you treated patients who have had sepsis?

18     A.  Yes, very frequently.

19     Q.  And in both the acute setting and in the setting

20     following --

21     A.  Yes.

22     Q.  -- any complications from sepsis?

23     A.  Yes, indeed, such as respiratory failure, renal

24     failure, pressure sores, and infections like C. diff.,

25     nosocomial infections from the use antibiotics, and of
```

```
 1        course --

 2                  THE COURT REPORTER:  Excuse me.  I'm having

 3        trouble hearing.

 4                  THE COURT:  Okay.  Hold on just a minute here.  I

 5        think we've had a failure in the sound system, so I'm going

 6        to let you repeat your response, Doctor, because we didn't

 7        get this.

 8                  THE WITNESS:  Yes.

 9                  THE COURT:  The last thing I have here is that

10        the question was:

11                  "QUESTION:  Any complications from sepsis?

12                   ANSWER:  Yes, indeed, such as respiratory

13                    failure, renal failure, pressure sores, and

14                    infections like C. diff."

15                  And beyond that was a little bit unclear, so go

16        ahead and continue your response.

17                  THE WITNESS:  Thank you.  Yes, I don't think I

18        spoke clearly.

19        A.  And so I have treated patients with complications

20        following sepsis, you know, such as respiratory failure.

21        Now, in fact, one nursing home where I'm the medical

22        director has a chronic ventilator unit with very similar

23        location.  And I've treated patients with renal failure

24        following sepsis, electrolyte disturbances, pressure sores,

25        venous thromboembolisms, C. diff. infections, and other
```

1    nosocomial infections following the use of strong

2    antibiotics, and of course patients who are completely

3    debilitated and functionally, you know, quadriplegic and

4    cannot move or fend for themselves at all.

5    Q.  Dr. Pandya, you just went through a list of medical

6    maladies.  Are these all things that Mr. Jaramillo has

7    suffered from during the course of his treatment, that you

8    saw through the medical records that you've reviewed?

9    A.  Yes.  Those are some of the complications he has; and

10   moreover, I believe he had delirium; he had urinary

11   infection; kidney stones; he had a right testicular

12   infection; Ogilvie syndrome, which is significant dilation

13   of the colon, and a massively dilated colon, and he

14   required a colostomy for that.

15        So, yes, very.  So Mr. Jaramillo had some

16   additional complications that I did not mention earlier.

17   Q.  And with respect to those additional complications, do

18   you regularly treat patients, in the course of your

19   clinical practice, that suffer from those complications?

20   A.  Yes.  They might not all occur in one patient, but I am

21   familiar with all of these complications and the

22   treatments.

23   Q.  Can you tell us what teaching positions you've held?

24   A.  Yes.  I was an assistant professor at the University of

25   Missouri in the Department of Internal Medicine and the

1   Division of Geriatrics.  That was for four years, from 1991

2   to 1995.

3          And then after that, I did my fellowship in

4   geriatrics and endocrinology at the University of Michigan.

5   That was from 1995 to 1998.  So I was having subspecialty

6   training at that time.

7          Following that, I was on the geriatrics staff

8   and still practicing and teaching in the geriatrics

9   program at William Beaumont Hospital in Royal Oak, and I

10  was also medical director there for the ambulatory care

11  clinic.

12         And at Lovelace, following, where I was for a

13  year, I was really practicing.  It was not a teaching

14  institution.

15         And then since September of 2003 I've been at

16  Nova Southeastern University, which is an osteopathic

17  medical school.  So I mentioned my role is 50 percent or so

18  practice, and the rest is teaching.  And so I teach medical

19  students.  I teach internal medicine, family medicine

20  residents in the fields of geriatrics and endocrinology.  I

21  direct the geriatrics and endocrinology boards for those

22  students.

23         We also have a geriatric fellowship program which

24  I helped to develop, so I teach geriatric fellows.  And, if

25  I may, those are physicians who have basic training in

1    internal medicine or family medicine, who wish to become

2    geriatricians.  So there is a one-year fellowship training

3    for that, for geriatrics.  They are required to do some

4    research.

5             And then I lecture at many conferences, you know,

6    state, nationally.  And recently, I've lectured at two or

7    three international conferences.

8    Q.  With respect to the complications that we discussed

9    earlier that Mr. Jaramillo has suffered from, in your

10   teaching capacities, have you taught students about the

11   treatment of those medical conditions?

12   A.  Yes.  I would say most of them.  And some of them --

13   you know, I do take care of patients with these

14   complications.  Students may or may not have been on-site

15   with me, you know, when a patient has all of the above.

16   But certainly we not only do lecture training, we provide

17   clinical training, so students rotate with us in the

18   clinic.  They come with us to the hospital and the nursing

19   home setting.

20   Q.  Mr. Jaramillo is currently in a nursing home setting,

21   correct?

22   A.  I believe so.  I would stand corrected if anything has

23   happened recently to him.

24   Q.  Can you give us a synopsis of your experience in

25   working in nursing home or long-term care facilities?

1    A.   So, if I understand right, you mean a clinical

2    synopsis of what sort of medical problems occur in nursing

3    homes?

4    Q.   Starting first with a synopsis of the places where you

5    have worked.

6    A.   Oh, okay.  Many places.  When I finished my residency,

7    which was in Phoenix at the County Hospital, where I saw a

8    lot of geriatric patients, I then did exclusively long-term

9    care medicine from 1987 to 1991.  For four years, I was

10   attending physician for the Maricopa County long-term care

11   system, so I had over 250 nursing home patients on my

12   panel, and that's all I did, was take care of nursing home

13   patients.

14          And then after that, when I moved to University

15   of Missouri, in addition to teaching and practicing

16   internal medicine, I practiced geriatrics.  We had a very

17   complex nursing home in Kansas City, so I visited patients

18   there.

19          I was also medical director of the rehab unit and

20   the mental health unit.  One of the reasons I mention this

21   is because many patients were older and had what we would

22   term as geriatric issues, you know, propensity for weight

23   loss, electrolyte disturbance, frequent infection, pressure

24   sores.

25          And then I mentioned when I was at William

 1    Beaumont Hospital in Michigan, I trained geriatric fellows
 2    over there, too.  They had a very successful fellowship
 3    program.  And in addition to my hospital consults and
 4    clinic work at William Beaumont, I was medical director at
 5    West Bloomfield Nursing Home.
 6            So I really have had an extensive experience in
 7    the long-term care setting.
 8            And then even in New Mexico, I mentioned that I
 9    asked for some of my time to be scheduled in the nursing
10    facility that was affiliated with Lovelace.
11            And, of course, since I've been in Florida, I was
12    medical director for five years at State Veterans' Nursing
13    Home.  And currently, I'm medical director at Covenant
14    Village, which is a continued care community with nursing
15    home, assisted living, and apartments.
16            And I'm also medical director of a facility
17    called Avante at Boca, which is north of Ft. Lauderdale.
18    That's a very complex place with chronic ventilator units.
19    So these are patients who have actually all the
20    manifestations that have been exhibited, but they're on
21    long-term ventilators with difficulty weaning them off
22    ventilators because they are extremely sick.
23            So we have one unit that's devoted to those
24    patients, and I and my group, you know, carry a large
25    number of those patients.

1      Q.  In those long-term care and nursing home facilities,

2      have you had the opportunity to personally observe the

3      effects of the types of complications that Mr. Jaramillo

4      has suffered from and how those medical conditions can

5      adversely affect a patient's prognosis?

6              MS. CURTIS:  I'm going to object at this point.

7      The standard for expert testimony is not "can" -- "whether"

8      "can" "might" "may."  For an expert to give testimony, it

9      has to be reasonably probable.  And so I object to that

10     particular question.

11             THE COURT:  Rephrase your question.

12             MS. RETTS:  Thank you.

13     Q.  (By Ms. Retts)  Dr. Pandya, in the course of your

14     nursing home and long-term care work, have you had the

15     opportunity to personally observe patients with the

16     maladies that have been suffered by Mr. Jaramillo and

17     observed how those maladies have affected a patient's

18     prognosis?

19     A.  Yes, I have.  And not just observing.  I actually

20     provide day-to-day care for these patients.  I am the

21     attending physician of record, so I'm not just supervising

22     or, you know, directing the care.  I'm actually a hands-on

23     physician.

24             And I have -- it's really devastating.  With

25     every event such as pneumonia, such as a kidney stone, such

1       as a pressure ulcer, particularly a pressure ulcer, it's

2       really a signal for a very bad prognosis.

3              But my point is that when an older person or a

4       chronically debilitated person has one of these events,

5       it's harder for them to bounce back to their prior level of

6       function and cognition, so they lose more ground every time

7       these events occur.

8              So, you know, I've observed people over the years

9       from being, you know, interactive and functional, to

10      becoming completely withdrawn or nonverbal, not able to

11      move, you know, becoming totally bed bound, becoming

12      totally dependent on caregivers for even the most basic

13      things like turning and toileting and bowel care.

14             So it's devastating.

15      Q.  A geriatrician's involvement with a patient does not

16      depend on the patient's age, does it?

17      A.  As I explained, no.  It depends, sometimes, on the care

18      setting.  So in my nursing homes we have some younger

19      patients, but they have needs that can only be met in a

20      nursing home.  So, you know, we will take care of these

21      patients.

22             And in my own geriatrics clinic, which we

23      developed here at Nova Southeastern University, we were

24      actually approached by a county organization that deals

25      with people with developmental disabilities like Down's

1   syndrome or cerebral palsy.  The life expectancy is shorter

2   in those patients.

3          But, moreover, they have needs.  They have

4   frequent infections.  They have mobility problems.  They

5   have problems with early dementia, behavioral issues where,

6   you know, geriatricians actually ideally manage those

7   things.

8          And if I can explain that?  The strength of

9   having people, you know, trained in geriatrics is that we

10  are equipped to manage many of these issues without

11  fragmenting the care of patients, you know, referring them

12  to multiple specialists.  We do consult, of course, if they

13  need procedures, if we're not making any headway with a

14  person's condition.

15         But that's the strength of a geriatrician,

16  because we are actually trained to deal with many of these

17  conditions.

18  Q.  If Mr. Jaramillo is not currently being seen by a

19  geriatrician, would you believe it would be medically

20  appropriate for him to be seen by a geriatrician?

21  A.  It's maybe.  I cannot speak with a comfort level on the

22  competency of his physicians.  But it's maybe.  And it just

23  illustrates that even within nursing homes which -- you

24  know, there are so few geriatricians in the country.  There

25  will never be enough geriatricians to provide care for all

1      of the adults.

2               But so many primary care providers actually will

3      consult a geriatrician to provide an opinion or assist with

4      some difficult aspect of care in their patients in the

5      nursing home.  So, you know, the nursing home provider may

6      get a consult from a geriatrician.  And I have been asked

7      to do that.

8      Q.   Is Mr. Jaramillo being currently seen by an

9      endocrinologist?

10     A.   I'm sorry.  I don't remember that, and I did not note

11     that.

12     Q.   As a diabetic, would you expect that he would be seen

13     by an endocrinologist?

14     A.   I think that it's useful.  If the diabetes is not well

15     controlled, then possibly once a year to have some

16     oversight from an endocrinologist is useful.  I apologize.

17     I don't remember whether he was seen by an endocrinologist.

18     Q.   In your professional capacity treating patients, have

19     you observed diabetes to adversely affect a diabetic

20     individual's life expectancy?

21              MS. CURTIS:  Objection, Your Honor.  It's not

22     specific enough to this particular -- it's -- the question

23     itself is not specific, one, as an expert.  It does not

24     meet the standard for expert testimony.  It is not specific

25     to this particular patient.  And for that reason, this is

1        not admissible testimony.

2                    THE COURT:  Counsel?

3            MS. RETTS:  Your Honor, Ms. Curtis has challenged

4        the expertise of this expert being able to give opinions

5        relative to diabetes and how it affects life expectancy.

6        And Dr. Pandya's personal observations of patients with

7        diabetes form a basis for her general experience she then

8        can utilize specifically to apply to this case.

9                    In her report, she indicated that her experience

10       and training led her to the conclusion that diabetes alone

11       can reduce life expectancy by almost ten years.

12                   THE COURT:  Let me clarify something here.  If

13       counsel don't mind, I want to ask the doctor a question

14       that will help me.

15                   Doctor, you referenced, earlier, treatment of a

16       condition in managing the patient or managing a patient's

17       conditions.  Help me to better understand the difference

18       between managing and treating.

19                   THE WITNESS:  Okay.  So it's really a continuum,

20       you know.  So chronic conditions such as heart failure or

21       hypertension would have to be treated appropriately with

22       lifestyle and/or medications or both, but then if it's a

23       chronic long-term condition, so it would have to be

24       managed.

25                   For instance, you know, with hypertension, kidney

1    function would have to be checked.  Hypertension can lead

2    to heart failure, so that would need to be watched out for

3    in a patient.

4              THE COURT:  Right.  So that part I understand.

5    But I guess maybe my more specific question is:  Do you do

6    both?

7              THE WITNESS:  Yes, indeed.

8              THE COURT:  Because you referenced earlier

9    having sometimes sought consultations outside of your

10   practice.

11             THE WITNESS:  Yes.  Right.  Indeed, we do do

12   both.  When we seek consultations is when, let's say, a

13   patient needs a procedure.  You know, somebody might need

14   endoscopy, so that is not in my scope.  That is a

15   gastroenterologist.

16             If somebody had heart failure that was worsening

17   and I could not identify a clear reason, then I would get

18   the opinion of a cardiologist.

19             And let's say somebody needed a cardio-

20   catheterization.  You know, that's not in my scope, so I

21   would certainly get consultation.

22             Mainly when a procedure is needed, and of course

23   that's very -- you know, different physicians have various

24   thresholds for getting consultations and various levels of

25   comfort.

```
 1                    THE COURT:  Yes, I understand what you're saying.
 2      All right.  Now, you are board certified in endocrinology;
 3      is that correct?
 4                    THE WITNESS:  Yes.
 5                    THE COURT:  And diabetes or the treatment of
 6      diabetic conditions come under that; is that correct?
 7                    THE WITNESS:  That's correct.
 8                    THE COURT:  I take it that part is not disputed;
 9      is that correct, counsel?
10                    MS. CURTIS:  That's correct.  That is not
11      disputed.
12                    THE COURT:  All right.  Now, I'm going to sustain
13      the objection, but I'm going to permit Ms. Retts to
14      rephrase her question.
15                    I think the question as it stands is:  In your
16      professional capacity treating patients, have you observed
17      diabetes to adversely affect a diabetic individual's life
18      expectancy?
19                    I would permit you -- and I think it's just too
20      broad here.  I'm sure there are thousands and thousands of
21      different patient scenarios that would impact on any number
22      of answers to that question.
23                    But I would permit you to rephrase your question,
24      something along the lines of inquiring about in her
25      opinion, based upon her experience, her education, and her
```

1    training, does she have an opinion as to perhaps how a

2    condition of diabetes would impact a person's -- I hesitate

3    to use "life expectancy" because I think that is something

4    that is, I think, very problematic.  Would it affect a

5    person's ability to progress in what would typically be the

6    form of a person who doesn't have that condition,

7    untreated, or perhaps not managed properly, whatever.

8              But I'll let you think about how you want to ask

9    it.

10   Q.   (By Ms. Retts)  Dr. Pandya, taking into account your

11   experience, your training, the peer-reviewed research that

12   you have had published relative to diabetes, can you tell

13   us how diabetes affects the condition of a person's health,

14   and how that differs from the normal progression of an

15   individual who did not have diabetes?

16   A.   Yes.  So individuals with diabetes are more prone to

17   cardiovascular complications.  That's the biggest cause of

18   mortality.

19             So they're more likely to have hypertension, high

20   cholesterol, more likely to have heart attacks, strokes,

21   peripheral arterial disease, amputations.  They are more

22   likely to have infection.  They are more likely to have

23   pneumonia, sepsis.

24             People with diabetes are also, and I have

25   observed this, more likely to develop pressure sores.

1            And one of the increasingly commonly recognized

2     complications of diabetes, which was not well thought out

3     before, was that of dementia.  You know, we know that

4     diabetes is the a of blindness, and it can cause renal

5     failure, and it's the most common cause of dialysis in this

6     country.

7            But it's being recognized that microvascular

8     damage, you know, without even a significant history of

9     stroke, but the hardening of the arteries in small, small

10    vessels can cause dementia.

11           And diabetes is also associated with depression,

12    so you see people are less interested in managing their

13    disease.  And when they have dementia, of course, it's a

14    complex disease to manage.  You know, you'll be on multiple

15    medications, multiple insulin shots.  So they are less

16    able to do that.  They become more dependent on others for

17    care.

18    Q.  Dr. Pandya, is it your opinion that Mr. Jaramillo's

19    current disease burden will make him, to a reasonable

20    degree of medical probability, more likely to develop

21    further episodes of medical complications that he has

22    previously experienced, including sepsis, pneumonia, venous

23    thrombotic disease, C. diff.?

24    A.  Yes.

25    Q.  Cellulitis or osteomyelitis?

1    A.  That is my opinion.  Also, importantly, not only

2    because he has diabetes but also because he is so

3    functionally impaired, you know, so he can't do -- he is

4    dependent on caregivers, so he needs -- you know, he is

5    likely to have aspiration pneumonia.  He is likely to have

6    pressure sores.

7           His history -- I always look at patients and

8    look back and see what their trajectory has been.  And he

9    already, in a short time, has had multiple hospitalizations

10   for all of the complications we talked about earlier, the

11   sepsis, delirium, pneumonia, urinary infections, kidney

12   stones.

13          I believe he has a urinary catheter, if I'm not

14   mistaken.  He has a colostomy.  You know, renal

15   insufficiency.

16          He is at high risk for developing blood clots in

17   his legs that could travel to his lungs.  That could be

18   fatal.

19          And, of course, his cognition and ability to

20   interact and survive is very limited.

21   Q.  Dr. Pandya, you were asked several questions about the

22   studies relative to traumatic brain injury, and I want to

23   go back and ask you some questions about that.  When

24   looking at a person who has some form of brain damage, from

25   a medical perspective in treating that person, what is

1      important to you, the mode of injury or the complications

2      from that injury?

3              MS. CURTIS:  Your Honor, at this time I would

4      object.  That question is overly broad.  This witness is

5      not qualified to give any opinion concerning brain damage.

6      I think clearly the evidence has been that using traumatic

7      brain injury or mixing different forms of brain injury to

8      come up with the same conclusion, there is no basis for

9      those opinions.

10             I understand that for purposes of the hearing the

11     Court may like to hear the answer, but I'd like to make

12     sure that I've made a record of that objection.

13             THE COURT:  You know, I'm going to sustain that

14     objection here for those very reasons.  Let's move on.

15             I'm going to recess for ten minutes, Doctor, so

16     if you can -- don't hang up.  Just understand I'm going to

17     put you on hold, and I'll take the button off here in ten

18     minute.  All right?

19             THE WITNESS:  All right.  Thank you.

20             THE COURT:  Thank you.  All right.  We'll be in

21     recess for ten minutes.

22             (Witness' telephone put on mute.)

23             (Recess from 11:58 a.m. until 12:07 p.m.)

24             THE COURT:  How much time here, Ms. Retts?

25             MS. RETTS:  Five to ten minutes.


JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1                    THE COURT:  Okay.  Ms. Curtis?

2                    MS. CURTIS:  Yes, ten minutes.

3                    THE COURT:  Okay.  So we're going to wrap it up

4          before 12:30.  All right.

5                    (Witness' telephone taken off mute.)

6                    THE COURT:  Doctor, are you there?

7                    THE WITNESS:  I'm here.

8                    THE COURT:  You're still with us.  All right.

9                    THE WITNESS:  I was accosted by a couple of

10         people, but I'm here.

11                   THE COURT:  You are very brave.  All right.  Let

12         us continue.  Counsel?

13                   MS. RETTS:  Thank you, Your Honor.

14         Q.  (By Ms. Retts)  Dr. Pandya, you have written quite a

15         number of peer-reviewed articles on diabetes; is that

16         correct?

17         A.  Yes, ma'am.

18         Q.  And that relates specifically to diabetes in the

19         nursing home setting?

20         A.  Yes.  I have been instrumental -- I chaired the

21         American Medical Directors' clinical practice guideline on

22         management of diabetes in the long-term care setting, and

23         that's been a widely used guideline; actually, even

24         accepted by the Centers for Medicare and Medicaid as, you

25         know, a reasonable approach, not the only way.


                    JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                         333 Lomas Boulevard, Northwest
                         Albuquerque, New Mexico  87102

1          And I recently was invited by -- amongst other

2     publications, I was also invited by the American Diabetes

3     Association to present my perspective on the issues and

4     challenges of managing diabetes in the long-term care

5     setting, and that was included in their recent consensus

6     statement of diabetes in older adults.  So it was a joint

7     project by the American Diabetes Association and the

8     American Geriatrics Society.

9          And then I've -- as you can probably see from my

10    CV, you can see I have worked with colleagues to write

11    articles on the challenges of treating diabetes; use of

12    applied care insulin; switching to newer insulins in the

13    long-term care setting; what glucose tolerance should be in

14    older adults; and so forth; skin tissue water content in

15    patients with diabetes, compared to those without; and then

16    the efficacy of some of the newer insulins in studies

17    looking at younger versus older adults.

18         So that's a summary.  And I -- oh, yes.  I have

19    written a book chapter in a book, a textbook on long-term

20    care called A Pocket Guide to Long-term Care, and that was

21    published, I believe, in 2011.

22         And we have a book that's in press by the

23    American Diabetes Association, called -- you know, about

24    diabetes and long-term care, and I was asked to write a

25    chapter on the medical director's perspective, which I

1     wrote with a colleague of mine.

2     Q.  Based upon your personal experience, training,

3     peer-reviewed literature that you have authored or

4     co-authored in the fields of diabetes and geriatrics, is it

5     your opinion that Mr. Jaramillo's prognosis is poor?

6           MS. CURTIS:  Objection, Your Honor.  One, it's

7     leading; and two, there is no peer-reviewed study.  That

8     opinion is not appropriate because while some things can be

9     experience-based, this is just a sideways attempt to get

10    into life expectancy.

11          Life expectancy under this set of circumstances

12    needs to be based on some formula or some study that can be

13    tested, especially given the statutorily based New Mexico

14    life expectancy tables, as well as the federal government's

15    published life expectancy tables.

16          And so for that reason, we would object to this

17    expert being permitted to give that testimony.

18          THE COURT:  Counsel?

19          MS. RETTS:  Your Honor, the actuarial tables are

20    not appropriate in this case because of the fact that the

21    jury instructions in particular allow for the consideration

22    of a patient's health and their habits.

23          This goes specifically to the patient's health.

24    And Dr. Pandya is not giving a precise number.  She's

25    giving the jury a way to understand, from a medical

1    perspective, based upon her training and experience in

2    treating patients with similar problems, what that

3    prognosis means; what it means to have these complications;

4    how that affects somebody's health.

5              Without such testimony, it's determined in a

6    vacuum.  The 81-year life expectancy is a number that's

7    plucked from a book, for the average person.  Mr. Jaramillo

8    is not the average person.

9              And Dr. Pandya has looked through those medical

10   records and applied her experience and training to those

11   medical records, and has opinions based upon those medical

12   records.

13             THE COURT:  I'll hold in abeyance a decision on

14   the objection.  Let me hear the response.  Go ahead and ask

15   the question.

16   Q.  (By Ms. Retts)  Dr. Pandya, based upon your own

17   personal experience, your training, your peer-reviewed

18   literature that you have co-authored or authored in the

19   areas of diabetes and geriatrics, is it your opinion that

20   Mr. Jaramillo's prognosis is poor?

21   A.  Yes.

22             MS. RETTS:  Those are all the questions I have,

23   Your Honor.

24             THE COURT:  All right.  Any redirect here?

25             MS. CURTIS:  Yes, Your Honor.

```
1                    REDIRECT EXAMINATION

2     BY MS. CURTIS:

3     Q.  Dr. Pandya, this is Lisa Curtis again, since you can't

4     see me.

5     A.  Yes.

6     Q.  Every complication that Mr. Jaramillo had was close in

7     time to the actual event, within the first year to two

8     years of his brain damage, correct?

9     A.  I believe that is correct.

10    Q.  And he --

11    A.  I am not familiar with what has happened to him in the

12    last couple of years.

13    Q.  So he has healed through every one of those

14    complications, correct?

15    A.  Again, I would have to know what his trajectory has

16    been most recently, what has happened to him in the last

17    few years since, you know, or even in the last year since I

18    reviewed his medical records.  That would really be

19    important.

20    Q.  Right.  So the information or the answer that you just

21    gave to opposing counsel a few moments ago, you don't know

22    what his prognosis is, really, for the future because you

23    don't know what his last several years of treatment have

24    consisted of or whether he has had even any complications

25    whatsoever?
```

1     A.  Well, one, it's true that I don't know, especially in

2     the last year or so, what complications he has had.  I

3     think that some of the problems he has had are not

4     necessarily curable problems; I mean, having a colostomy,

5     being prone to medical problems, and this is not a curable

6     problem; having kidney stones; and generally he will

7     continue to get urinary or kidney infections.

8              He will still be -- he'll continue to be prone to

9     clostridium difficile infections.

10             He is very much prone to pressure sores because

11    of his poor mobility.

12             And, as I have said, he is very much prone to

13    developing further venous thromboembolisms, you know,

14    either deep vein thrombosis of the legs or blood clots in

15    the lungs.

16    Q.  Well, Doctor, let's take those one at a time.  All

17    right?  You're not qualified to give an expert opinion on

18    whether he's prone to Ogilvie's or megacolon?  I mean, no

19    one even know what causes those, right?  That would

20    definitely be the area for a gastroenterologist?

21    A.  Except that I have seen that once people get it, they

22    tend to get it frequently.

23    Q.  Well, there is research on this topic, though, Ogilvie

24    syndrome or megacolon, that you are unfamiliar with,

25    correct?

1      A.  That's correct.  That's correct.

2      Q.  And then in recent years, you just don't know that Mr.

3      Jaramillo has actually been very healthy; he hasn't been to

4      the hospital at all?

5              MS. RETTS:  Your Honor, I would object to the

6      extent that necessarily in a lawsuit, you have discovery

7      cut off at a certain point in time, and so when we do not

8      have current records, to the extent that there is a

9      challenge based upon records that haven't been produced

10     thus far, it's not an appropriate challenge, if we don't

11     have medical records from the most current period of time,

12     because the discovery ends at that period of time.

13             MS. CURTIS:  Your Honor, that's very confusing.

14             THE COURT:  The doctor has already said she is

15     not familiar with any of the treatment, or any of the

16     progress of his condition, or what the treatments have

17     consisted of over the last few years.  If I understood

18     that, that was her testimony, was it not?

19             MS. CURTIS:  That is my understanding, Your

20     Honor.

21             THE COURT:  So you're asking her what, then?  To

22     speculate?

23             MS. CURTIS:  No.  You know, that's a very good --

24     that's a very good direction, Your Honor, and I will -- let

25     me do it this way, since she's an expert.

1                  THE COURT:  All right.

2        Q.  (By Ms. Curtis)  Dr. Pandya, I do acknowledge that you

3        are an expert in diabetes management and treatment, and in

4        that setting I'm allowed to ask you hypothetical questions.

5                  So if in fact Mr. Jaramillo had healed through

6        all of his complications and has been very healthy for the

7        last several years, would that give you any information

8        about what his future prognosis is?

9        A.  That would be difficult to say, because a patient can

10       have periods of stability and then experience a sudden

11       decline.  And then my biggest concern for saying that --

12       you know, my biggest reason for saying that he's prone to

13       these complications again is his total, you know, debility,

14       dependence on care, feeding.  He's not able to function

15       normally.

16                 And as I explained before, he's therefore still

17       prone to further complications.

18       Q.  And let me just be clear.  You're saying not by a

19       reasonable medical probability that he will suffer any of

20       those conditions, just that he could; is that correct?

21       A.  Well, I think there is reasonable probability that he

22       will, and I'm saying this based on my experience.  I have

23       had long, you know, longitudinal relationships with

24       patients and have taken care of them over many, many

25       years.


JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

```
 1                    So it's not a question of "if."  It's a question
 2       of "when."
 3       Q.  So by reasonable medical probability, do you believe
 4       that Jose Jaramillo will have further hospitalizations?
 5       A.  Yes.
 6       Q.  And how many do you believe he'll have?
 7       A.  It's impossible to say.  I really could not say.
 8       Q.  So you understand that there is a cost to that care and
 9       treatment?
10       A.  I'm sorry?  There is --
11       Q.  You understand that if he is reasonably probable to
12       need hospitalizations in the future, that there is a cost
13       for that care and treatment?
14                    MS. RETTS:  Your Honor, I would object to the
15       relevance.  This is an attempt to back-door the problems
16       and their cost-of-care expert's report.
17                    MS. CURTIS:  Your Honor?
18                    THE COURT:  Yes?
19                    MS. CURTIS:  I believe there has been lengthy
20       testimony about future prognosis and the fact that he's
21       going to need additional care.
22                    THE COURT:  I'll permit it.  Let's move on.
23       Answer the question.
24       Q.  (By Ms. Curtis)  Doctor, can you answer that question,
25       please?
```

1    A.   Yes.  Of course.  As far as any hospitalizations,

2    further hospitalizations, there is always cost.

3    Q.   Do you agree with the treatment?  At least up to the

4    time of the records that counsel has provided you, they

5    show that he has had good and appropriate care and

6    treatment of the sequelae from his invasive pneumococcal

7    disease?

8    A.   I think that certainly he has had appropriate care,

9    you know, following his pneumococcal disease, for all of

10   the complications that he presented, both medical and

11   functional and nutritional.  Yes, I think the care has

12   been appropriate.

13   Q.   All right.  Because I don't know exactly when your

14   records end.  Do you have an opinion as to whether his

15   diabetes has been in good control since the time of his

16   residence at Sagecrest?

17   A.   I'm sorry.  I don't have all my notes from that time.

18   I'm looking at the report that I was asked to prepare

19   specifically, you know, about his diabetes care.  Certainly

20   when he was diagnosed, into -- I do have a little more

21   information -- in June 2007 he was treated very promptly

22   with two oral medications.  And in September 2007 his

23   hemoglobin A1c was 7.1 percent, and in December it was as

24   low as 5.8 percent.

25        So I think that his care has been reasonable.


JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1              And I wrote in my notes that between January and

2      April he had excellent fasting blood glucose levels, and he

3      was monitored appropriately, and I did not --

4              THE COURT REPORTER:  I'm sorry, but I can't hear

5      her.

6              THE COURT:  Doctor?  Doctor?

7              THE WITNESS:  Yes?

8              THE COURT:  Finish the last three sentences,

9      because my court reporter didn't hear that.

10             THE WITNESS:  Okay.

11     A.  So in September 2007, the same year he was diagnosed,

12     his hemoglobin A1c was 7.7 percent, which is pretty good.

13     And in December it came down.  In December 2007, it was as

14     low as 5.8 percent.

15             And he received examinations, which indicate good

16     care.

17             And between January and April, I did note from

18     his records that he had good fasting blood glucose levels.

19     He was monitored with repeat of blood glucoses.  He was on

20     two oral medications.

21             So let me see if I note anything further.

22             I did not make specific comments beyond that time

23     about his diabetes management.

24     Q.  All right.  So, again, since you're an expert, the

25     question I asked you was Sagecrest, and I don't believe

1     that encompassed any of the areas that you were talking

2     about.

3              Can you tell us, do you know whether his diabetes

4     was in good control during the time he has been a resident

5     at Sagecrest?

6     A.  Could you please let me know what year or when that

7     was?

8     Q.  He has been there approximately three years.

9     A.  So the past three years?

10    Q.  Yes.  Do you have those records?  Or do you have an

11    opinion that you're going to express at trial about whether

12    his diabetes has been under good control for the last three

13    years?

14    A.  I did not make specific notes about his blood sugars at

15    that time, so I'm sorry, I cannot tell you anything more

16    specific, you know, about those previous -- those recent

17    years.

18              THE COURT:  Let's move on.

19              MS. CURTIS:  Yes.

20    Q.  All right.  So let me just ask you a couple of broad

21    questions in response to the answers that you gave counsel.

22    More than 51 percent -- 51 percent or greater of people

23    with diabetes do not have dementia, correct?

24    A.  I'm sorry?  Can you say that again?

25    Q.  Sure.  Of all the people that have diabetes, 51 percent

1    or greater do not have dementia, correct?

2    A.  I don't know the exact percentage or what, you know,

3    studies you are referring to, but I think it's fair to say

4    that the majority of people with diabetes do not have

5    dementia.  But that the literature does show that among

6    people with diabetes, they are more likely to have vascular

7    dementia or Alzheimer's dementia than people without

8    diabetes.

9          And actually, I do remember, I gave a keynote

10   address on diabetes and dementia at our regional

11   Alzheimer's conference, and people with diabetes are 50

12   percent more likely to develop Alzheimer's dementia than

13   people without diabetes.

14   Q.  All right.  But that doesn't mean that over 50 percent

15   or the majority of people with diabetes have dementia,

16   right?  Because they don't?

17   A.  No.  It does not mean the same thing.

18   Q.  Yeah.  All right.

19          So I would ask you just hypothetically assuming

20   that Jose Jaramillo has well-controlled diabetes and has

21   had well-controlled diabetes since he was diagnosed in

22   2007, he is unlikely, if he continues to be well

23   controlled, to have any of the long-term complications that

24   you see in diabetics that do not have well-controlled

25   disease?

1    A.  I'm not sure if it's that simple to say that, that he

2    is unlikely to have any complications.  I think just by

3    virtue of the length of the time somebody has diabetes,

4    they are likely to have some complications.

5         I don't think it's possible just to say that his

6    diabetes is well controlled, that's why we can reasonably

7    say that he won't have any long-term sequelae, you know,

8    long-term complications pertaining to diabetes.

9         I think the length of diabetes -- and I also note

10   that he also had hyperlipidemia.  No.  Actually, I'm sorry.

11   At least in the beginning, 2007.

12        But I think with his duration of diabetes,

13   itself, I don't think I could safely say that he's unlikely

14   to have complications because it's well controlled.  That

15   has not been my experience.

16   Q.  Let me ask that question just in reverse, and this will

17   just be my last area.  And that is:  The people that have

18   uncontrolled diabetes are most likely to have long-term

19   complications, correct?

20   A.  That is correct.

21   Q.  Thank you.

22   A.  That is what the literature supports.

23   Q.  Thank you.

24        MS. CURTIS:  Thank you, Judge.  I don't have any

25   further questions.

1             THE COURT:  All right.  I have one question,

2     Doctor, and you answered it earlier, but that was when we

3     had a little trouble here with the real-time, and I didn't

4     capture it.  I can't find it, so I'm going to ask you

5     again, and it's just for my own benefit.

6             You had mentioned early on -- you explained the

7     difference between a gerontologist and a geriatrician.

8             THE WITNESS:  Yes.

9             THE COURT:  Clarify the differences for me again.

10            THE WITNESS:  Okay.  So a gerontologist usually

11     is a scientist, a master's, a Ph.D. level, but not a

12     medically-trained physician who specializes in the study of

13     aging.  So they might specialize in like the psychology of

14     aging, you know, physiologic decline, muscle and bone

15     changes.  They look at the study of aging and do research

16     in that area.

17            A geriatrician, while they may still be doing

18     research, are usually physicians who are trained in

19     internal medicine or family medicine, who have additional

20     fellowship training in geriatrics, as I have explained in

21     my own institution.  And then, you know, they can sit for a

22     board certifying exam.  And their clinical, you know,

23     practice is generally focused in the area of taking care of

24     older adults in different sites.  You know, it may be

25     hospice care, long-term care settings, geriatric settings,

1      and so forth, hospital service.

2              THE COURT:  Okay.  And one other question.  What

3      is the, if there is one, cut-off point for making the

4      diagnosis of diabetes, and what numerical percentage range

5      is that?

6              THE WITNESS:  Oh, okay.  Yes.  That's -- that's

7      important because that has changed.  About five to, say,

8      three years or so ago, diabetes was diagnosed as either

9      with an abnormal fasting glucose greater than 126, or a

10     random glucose or post-meal glucose greater than 200.

11             And recently, in the last three years or so, the

12     American Diabetes Association and all the international

13     associations have reached the conclusion that it is now

14     okay to measure the hemoglobin A1c level, which is not the

15     blood sugar; it's the percentage of your hemoglobin that is

16     attached to glucose.

17             THE COURT:  Right.  And it measures a three-month

18     period.

19             THE WITNESS:  Right.

20             THE COURT:  That part I understand.

21             THE WITNESS:  That gives you an idea.  And so you

22     can diagnose diabetes now if somebody's A1c is greater than

23     6.5 percent.

24             THE COURT:  All right.  Counsel, in lieu of my

25     questions, are there any follow-ups on those points?


                    JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                         333 Lomas Boulevard, Northwest
                         Albuquerque, New Mexico  87102

```
 1                    MS. CURTIS:  No, Judge.

 2                    THE COURT:  Ms. Retts?

 3                    MS. RETTS:  No, Judge.

 4                    THE COURT:  Doctor, I thank you, and I'm going to

 5      release you at this time.

 6                    THE WITNESS:  Thank you.

 7                    THE COURT:  All right.  Have a good rest of the

 8      day.  I think we're going to get rain, if not snow, here,

 9      and I recall that you are in Florida.  Lucky you.

10                    THE WITNESS:  I am.  Thank you so much.

11                    THE COURT:  Goodbye.

12                    THE WITNESS:  Goodbye.

13                    (The witness' phone was disconnected.)

14                    THE COURT:  Okay.  The Court is taking this

15      matter under advisement.  All right?

16                    Now, are both of you going to be here, then,

17      for the 2:00 Daubert hearing?  Or will there be other

18      counsel?

19                    MS. CURTIS:  I will be doing the argument.  I

20      don't know that I won't have additional support.

21                    THE COURT:  Okay.

22                    MS. RETTS:  It will just be me, Your Honor.

23                    THE COURT:  So my question is, we can do this at

24      the end of the day.  It doesn't really matter.  But I want

25      to see, do I have copies of the references that you were
```

1      questioning the doctor on?

2                  MS. CURTIS:  I can give you copies.

3                  THE COURT:  Yes.  I did have Carol copy the --

4                  MS. CURTIS:  Number 4.

5                  THE COURT:  -- Number 4, Life Expectancy After

6      Traumatic Brain Injury.  But to the extent you questioned

7      the doctor specifically on any of these articles or

8      treatises, I would like to have copies, so if you could

9      meet and confer to make sure that I have the part that's

10     relevant.  I don't need the whole book, if that's what you

11     are looking at.  But I do have Number 4, which is the Life

12     Expectancy.  Those can be provided to me at a later time.

13                 And same thing to you, Ms. Retts, if you're going

14     to be referring to anything, as well.

15                 And I take it there is no objection to the Court

16     considering those, because it will help me to refer back to

17     the real-time and understand the context of the doctor's

18     testimony.

19                 MS. CURTIS:  Thank you.

20                 THE COURT:  All right.  Let's take a break here,

21     and we'll see you back here at 2:00 with our next witness.

22                 Thank you.

23                 MS. RETTS:  Thank you, Judge.

24                 THE COURT:  All right.  We'll be in recess.

25                 (Recess from 12:33 p.m. until 2:05 p.m.)

```
 1                        DAUBERT MOTION
 2                 (In open court at 2:05 p.m.)
 3            THE COURT:  Good afternoon again.
 4            MS. CURTIS:  Good afternoon, Judge.
 5            MS. RETTS:  Good afternoon.
 6            THE COURT:  You may be seated, and let us resume
 7       here.
 8            We are back on the record in the case of Hart v.
 9       Corrections Corporation of America, et al., this being on
10       the Civil Docket, 11-CV-267.
11            Just give me a moment here.  The Court will note
12       the appearances of Ms. Curtis for the plaintiff and Ms.
13       Retts for the defendants here.  All right.
14            And thank you for preparing the copies of the
15       reports and documents that were referred to in this
16       morning's testimony.  I appreciate that.  And I take it
17       there is no objection to the Court considering these as
18       part of its analysis of today's issue?
19            MS. RETTS:  No, Your Honor.  I just wanted to
20       make clear that those are excerpts; they're not the full
21       documents.
22            THE COURT:  But this is the relevant part?
23            MS. RETTS:  Yes.
24            THE COURT:  That's all I need.  Thank you so
25       much.
```

1              Let us proceed at this time with the second

2     hearing that we have set here under Daubert in the Court's

3     gatekeeping responsibilities, and that is the plaintiff's

4     Daubert motion to exclude expert testimony of Lowell Young,

5     M.D.  The motion being filed on the docket is Document

6     Number 124.  So are you going to proceed, counsel, in the

7     same fashion we did this morning, as far as the protocol?

8              MS. CURTIS:  Yes, Your Honor.

9              THE COURT:  All right.  Ms. Curtis, I do

10    recognize you, then, at this time.  We do have Dr. Young on

11    the phone.  Do you want him sworn in at that point?

12             MS. CURTIS:  Might as well.  Yes.

13             THE COURT:  Okay.  Dr. Young, good afternoon.

14    This is Judge Armijo.

15             THE WITNESS:  Good afternoon, Your Honor.

16             COURTROOM DEPUTY CAROL BEVEL:  Would you please

17    raise your right hand.  You do solemnly swear that your

18    testimony in this matter shall be the truth, the whole

19    truth, and nothing but the truth, so help you God?

20             THE WITNESS:  I do.

21             COURTROOM DEPUTY CAROL BEVEL:  Would you please

22    state your name and spell your last name for the record.

23             THE WITNESS:  Lowell Sung-Yi Young.  The last

24    name is spelled Y-O-U-N-G.

25             THE COURT:  You may proceed.

1              MS. CURTIS:  Thank you, Your Honor.

2              Your Honor, generally, as the Court is aware, we

3       have made an objection to Dr. Lowell Young testifying as an

4       expert for the defendants in this case, not because Dr.

5       Young is not an expert in some things, but that he is not

6       an expert qualified to testify in this case for causation,

7       which is what he has been offered on.

8              The defendants, in their response, cited to the

9       Ralston case -- that would be Ralston v. Smith and Nephew

10      Richards, which is a 2001 Tenth Circuit case -- concerning

11      the admission of expert testimony, citing Kumho Tire

12      extensively.  It's not that any expert can testify.  They

13      must stay within the reasonable confine of their subject

14      area.

15             The issue around the reasonable confine of

16      subject area has to do with what the expert can contribute

17      at trial to the jury.  They must be able to assist the jury

18      with an issue that is in dispute.  Dr. Young, while he is

19      certainly a very qualified medical researcher and animal

20      researcher, has not practiced medicine, as you see in

21      Exhibit 1 to the motion, Judge, for 13 years.

22             He does very important research on a particular

23      bacteria that evidences in late-stage AIDS patients, and he

24      has been qualified as an expert in New Mexico on that

25      particular subject.


                    JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                         333 Lomas Boulevard, Northwest
                         Albuquerque, New Mexico  87102

1          However, what he wishes to testify today to, and

2    at the trial of this case, has to do with the ability of

3    the pneumococcal vaccine to have stopped Jose Jaramillo

4    from developing invasive pneumococcal disease.

5          The second challenge to Dr. Young is the basis

6    for his opinion.  This basis, while the Court I believe

7    will understand the difference, is something that I will

8    seek to bring out through Dr. Young, is that he wishes

9    there to be randomized controlled trials, which is a

10   particular level of medical research, in order for the

11   plaintiff to be able to prove that in fact this vaccine,

12   which is widely accepted as necessary by the CDC and the

13   ACIP, which is a committee of the CDC, as needing to be

14   given to all diabetics, that he does not believe, because

15   we are without controlled -- I'm sorry -- randomized

16   controlled trials, that he could testify that it would have

17   been effective with regard to Jose Jaramillo.

18         What Dr. Young is doing is raising the bar on the

19   burden of proof so high that it could never be met if this

20   was the requirement.

21         The important difference, Judge, that I'd like to

22   bring out quickly before I ask questions of Dr. Young, is

23   that the study that Dr. Martin relied on is a very well

24   accepted, in fact "the" study, on effectiveness of

25   pneumococcal vaccine on invasive pneumococcal disease.

1            It's called the Cochrane Database Review.  It had

2        18,000 patients in it, and it is accepted by all other

3        entities as strong evidence for worldwide vaccine

4        administration.  But that is called a case controlled

5        trial.

6            Case controlled trials are frequently used to

7        justify interventions in both public health applications

8        like vaccination of relatively unusual diseases, as well as

9        in clinical medicine.

10            The standard, which is randomized controlled

11       trials, are simply impractical.  That's why they're not

12       done on everything.  They cannot be done on a rare disease

13       like invasive pneumococcal disease.

14            Out of the Cochrane study that had 18,634 people,

15       out of that group that was vaccinated, only 15 got

16       pneumonia at all.  And so the incidence of getting

17       pneumonia, once vaccinated, is extraordinarily low.

18            But, then, pneumonia and invasive pneumococcal

19       disease are not the same entity, and this is a very

20       important fact in the case, as we argued in our motion and

21       as Dr. Young has admitted in the testimony that we

22       provided, because just like how the flu can lead to adult

23       respiratory distress syndrome, they are not the same

24       thing.

25            Pneumonia, in certain populations, if the

1        vaccine is not provided, can lead to invasive pneumococcal

2        disease, which is what Jose Jaramillo had; and that is, he

3        had bacterial meningitis that caused brain damage.

4               So the level of proof that Dr. Young is requiring

5        to find causation is not the legal burden, which is greater

6        than 50 percent.  He has raised it to a completely

7        different level.  And, in addition, the two studies as

8        recited in our motion, the Ortquist study and -- and I

9        want to make sure I say this right -- the Simberkoff

10       studies are studies concerning pneumococcal vaccine and

11       pneumonia.  They are not invasive pneumococcal disease

12       studies.

13              So he has got two studies he's talking about, but

14       as he has admitted in his deposition, pneumonia and

15       invasive pneumococcal disease are different diseases.  One

16       leads from the other, but you cannot call those studies as

17       being remotely related.

18              Just so the Court knows, it's not that we believe

19       that Jose Jaramillo wouldn't have contracted pneumonia,

20       potentially, if vaccinated.  That can happen.

21              The whole issue in this case is, if vaccinated,

22       it would never have come to the level of invasive

23       pneumococcal disease.  He would have had a short run of

24       pneumonia, and he would have gone right back to CCA's

25       institution.


JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

```
 1              Dr. Young, now at this point in time I would like
 2      to ask you a few questions, if I may, Your Honor?
 3              THE COURT:  You may.  Doctor, let me just have
 4      you advise me if you can't hear me, and this is Judge
 5      Armijo, or the attorneys.  They are speaking with a mike,
 6      but I want to be sure that you're able to clearly hear
 7      them.  All right?
 8              THE WITNESS:  Yes.  I can hear you.  The
 9      attorney's voice was very faint.
10              THE COURT:  Okay.  Well, I will ask her to speak
11      up.
12              THE WITNESS:  All right.
13              THE COURT:  Carol, there may be a way to adjust
14      that mike.  Just give us a second here.  All right.  Ms.
15      Curtis, say a few words and see if that helps.
16              MS. CURTIS:  Dr. Young, this is Lisa Curtis.  Can
17      you hear me?
18              THE WITNESS:  Yes, I can.
19              THE COURT:  Okay.
20              THE WITNESS:  Please continue at that pace.
21              THE COURT:  She will try.
22              MS. CURTIS:  Yes, I will.  And I'm not normally
23      thought of as soft-spoken, so I don't think you'll have any
24      trouble hearing me.
25
```

1          LOWELL SUNG-YI YOUNG, M.D. (Appearing Telephonically),

2              after having been first duly sworn under oath,

3              was questioned and testified telephonically

4              as follows:

5                            DIRECT EXAMINATION

6     BY MS. CURTIS:

7     Q.  Dr. Young, you heard my argument a few moments ago,

8     correct?

9     A.  (WITNESS TESTIFYING TELEPHONICALLY)  Pardon?

10    Q.  Were you capable of hearing the argument I just made --

11    A.  Yes.

12    Q.  -- to the judge?  Okay.  Thank you.  It is true, isn't

13    it, Dr. Young, that you have not practiced medicine since

14    the year 2000?

15    A.  That is true.

16    Q.  And that the work that you're doing, and have been

17    doing, is animal research on beige mice concerning

18    mycroavium bacterium?

19    A.  Mycobacterium avium.

20    Q.  Thank you.  And you have not treated, as a physician,

21    any patient, any human patient, with any invasive

22    infectious disease?

23    A.  That is correct, in the last 13 years.

24    Q.  Also, the one time you have been qualified in a federal

25    court in New Mexico to testify, it was with regard to that

1    very specific bacterium work that you're doing?

2    A.   That is true.

3    Q.   Now, Doctor, am I correct that your disagreement with

4    what we've been calling pneumococcal vaccine, or PPV-23, is

5    that there are no specific randomized controlled trials in

6    people with diabetes?

7    A.   That demonstrate effectiveness in prevention of

8    pneumococcal disease of any kind.

9    Q.   Right.  There's no specific randomized controlled

10   trials?

11   A.   That's correct.

12   Q.   But you do recognize that there are case controlled

13   studies, like the Cochrane study, that find the efficacy

14   rate of PPV, or pneumococcal vaccine, to be generally 74

15   percent?

16   A.   That is an overall figure for pneumococcal disease.  It

17   is not an overall figure for pneumococcal meningitis.

18   Q.   Right.  Because invasive pneumococcal disease can be

19   several things?  Bacteremia?  Correct?

20   A.   Correct.

21   Q.   Or meningitis?

22   A.   Correct.

23   Q.   And I'm forgetting the third.  What is the third?

24   A.   Endocarditis.

25   Q.   Endocarditis.  Okay.  So what these are, are additional

```
1      invasive diseases that come out of pneumonia; is that
2      correct?
3      A.   Invasive diseases that what pneumonia?
4      Q.   That come out of pneumonia?
5      A.   No, they don't turn out as pneumonia.  They can
6      accompany pneumonia.
7      Q.   Okay.  I'm sorry.  We are having just a little bit of
8      difficulty hearing each other, so I will try to speak up a
9      little bit.
10            Pneumonia and invasive pneumococcal disease are
11     not the same disease; is that correct?
12     A.   That is correct.
13     Q.   And the Simberkoff and Ortquist studies deal with
14     pneumococcal vaccine and pneumonia only, correct?
15     A.   That's correct.
16     Q.   And so the coverage of pneumococcal vaccine, you agree,
17     don't you, Doctor, that the coverage is between 80 and 90
18     percent of all serotypes for invasive pneumococcal disease?
19     A.   I agree with that.
20     Q.   Now, this may sound like a simple question, but 80 to
21     90 percent is much higher than 51 percent, correct?
22     A.   Yes.
23     Q.   And the efficacy that the Cochrane study shows is 74
24     percent, which is much higher than 51 percent, correct?
25     A.   I would agree with that.
```

1    Q.  All right, sir.  So your sole dispute with the

2    effectiveness of pneumococcal vaccine for Jose Jaramillo is

3    that there has not been a randomized controlled trial in

4    diabetics?

5    A.  That is correct.  There is no evidence that in patients

6    with underlying diabetes, that this vaccine is protective

7    against any type of pneumococcal disease, whether it's

8    pneumococcal pneumonia, pneumococcal meningitis,

9    pneumococcal bacteremia, or pneumococcal endocarditis.

10   Q.  You recognize, as I believe you discussed in your

11   deposition, that the Cochrane database had over 18,000

12   patients that had all different types of underlying health

13   situations, including diabetes?

14   A.  Yes.

15   Q.  All right.  And that out of those 18,000 patients, only

16   15 patients even got any form of pneumococcal disease, if

17   vaccinated?

18   A.  Right.

19   Q.  All right.  So although you recognize that the Cochrane

20   database review contains people with diabetes, you are

21   unwilling to say that that study is sufficient to show what

22   the efficacy of the pneumococcal disease vaccine would be

23   in Jose Jaramillo?

24   A.  Right.  It's clearly inadequate.  Although small

25   numbers of cases of pneumococcal disease and a limited

1    number of patients with underlying diabetes, you cannot say

2    that based on those 18,000 patients, that diabetics were

3    protected.

4    Q.  And that's because you would want a randomized

5    controlled trial, to be able to say that diabetics were

6    protected with the pneumococcal vaccine, correct?

7    A.  Or even a case controlled study.  There isn't a case

8    controlled study that shows that there is protection.

9    Q.  Other than the fact that there are diabetics in the

10   Cochrane study?

11   A.  There are diabetics, but they are not specifically a

12   population of diabetics that have been protected.

13   Q.  Do you recognize, Dr. Young, the reason why randomized

14   controlled trials are simply impractical in a rare disease

15   like invasive pneumococcal disease?

16   A.  I don't think they are impractical.  I think they could

17   have been done.  If the manufacturer of the vaccine had

18   wanted to study it, it could have been studied.

19   Q.  18,000 people is quite a large number for a study,

20   isn't it?

21   A.  That's true.  But for influenza vaccine, tens of

22   thousands of people are vaccinated.

23   Q.  The case controlled studies, do you agree, are

24   frequently used to justify interventions in both public

25   health and clinical medicine?

1    A.   Yes.

2    Q.   And you recognize that the Cochrane study is one of the

3    significant bases for the ACIP's finding and the CDC's

4    determination that all diabetics should be vaccinated with

5    pneumococcal vaccine?

6    A.   That may be part of their rationale, but the evidence

7    isn't there.

8    Q.   So you just disagree with the CDC and the ACIP because

9    there are no specific randomized controlled trials for

10   diabetics?

11   A.   That is my position.

12              MS. CURTIS:  Your Honor, I don't have any further

13   questions at this time.  I pass the witness.

14              THE COURT:  All right.

15              MS. RETTS:  Your Honor, before I begin with

16   questions of Dr. Young, I'd just like to address a few --

17              THE WITNESS:  Could you speak up?  I can't hear

18   you.

19              THE COURT:  Just a minute, Doctor.  Here's what

20   we're going to do.

21              THE WITNESS:  Yes.

22              THE COURT:  I'm going to put you on hold for a

23   minute.

24              THE WITNESS:  Sure.

25              THE COURT:  Just stand by.

```
 1              (Witness' telephone put on mute.)
 2              THE COURT:  Let's prop it up with a book or
 3    something here.  I think the closer you get -- Carol, why
 4    don't you try this, for lack of a better solution.  The
 5    other witness had no problems, but he may be hard of
 6    hearing.  See if that will work.  Do you think?  Is it
 7    slipping?
 8              MS. RETTS:  We'll address it if it slips.
 9              THE COURT:  All right.
10              (Witness' telephone taken off mute.)
11              THE COURT:  Let's try it.
12              THE WITNESS:  Okay.  That's better.
13              THE COURT:  Well, that was the judge.  All right.
14    Counsel, go ahead.
15              MS. RETTS:  I will try to project.
16              THE COURT:  All right.
17              MS. RETTS:  Your Honor, I would like to address a
18    few points in plaintiff's Daubert motion, and argument,
19    before continuing with questioning of Dr. Young.
20              THE COURT:  Can you hear that, Dr. Young?
21              THE WITNESS:  Yes.
22              THE COURT:  All right.
23              MS. RETTS:  Particularly as to the first point of
24    Dr. Young's qualifications, Dr. Young has extensive
25    experience and training in the infectious disease arena,
```

1          including actual treatment of patients.  There is nothing

2          within Daubert or any of its progeny that suggests that a

3          physician who is now not involved in clinical practice,

4          but was for a substantial length of time, is somehow

5          unqualified.

6                    Dr. Young's animal research has also provided him

7          with the requisite skills to be able to analyze critically

8          the studies, such as the one that Ms. Curtis pointed out.

9                    Indeed, if the plaintiff's argument is accepted,

10         then their expert is likewise to be excluded because his

11         specialty is in sexually transmitted diseases.

12                   Dr. Young has the requisite background from his

13         clinical practice.

14                   I would also note that a lot of the problems that

15         plaintiff points out in the testimony are not from Dr.

16         Young's opinions, but from an attempt to inject into his

17         deposition areas that he is not opining about.

18                   Dr. Young is not testifying about the standard of

19         care.  He was asked questions about what the California

20         Pacific Medical Center does currently with regard to

21         vaccination, which formed a basis for plaintiff's argument

22         in their motion that he was not qualified.  But whether the

23         California Pacific Medical Center currently has a policy of

24         vaccinating patients is not related to the issue of

25         causation in this case, because one can have a policy that

1    is based upon factors different than the actual medical

2    evidence at issue.

3            What we're talking about here is the actual

4    medical evidence at issue relative to efficacy of this

5    vaccine in the diabetic population for specifically

6    preventing pneumococcal meningitis.

7            The plaintiff has indicated that pneumonia is not

8    relevant to the inquiry at hand and that the studies relied

9    upon by Dr. Young, relative to pneumonia, don't make a

10   difference and don't support his analysis.

11           However, pneumonia is very relevant for a few

12   considerations.

13           First, in this case it is undisputed that Mr.

14   Jaramillo likely would have gone on to develop pneumonia

15   even if he was vaccinated.  So when we're, again, looking

16   at the "but for" component of plaintiff's burden of proof,

17   we have to look at what the difference is between the

18   vaccination versus the non-vaccination.

19           So the pneumonia is important to that issue,

20   because if he would have developed pneumonia, what are the

21   complications from that pneumonia that he could still be

22   experiencing today?  What is the hospital course?  What is

23   that realm of experience?

24           It's not just simply that he has pneumococcal

25   meningitis at this point.  It's that he would have had

1    pneumonia regardless, and there has been no attempt to

2    tease that out, and that also forms the basis of some of

3    our motions in limine.

4            Pneumonia is also important because pneumonia is

5    the precursor, in the majority of cases, to pneumococcal

6    meningitis, which I will have demonstrated through Dr.

7    Young's testimony, so that it's very illogical to suggest

8    that one can contract pneumococcal meningitis if they don't

9    contract an underlying precursor illness.

10           So if the vaccine is not particularly effective

11   at preventing pneumonia, then why should it be particularly

12   effective at preventing pneumococcal meningitis, which is

13   the step-through?  So it has to step through from the

14   pneumonia, which is the most common cause, to a bloodstream

15   infection, and then cross the blood-brain barrier for the

16   pneumococcal meningitis.

17           And there are absolutely no studies whatsoever

18   that have looked specifically at the blood-brain barrier

19   jump, the Pneumovax 23, and showed that that vaccine has

20   some significant protection in preventing that jump.

21           Instead, the studies that have been done lump

22   together pneumococcal meningitis with other invasive

23   forms of pneumococcal disease which are fundamentally

24   different because they don't involve that blood-brain

25   barrier jump.

```
 1                       CROSS-EXAMINATION

 2   BY MS. RETTS:

 3   Q.  Dr. Young, could you please give us a synopsis of your

 4   educational background?

 5   A.  Yes.  I graduated from Princeton University in 1960;

 6   from the Harvard Medical School in 1964; and I did my

 7   internship and residency in the Cornell program in New York

 8   City from 1964 to 1967.

 9            I spent two years at the Centers for Disease

10   Control, the CDC, from 1967 to 1969.  And from 1969 to

11   1970, I took a year of infectious disease fellowship at the

12   Memorial Sloan-Kettering Cancer Center, after which I

13   joined the staff of the Memorial Sloan-Kettering Cancer

14   Center.

15   Q.  And can you give us a synopsis of the positions that

16   you have held during your career where you have treated

17   patients for infectious diseases?

18   A.  Yes.  From 1970 to 1972, I was on the staff of the

19   Infectious Disease Service at Memorial Sloan-Kettering

20   Cancer Center.  From 1972 to 1985, I was on the faculty of

21   the UCLA School of Medicine, where I was an assistant

22   associate and then full professor of medicine.

23            And since 1985, I've been in San Francisco.  From

24   1985 to the year 2000, I was chief of the Division of

25   Infectious Diseases at California Pacific Medical Center,
```

1    and clinical professor of medicine at the University of

2    California, San Francisco.

3    Q.  Could you tell us what your duties were while at the

4    CDC?

5    A.  Yes.  I was a member of the special pathogens unit,

6    which had responsibility for diseases such as meningococci

7    influenza and tularemia.

8    Q.  Can you tell us what your duties were when you were the

9    chief of the Division of Infectious Diseases at the

10   California Pacific Medical Center?

11   A.  I was responsible for the consultation services in

12   infectious diseases; the teaching of medical students,

13   residents, and fellows; as well as in-patient

14   consultations, both in medicine and in surgery, for

15   problems of infectious disease.

16   Q.  In your professional experiences where you have treated

17   patients, have you treated patients who have had

18   pneumococcal infections?

19   A.  Absolutely.

20   Q.  Have you treated patients who have had pneumococcal

21   meningitis?

22   A.  Yes.

23   Q.  Have you treated patients who have had pneumonia?

24   A.  Yes.

25   Q.  You also have been involved in research on infectious

1    diseases; is that correct?

2    A.  That is correct.

3    Q.  And can you give us a synopsis of the research that you

4    have done that relates to pneumococcus?

5    A.  Right.  Well, I was interested, in the first part of my

6    career, in Gram-negative sepsis, and in particular the

7    sharing of antigens, or parts of the outercoat of the layer

8    of the germ, of the pneumococcus as well as a germ called

9    Klebsiella pneumoniae.  We published several studies of

10   what's called the cross-reaction.

11           I have been interested in sepsis, sepsis

12   syndrome, Gram-negative sepsis, and there are similarities

13   and there are differences between that and pneumococcal

14   disease.

15   Q.  Did Mr. Jaramillo have sepsis?

16   A.  Yes.

17   Q.  Have you written research papers specific to

18   meningococcal disease?

19   A.  Yes.  You mean pneumococcal disease?

20   Q.  Pneumococcal disease.  Sorry.

21   A.  Yes.

22   Q.  Have you written research papers specific to

23   meningitis?

24   A.  No.

25   Q.  Have you conducted your own independent research

1   relative to pneumococcus?

2   A.  Not independent research.  I've used the vaccine, but I

3   haven't been part of any independent research effort.

4   Q.  In your teaching capacities, have you instructed

5   students relative to the treatment of patients who have

6   pneumococcal meningitis?

7   A.  Yes.

8   Q.  Have you, in your teaching capacities, taught students

9   relative to the treatment of patients who may have other

10  pneumococcal illnesses?

11  A.  Yes.

12  Q.  To help us get a better understanding of what

13  pneumococcal meningitis is, can you explain the disease

14  process of how a pneumococcal infection can progress to

15  pneumococcal meningitis?

16  A.  Right.  Right.  What you need for pneumococcal

17  meningitis is what's known as a focus.  There has to be a

18  part of the body where the germ enters the bloodstream.

19  This can be anywhere in the respiratory tract.  So the

20  pneumococcus is the respiratory pathogen.

21          And when we say "the respiratory tract," we're

22  saying the lungs, the sinuses, the ears.

23          The organism crosses into the bloodstream of the

24  patient and then circulates in a process which is called

25  bacteremia.  All that "bacteremia" stands for is meaning

1    bacteria in the blood.

2           There is what is known as the blood-brain

3    barrier, the barrier between the bloodstream and the

4    cerebral spinal fluid which circulates around the brain.

5           The germ has to cross the blood-brain barrier.

6    It --

7           MS. CURTIS:  Your Honor, at this time I would

8    like to object.

9           THE COURT:  Just a minute, Doctor.

10          MS. CURTIS:  I would like to object that the

11   opinion testimony that Dr. Young is entering into right now

12   is not only not in his report, but also not in his

13   deposition and not in his expert witness designation.  And

14   so we'd move to strike him based on what he was offered to

15   testify about, as well as what he stated in his report and

16   what he stated in his deposition.

17          And so this new line of expert testimony is

18   inappropriate, and I would ask that he not be allowed to

19   proceed.

20          THE COURT:  Counsel?

21          MS. RETTS:  I would disagree with that

22   characterization, Your Honor.  It is adequately covered in

23   Dr. Young's report, and this is the basic foundation for

24   the scientific issues in this case.  And, in fact, in Dr.

25   Young's deposition, and I'll cite pages, he has given

```
1    testimony on Page 26 relative to pneumonia and its relation
2    to invasive pneumococcal disease.  He has given statements
3    about how it is unlikely that there would be any effect on
4    a patient, any effect of a vaccine on a patient when
5    there's no underlying evidence that there is any effect on
6    pneumonia because pneumococcal meningitis is a different
7    entity.
8             That counsel chose not to question him further on
9    that is not a non-disclosure issue.
10            THE COURT:  Overruled.
11            I think when you left off, Doctor, we were
12    talking about the blood-brain barrier.
13    A.  Yes.  The blood-brain barrier is the barrier between
14    the bloodstream and the cerebral spinal fluid.  Now,
15    meningitis refers to an inflammation of the lining of the
16    brain.  The meninges are the membranes which encase the
17    brain and the spinal cord.
18            So when you have meningitis, you have infection
19    of the layer that covers the brain and of the cerebral
20    spinal fluid.
21    Q.  And there's a difference between viral meningitis and
22    bacterial meningitis, correct?
23    A.  Absolutely.  Viral meningitis is usually benign,
24    self-limited, and there's only one form that can be treated
25    medically with antibiotics.
```

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1    Q.   And what we're talking about in this case is a

2    bacterial meningitis, correct?

3    A.   Absolutely.   Bacteria are the creatures which

4    penicillin-type drugs will target.

5    Q.   Is pneumonia the most common precursor of pneumococcal

6    meningitis?

7    A.   Yes.

8    Q.   Have there been research articles or data published

9    that support that?

10   A.   Yes.

11   Q.   Is there any research, either in a clinical trial or a

12   cohort study, that shows that -- strike that.

13            Is there any research that has been done, in a

14   clinical trial or a cohort study, specific to whether the

15   vaccine at issue in this litigation prevents pneumococcal

16   meningitis?

17   A.   No.

18   Q.   Now, opposing counsel asked you several questions about

19   research trials, but you also agree that there is no cohort

20   study supporting efficacy of Pneumovax 23 in preventing

21   pneumococcal meningitis specifically in a diabetic

22   population?

23   A.   That is my position.

24            MS. CURTIS:   I object, Your Honor.

25            THE COURT:   Just a moment.   Hold on.   Before you

1    answer, Doctor, let me hear the objection.

2              MS. CURTIS:  I'm just going to object.  I mean,

3    counsel is leading the expert, as opposed to asking

4    questions that are non-leading.

5              THE COURT:  Rephrase your question, counsel.

6    Q.  (By Ms. Retts)  Dr. Young, you were asked some

7    questions about research trials and your opinions as they

8    relate to research trials.  When you considered your

9    conclusions and opinions in this case, did you look for

10   data other than that generated from controlled research

11   trials?

12   A.  Right.  I looked for all the data that was available to

13   indicate that patients with underlying diabetes were

14   protected by Pneumovax, and could find no evidence for

15   that.

16             MS. RETTS:  I don't have any further questions,

17   Your Honor.

18             THE COURT:  Okay.  Ms. Curtis, before you do

19   that, let me talk to my staff for just a moment.

20             MS. CURTIS:  Yes.

21             THE COURT:  Just hold on, Doctor.

22             THE WITNESS:  Okay.

23             (A discussion was held off the record between the

24             Court and Courtroom Deputy Carol Bevel.)

25             THE COURT:  Okay.  Ms. Curtis?

1              MS. CURTIS:  Thank you, Judge.  Dr. Young, can

2     you hear us?

3              THE COURT:  We're back on the record.  Can you

4     hear us all right?

5              THE WITNESS:  Yes, I can hear you fine, Judge.

6              THE COURT:  All right.  Let's continue.

7              MS. CURTIS:  I could tell, somehow, he wasn't

8     with us.

9              THE COURT:  That's because the Judge forgot to

10    push the button.  That does happen.  But it is not a "Send"

11    button.

12             MS. CURTIS:  Yes.

13                    REDIRECT EXAMINATION

14    BY MS. CURTIS:

15    Q.  Dr. Young, you just said a few moments ago to opposing

16    counsel that there is no evidence of the protective effect

17    of the pneumococcal vaccine on diabetics?

18    A.  Correct.

19    Q.  That's not completely accurate, correct?  I believe

20    your testimony earlier was that you recognize the Cochrane

21    study included diabetics, and that the finding of that

22    study was that pneumococcal vaccine was protective?

23    A.  Right.  But there was -- the diabetic population wasn't

24    singled out in that Cochrane analysis.

25    Q.  Right.  But you do admit that there is some evidence

1    that pneumococcal vaccine is protective, as stated in the

2    Cochrane study which included diabetics?

3    A.  No, I disagree with that.  I don't think the diabetic

4    population was specifically subgroup analyzed in the

5    Cochrane study.

6    Q.  I didn't say that they were subgroup analyzed.

7    A.  Well, diabetics are a subgroup.

8    Q.  Just a moment.  Doctor, just a moment.  Let me ask you

9    a question.  My question was not limited to whether

10   diabetics were subgroup analyzed in the Cochrane study.

11          My question was:  There is some evidence, in

12   fact, that pneumococcal vaccine is protective in

13   diabetics, because diabetics were included in the Cochrane

14   study?

15   A.  I disagree with that.  Just because diabetics were

16   included in the Cochrane study doesn't mean that they, as a

17   specific risk group, were specifically protected.  There is

18   no evidence for that.

19          That's like saying there were women in the

20   Cochrane study; and therefore, women were specifically

21   protected.  The analysis wasn't done in that manner.

22   Q.  But women are specifically protected by the

23   pneumococcal vaccine, right?

24   A.  No, they're not.

25   Q.  Even though probably half the --

```
 1    A.   In that --

 2    Q.   Just a moment.

 3    A.   In that Cochrane analysis --

 4    Q.   Just a minute, Dr. Young.

 5    A.   -- they're not protected.  They weren't -- there was

 6    not a specific analysis by sex.

 7    Q.   Okay.  I think we understand your point.  I want to

 8    address a couple of issues that counsel talked to you about

 9    concerning your history.  I believe you and I went over

10    these a little bit.

11         The last pneumococcal study that you were

12    involved in was in 1979, correct?

13    A.   Correct.

14    Q.   Pneumococcal infections after bone marrow

15    transplantation?

16    A.   Correct.

17    Q.   You would agree since 1979, which would have been 34

18    years ago, there have been quite a few advances in the

19    treatment of infectious disease?

20    A.   I agree with that.

21    Q.   And even in the last 13 years there have been many --

22    during the time you haven't been a practicing infectious

23    disease physician, there have been many advances in the

24    treatment of infectious disease, even invasive pneumococcal

25    disease?
```

1    A.  Well, there certainly have been advances, but as far as

2    the vaccine is concerned, the polysaccharide vaccine is the

3    same one as from the 1970s.

4    Q.  The polysaccharide vaccine that is the one that's

5    PPV-23, the CDC determined that that was to be given to

6    diabetics in 1997, right?

7    A.  I believe that's the recommendation, yes.

8    Q.  So in 1997, as an infectious disease physician, you

9    would have given the pneumococcal vaccine to your diabetic

10   patients?

11   A.  Yes.

12          MS. CURTIS:  Your Honor, at this time I would

13   cease questioning Dr. Young, although I do have some

14   additional argument.

15          THE COURT:  I've got a couple questions here,

16   Doctor.  Just give me a moment here.

17          During your practice and at any time you may have

18   been training or educating students, did that include

19   training involving patients who had both diabetes and

20   pneumonia?

21          THE WITNESS:  Yes.

22          THE COURT:  And the same question with respect to

23   your training.  Did that ever involve patients who had both

24   diabetes and pneumococcal meningitis?

25          THE WITNESS:  Yes.


                   JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                          333 Lomas Boulevard, Northwest
                          Albuquerque, New Mexico  87102

1              THE COURT:  All right.  Those are my two

2    questions.  In light of those, are there any follow-up

3    questions from either attorney?

4              MS. RETTS:  No, Your Honor.

5              THE COURT:  Ms. Retts?  All right.  Ms. Curtis,

6    anything further?

7              MS. CURTIS:  I just have one question, Your

8    Honor.

9              THE COURT:  That's fine.

10                      FURTHER EXAMINATION

11   BY MS. CURTIS:

12   Q.  So, Dr. Young, just a moment ago I asked you whether

13   you gave patients, 13 years ago, the pneumococcal

14   vaccine.

15   A.  I'm sorry.  Could you just speak up a little bit

16   louder?

17   Q.  Dr. Young, you do have a slight hearing issue, don't

18   you?  I'd forgotten.

19   A.  Well, I can just hear you now, but if you could repeat

20   the question.

21   Q.  Yes, sir.  A few minutes ago I asked you whether you

22   gave the pneumococcal vaccine to diabetics when you were in

23   practice.

24   A.  The answer is "Yes."

25   Q.  All right.  I just wanted to make sure that I

1      understood.

2                    MS. CURTIS:  Thank you.

3                    THE COURT:  I have one other question.

4                    Would you describe for me what you have been

5      doing in the last 13 or so years with respect to the work

6      that you do?

7                    It wasn't clear to me whether the work that

8      you're doing now you believe in any way relates to

9      your having considered this particular case and made

10     the recommendations and the opinions that you have

11     given.

12                   THE WITNESS:  Right.  Well, the work that I've

13     been doing in the laboratory has been with a germ called

14     mycobacterium avium complex.  It occupied approximately

15     50 percent of my time and was entirely supported by the

16     National Institutes of Health, part of the AIDS treatment

17     program.

18                   And then the remaining of the time, 40 percent, I

19     was editor of a journal called Antimicrobial Agents and

20     Chemotherapy, which is the world's leading journal in the

21     field of antibiotics.

22                   The remaining 10 percent of my time I spent on

23     hospital committees.

24                   THE COURT:  Okay.  Anything further, counsel, of

25     Dr. Young?

```
1                    MS. CURTIS:  No, thank you.

2                    THE COURT:  Ms. Retts?

3                    MS. RETTS:  No.

4                    THE COURT:  Doctor, I will excuse you at this

5        time.  Thank you very much.

6                    THE WITNESS:  Thank you.  Goodbye.

7                    THE COURT:  All right.  Goodbye.

8                    THE WITNESS:  Goodbye.

9                    THE COURT:  Have a good day.

10                   THE WITNESS:  You, too.

11                   (The witness' phone was disconnected.)

12                   THE COURT:  Okay.  We have that humming noise

13       there.

14                   (A discussion was held off the record between the

15                   Court and Courtroom Deputy Carol Bevel.)

16                   THE COURT:  All right.  Counsel?

17                   MS. CURTIS:  Yes, Your Honor.

18                   THE COURT:  Go ahead, Ms. Curtis.

19                   MS. CURTIS:  Your Honor, quickly, I just wanted

20       to finally address that the questioning of Dr. Young is

21       evidence of the reason why we made the challenge to begin

22       with.

23                   He wants a level of proof that does not exist,

24       and cannot be met, and is not an appropriate level for

25       causation opinion.
```

1            He admitted that the CDC, the ACIP, all require

2     that there be vaccination of diabetics.  He said that the

3     case controlled studies, like the Cochrane study, which is

4     the basis for Dr. Martin's opinion, is a reasonable basis

5     for public health decisions on vaccination and clinical

6     medicine.

7            And, finally, he said that he, himself, when he

8     was in clinical practice 13 years ago, vaccinated diabetics

9     with the pneumococcal vaccine.

10           These are all reasonable things to do, and they

11    would be reasonable cross-examination questions if I had a

12    bunch of medical researchers sitting on the jury, but I'm

13    not going to.  I'm going to have a bunch of lay people that

14    won't understand the difference between what he is saying

15    about specific studies being honed in on a very, very

16    specific population.

17           You heard Dr. Young testify that he doesn't

18    believe the Cochrane study proves that women should be

19    vaccinated with pneumococcal vaccine, although it had

20    18,000 people, which he understands includes women.  All

21    right?

22           This need for tremendous specificity, which is

23    not needed by any public health organization in the world,

24    is unreasonable.  And it's misleading, is my biggest

25    concern about that testimony, is that juries are easily

1    misled by a very strong opinion by someone who is not

2    following our burden requirements.

3              And so this is my issue with his testimony.

4              It's not that he's not a very qualified medical

5    researcher.  It's that his testimony -- his not being in

6    the field for 13 years means he has no personal experience

7    with it.  And two, that he is requiring a different level

8    of research.

9              Also, he literally disavowed his own two bases,

10   medical bases for his testimony, which is the Simberkoff

11   and the Ortquist articles, saying that they only dealt with

12   pneumonia, not invasive pneumococcal disease.

13             So it's the misleading nature of his emphatic

14   testimony that I don't believe.

15             And the reason that we have Daubert hearings like

16   this is that the Court can analyze these very intricate

17   research issues much better than a lay jury.

18             And so it's that emphatic refusal to take what

19   evidence exists for everyone else that makes vaccination

20   decisions, including himself, in the clinical setting, and

21   transfer those to a causation opinion.

22             And so it's the misleading nature of the

23   testimony is the reason for the Daubert motion, Your

24   Honor.

25             THE COURT:  All right.

1              MS. CURTIS:  Thank you.

2              THE COURT:  Counsel?

3              MS. RETTS:  Your Honor, I think it's important to

4     note this continued blurring between the standard of care

5     and causation.

6              We have cases all across this country that deal

7     with drugs in a medical arena, where the treating

8     physician's opinion relative to the standard of care may be

9     different than the underlying causation and data and

10    evidence relative to drug efficacy.

11             Certainly public health decisions are not

12    necessarily made upon the same standard of causation that's

13    required for proof in this case.

14             This also brings up this important issue about

15    the serotype which plaintiff continues to believe is

16    irrelevant in this case.  But all of the studies that we're

17    talking about still deal only with serotypes included in

18    the vaccine.

19             So this is another issue here, and Dr. Young

20    needs to be able to explain that there simply is no data of

21    any sort.  There's no randomized clinical trial, and the

22    reliance upon a randomized clinical trial is not Dr.

23    Young's; it's plaintiff's counsel's questioning and

24    focusing in solely on that, in directing him back solely to

25    that, to the exclusion of the other basis for that opinion,

1          which is, in his report he cited to medical literature, he

2          cited to research articles.

3                    And the fact that different medical experts come

4          to different conclusions based upon research, when the

5          research has specific limitations in it, goes to the weight

6          of the evidence, not the admissibility.

7                    Certainly there are letters after the Cochrane

8          study, indicating challenges to its analysis.  And as

9          Dr. Young pointed out, those specific subgroups have not

10         been studied in any type of retroactive cohort study, any

11         type of analysis other than even the randomized clinical

12         trial.

13                    And I think it's really important to note that

14         distinction, because it creates the problem of confusing

15         the jury in the other sense, of saying, just because

16         there is a policy on this, that causation is necessarily

17         proven.

18                    Those two things are not mutually exclusive.  And

19         the example I would give of that is the CDC's recent

20         recommendation relative to hepatitis testing, hepatitis C

21         in particular, recommending that adults over the age of, I

22         believe it's 55, all be tested for hepatitis C.

23                    Well, we certainly all know that hepatitis C is

24         based upon, usually, some risky form of behavior, risky

25         sexual behavior, risky drug-using behavior.  Certainly it's

1   not believed that the whole population of folks over 55 has

2   engaged in that type of behavior, such that the standard of

3   care is that they are all tested regardless of their

4   underlying risk factors.

5        But that illustrates, I think, nicely this idea

6   that a public health policy is necessarily over-protective.

7   It's necessarily maybe broader than the underlying data

8   that would support causation.

9        And that can get confusing, which is why Dr.

10  Young's testimony is necessary to explain the scientific

11  analysis for the disease process, explain the meningitis,

12  how it differs from pneumonia, but how it is actually most

13  commonly based on pneumonia, and you need that blood-brain

14  barrier jump to explain all these facets that play into

15  this case, other than just a blanket policy or a

16  recommendation, which we know from the course of medical

17  practice, those things change over time.

18       And they change over time because of medical

19  research that's been done or data that exists to support

20  things.

21       THE COURT:  Is it relevant at all to that last

22  series of remarks, that he has not been doing the same work

23  that he had been doing for the last 13 or so years?

24       MS. RETTS:  The underlying pneumococcal bacteria

25  has not changed.  The bacteria is the bacteria.  So

1    when Dr. Young was treating patients, the pneumococcal

2    bacteria caused meningitis in the same way that it does

3    today.

4            THE COURT:  Right.  But in terms of his

5    involvement in any recent research?

6            MS. RETTS:  Dr. Young has done --

7            THE COURT:  He's doing something very different

8    now than he was doing 13 years ago.

9            MS. RETTS:  But specific to the research that he

10   does, what I think is important in that, as a medical

11   researcher, he has the expertise to be able to look at

12   research studies and critically analyze them.

13           THE COURT:  I tried to elicit that from him.

14   That's why I asked those two questions at the end.  And he

15   didn't say very much.

16           MS. RETTS:  Yeah.

17           THE COURT:  And nobody followed up on it.

18           MS. RETTS:  I believe that that's in his

19   deposition testimony, which I thought was attached to the

20   Daubert motion.

21           THE COURT:  It is.  Yes.

22           MS. RETTS:  Was the fact that, you know, as part

23   of a researcher's job, he is developing these studies.

24   He's going through and looking very scientifically at these

25   types of things.

1           So that's an underlying skill set that he has

2      that's different from just a clinical practitioner, to go

3      through and take a look at research that's been done and

4      make conclusions about that research.

5           THE COURT:  Okay.  I understand.  All right.

6           Ms. Curtis, anything further?

7           MS. CURTIS:  If I could just -- I just wanted to

8      say one thing, because it was raised, Your Honor, if I

9      may?

10           I do have a new cuss word in my repertoire.  It's

11      called "serotype."  That word just sends fits.

12           Dr. Young said absolutely not a single word about

13      serotype, Your Honor.  And if you'll notice in the

14      exhibits, at Page 59 --

15           THE COURT:  Okay.  Hold on.  Hold on.  Let me

16      look it up here.  All right.  Go ahead.

17           MS. CURTIS:  I asked:  "I asked you whether

18      you've been engaged by the defendants to give an expert

19      opinion at trial in this case regarding serotypes."

20           THE COURT:  Page 59, you said?

21           MS. CURTIS:  I'm sorry.  It's Page 61 of the

22      deposition.

23           THE COURT:  All right.

24           MS. CURTIS:  Which, of course, is four to a page,

25      so 61 is that last page on the right.

1                    THE COURT:  Okay.  Hold on.

2                    MS. CURTIS:  You bet.

3                    THE COURT:  Talking about Dr. Young's deposition?

4                    MS. CURTIS:  Yes, Your Honor.

5                    THE COURT:  And it's Page 61?

6                    MS. CURTIS:  Yes.

7                    THE COURT:  And we're talking about the exhibit

8      that's attached to the defendants' response?

9                    MS. CURTIS:  Your Honor, I have an actual copy of

10     the deposition.

11                   THE COURT:  Because I'm not looking -- I don't

12     see a 61 on the attachment.

13                   MS. CURTIS:  You know, it may be in the serotype

14     motion in limine.

15                   THE COURT:  Okay.  Go ahead and put it on the

16     ELMO if you want.

17                   MS. CURTIS:  Yes, yes, yes.  That's a great idea.

18                   THE COURT:  It's not in the motion.  All right.

19     And you can make it smaller with the push of a button on

20     there.  All right.

21                   MS. CURTIS:  "I asked you whether you've been

22     engaged by the defendants to give an expert opinion at

23     trial in this case regarding serotypes."

24                   "THE WITNESS:  The answer is that's never come up

25     in this case."


JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1            And I said:  "Okay, that's fine.  I -- just an
2    area I needed to ask you whether that's an issue or not.
3    But I didn't see anything in your report concerning
4    serotypes."
5            I said:  "That's correct, right?"
6            And he said:  "That's correct."
7            Then here at Line 12 --
8            THE COURT:  Just go ahead and move it over there.
9    There we go.
10           MS. CURTIS:  Line 12:  "So I just want to know
11   that you're not going to testify about serotypes for
12   invasive pneumococcal disease in New Mexico."
13           "ANSWER:  I have no information on that, if
14   that's your question."
15           All right.  So Dr. Young -- I'm not sure why
16   defense counsel raised the serotype issue.  I just wanted
17   to make sure that we are very clear, because I didn't ask
18   any of those questions of him.  That's not an area of
19   testimony for Dr. Young.
20           THE COURT:  All right.  Anything further?
21   Anything, Ms. Retts?
22           MS. RETTS:  Your Honor, I would just address that
23   Ms. Curtis did raise the serotype issue with Dr. Young in
24   her questioning of him, which is why I brought it up.  And
25   his testimony was that we don't know the serotype, which a

1    lot of those serotype issues are actually affirmatively

2    established through the request for admissions.

3            THE COURT:  Okay.  Ms. Retts had indicated that

4    there was, in her remarks here, which she termed, if I have

5    it correctly here, a blurring of or between the standard of

6    care and causation.

7            What would be your response to that, Ms. Curtis?

8            MS. CURTIS:  Yes.  When I heard that argument, I

9    don't believe there's any blurring between the standard of

10   care and causation.

11           I'm talking about the burden of proof.  The

12   burden of proof for causation is that it is more likely

13   than not that the failure to give pneumococcal vaccine was

14   the cause of Jose Jaramillo's invasive pneumococcal

15   disease.

16           That's what I'm talking about.  I'm not blurring

17   the standard of care.

18           Obviously, the issue is relevant, that Dr. Young

19   is testifying that he doesn't believe that there's

20   sufficient medical research to support the causation

21   opinion that pneumococcal vaccine would stop invasive

22   pneumococcal disease in a diabetic.

23           However, he chose to do it.  He chose to do it to

24   his own patients, although today in court he's testifying

25   that there's no reason to believe that it would have any

1      effect.

2              I mean, so from that perspective, that's not a

3      standard of care issue.  That's literally just an

4      impeachment issue.  If you don't believe that there's any

5      effect, why would you give it to your patients?

6              So the protective effect issue is merely for

7      impeachment.

8              But no, my whole issue is about burden of proof

9      and causation.  Causation cannot be proven, Your Honor, by

10     the standard that is required by Dr. Young.  That is an

11     undue standard of care.

12             He just won't -- he will not cite to the

13     resources that show this is an effective vaccine.  He just

14     denies that and requires a level of proof that is

15     unreasonable and does not exist.

16             So that's why standard of care and causation are

17     not blurred.

18             THE COURT:  Okay.  All right.  Is there anything

19     further, then, on this motion here before we talk about

20     scheduling?

21             MS. CURTIS:  No, Your Honor.

22             MS. RETTS:  No, Your Honor.

23             THE COURT:  Okay.  And I take it there's nothing

24     the parties wish me to consider, other than, obviously, the

25     deposition testimony that's attached?

1          We don't have any reports or anything like we did

2    this morning?

3          MS. CURTIS:  I don't believe so, Your Honor.

4          THE COURT:  All right.  That's what I need to

5    know.

6          The matter is under advisement.

7          Let's talk about scheduling.  Do you want this on

8    the record?  I don't think that we need to be on the record

9    for this.  Julie, we'll conclude this hearing, and we are

10   off the record.

11          (Proceedings concluded at 3:10 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

```
 1    UNITED STATES OF AMERICA

 2    DISTRICT OF NEW MEXICO

 3

 4                    CERTIFICATE OF OFFICIAL REPORTER

 5                    I, Julie Goehl, RDR, CRR, RPR, RMR,

 6    New Mexico CCR #95, Federal Official Realtime Court

 7    Reporter, in and for the United States District Court

 8    for the District of New Mexico, do hereby certify that

 9    pursuant to Section 753, Title 28, United States Code,

10    that the foregoing is a true and correct transcript of

11    the stenographically reported proceedings held in the

12    above-entitled matter and that the transcript page

13    format is in conformance with the regulations of the

14    Judicial Conference of the United States.

15                    Dated this 21st day of March, 2014.

16

17                    _____
                      JULIE GOEHL
18                    FEDERAL OFFICIAL COURT REPORTER
                      Registered Professional Reporter
19                    Registered Merit Reporter
                      Certified Realtime Reporter
20                    NM Certified Court Reporter #95
                      333 Lomas Boulevard, Northwest
21                    Albuquerque, New Mexico  87102
                      Phone:  (505)348-2209
22                    Fax:  (505)348-2215

23

24

25
```