**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**F. MICHAEL HART, Guardian ad**
**Litem for JOSE JARAMILLO, an**
**incapacitated person,**

        Plaintiff,

        vs.                    **No. 2:11-CV-00267-MCA-WPL**

**CORRECTIONS CORPORATION OF**
**AMERICA, a Foreign Corporation,**
**CIBOLA COUNTY**
**CORRECTIONAL CENTER, WALT**
**WELLS, WARDEN, and RODDIE**
**RUSHING, WARDEN,**

        Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

      **THIS MATTER** is before the Court on *Defendants' Motion for Summary Judgment* [Doc. 129]. Having considered the parties' submissions, the relevant case law, and otherwise being fully advised in the premises, the Court will grant in part and deny in part *Defendants' Motion for Summary Judgment* [Doc. 129].

**I.**    <u>**BACKGROUND**</u>

      The following facts are undisputed for the purpose of *Defendants' Motion for Summary Judgment* [Doc. 129]. Mr. Jaramillo was an agricultural laborer in Hatch, New Mexico, when he was arrested for the crime of Reentry of Removed Alien in violation of 8 U.S.C. § 1326(a)(1)(2) and 8 U.S.C. § 1326(b)(2). <u>See United States v. Jaramillo-Frias,</u> 2:06-CR-02304-JAP, Doc. 15 (D.N.M. February 6, 2007). Mr. Jaramillo pled guilty and

was sentenced to thirty-three months of incarceration.  Id.  He began serving his sentence at the Cibola County Correction Center (CCCC), which is operated by the Corrections Corporation of America (CCA).

On June 20, 2007, June Kershner, a certified nurse practitioner at CCCC, performed an intake physical examination on Mr. Jaramillo.  During the physical examination, nurse Kershner diagnosed Mr. Jaramillo with the new onset of Type 2 diabetes.  [Doc. 129-2 (Ex. H); Doc. 138 (Ex. 3)]  Despite his diabetes diagnosis, Mr. Jaramillo did not receive the Pneumovax 23 vaccine, which protects against pneumococcal disease, even though the Federal Bureau of Prisons (BOP) Clinical Practice Guidelines in effect at that time recommended that the pneumococcal vaccine be administered to all inmates with diabetes mellitus.  [Doc. 129-1 (Ex. G)] Defendant CCA did not require the pneumococcal vaccine to be administered to diabetic patients until April of 2011.  [Doc. 129-2 (Ex. H) at 7-8, 12]

On May 22, 2008, Mr. Jaramillo was again seen by nurse Kershner.  Observing that he had "flu like symptoms" and a "sudden change in mental status," nurse Kershner summoned an ambulance, which transported Mr. Jaramillo to Cibola General Hospital. [Doc. 141 (Ex. 6) at 5]  He was subsequently transferred to Lovelace Women's Hospital in Albuquerque, New Mexico, where he was diagnosed with sepsis from pneumococcal meningitis.  [Doc. 137 at 6; Doc. 141 (Ex. 17)]  Thereafter, Mr. Jaramillo was transferred to the Federal Medical Center in Rochester, Minnesota, where he was diagnosed with "cognitive impairment secondary to pneumococcal meningoencephalitis."  [Doc. 141-1 at 3 (Ex. 18)]  In December of 2010 Mr. Jaramillo was released to a nursing home in Las

Cruces, New Mexico, where he remains today.

On February 15, 2011, Mr. Jaramillo's Guardian ad Litem (Plaintiff) filed a *Complaint to Recover Damages for Personal Injuries Arising from Medical Malpractice* against CCCC, CCA, Warden Walt Wells and Warden Roddie Rushing (Defendants) in the Second Judicial District of the State of New Mexico.  [Doc. 1-1]  Defendants removed the case to this Court on the basis of diversity jurisdiction.  [Doc. 1]

On May 15, 2013, Defendants filed *Defendants' Motion for Summary Judgment*. [Doc. 129], arguing that they are entitled to summary judgment on Plaintiff's medical malpractice claim because: (1) if Defendants' *Daubert* motions challenging Plaintiff's expert witnesses are granted, then the evidence will be insufficient to establish causation and damages; (2) the evidence is insufficient to establish that administration of the Pneumovax 23 vaccine would have prevented Mr. Jaramillo from contracting pneumococcal meningitis; (3)  the evidence is insufficient to establish that there was a delay in the diagnosis or treatment of Mr. Jaramillo's pneumococcal meningitis; (4) Plaintiff did not timely disclose his claim of inadequate staffing in violation of Fed. R. Civ. Proc. 26(a)(2)(B); (5) there is no basis for individual liability against Wardens Wells and Rushing because they were not personally involved in the medical decisions regarding Mr. Jaramillo's care; and (6) the evidence is insufficient to support an award of punitive damages.

## II.   STANDARD

Summary judgment under Fed. R. Civ. P. 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).  When a motion for summary judgment is made and supported as provided in this rule, the adverse party must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed.R.Civ.P. 56(c)(1).  Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324.  It is not the court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  Id.

## III.    DISCUSSION

### A.      Fed. R. Civ. P. 56 and D.N.M.LR-Civ. 56.1

As an initial matter, Plaintiff contends that Defendants' motion for summary judgment should be denied summarily because it fails to set forth "a concise statement of material facts as to which the Defendants contend a genuine issue does exist" in violation of Fed. R. Civ. P. 56 and it "fails to number each fact it contends is not in dispute" in violation of D.N.M.LR-Civ. 56.1(b).  [Doc. 137 at 4]  Although Defendants have a separate section of their memorandum entitled "undisputed facts," they do not number the undisputed facts in accordance with the local rules.  See D.N.M.LR-Civ. 56.1(b). D.N.M.LR-Civ. 1.7 provides that the local rules "may be waived by a Judge to avoid injustice."  The Court concludes that justice and judicial economy would best be served by waiving the violation of the local rules and addressing the merits of *Defendants' Motion for Summary Judgment*, and streamlining the issues to be litigated at trial. Accordingly, *Defendants' Motion for Summary Judgment* will not be denied summarily.

B.      *Daubert Motions*

Defendants contend that they are entitled to summary judgment because the testimony of Plaintiff's expert medical witnesses should be excluded for the reasons explained in their pending *Daubert* motions.  [Doc. 129 at 6-7]  The merits of Defendants' *Daubert* motions will be addressed in separate rulings.

C.      *Sufficiency of the Evidence Regarding Pneumovax 23*

Defendants next contend that they are entitled to summary judgment because the evidence is insufficient to establish causation, specifically, that the failure to administer the Pneumovax 23 vaccine was the proximate cause of Mr. Jaramillo's injuries.  Noting that Plaintiff's claim is governed by the "lost chance" theory of medical malpractice,

Defendants argue that the absence of evidence regarding the serotype contracted by Mr. Jaramillo, and whether it was one of the twenty three serotypes against which the vaccine protects, is fatal to Plaintiff's claim.  [Doc. 129 at 7-11]  Plaintiff responds that "[t]his is not a loss of chance case" and that the expert testimony of Dr. David Martin is sufficient to establish proximate causation.

As a preliminary matter, the question of whether Plaintiff's medical malpractice claim is governed by the "lost chance" theory of recovery is addressed.  In <u>Alberts v. Schultz</u>, 975 P.2d 1279 (N.M. 1999), the New Mexico Supreme Court recognized the loss of chance theory of recovery in medical malpractice cases.  The Court explained that "[g]enerally, the fact pattern in a lost-chance claim begins when a patient comes to a health giver with a particular medical complaint."  <u>Id.</u> at 1282.  The medical complaint, or presenting problem, is "[t]he illness, disorder, discomfort, pain, fear, etc. that is the main reason for the patient's seeking medical help."  <u>Id.</u>  "A claim for loss of chance is predicated upon the negligent denial of a healthcare provider of the most effective therapy for a patient's presenting medical problem."  <u>Id.</u>  "The essence of a patient's claim is that, prior to the negligence, there was a chance that he or she would have been better off with adequate care."  <u>Id.</u>  "Under the loss-of-chance theory, the health provider's malpractice has obliterated or reduced those odds of recovery that existed before the act of malpractice."  Id.

> Ultimately, the patient may suffer the consequences of the presenting medical problem.  However, under the lost-chance theory, the patient does not allege that the malpractice caused his or her entire injury.  Rather, the claim is that the health care provider's negligence reduced the chance of avoiding the injury actually sustained.. . . Thus, it is that chance in and of

> itself—the lost opportunity of avoiding the presenting problem and achieving a better result—that becomes the item of value for which the patient seeks compensation.

Id. at 1283.

Because "vaccines are a preventative form of medicine," Defendants argue that "their inclusion as the basis for medical negligence cases poses serious problems of causation." [Doc. 129 at 8 n.5] Defendants do not concede that "this case is even suitable for a 'lost chance' theory," since Mr. Jaramillo did not seek medical intervention for a particular medical complaint, but nonetheless contend that the present "[m]otion is controlled by" the lost chance doctrine. [Doc. 129 at 8, 8 n.5] Plaintiff responds that a "plain reading of the [C]omplaint, (Docket No. 1) shows that this case is not a case brought under the loss of chance claim as Plaintiff is not alleging a reduced chance of avoiding injury," but rather that Defendants' "malpractice caused Jose Jaramillo's entire injury." [Doc. 137 at 15]

Although Plaintiff's Complaint does not use the words "loss of chance" or "lost chance," the allegations in his complaint are consistent with a loss of chance theory of recovery. Plaintiff contends that Mr. Jaramillo's injuries could have been "reasonably prevented" if he had been given the pneumococcal vaccine in accordance with BOP guidelines and if he had been appropriately assessed, treated, and cared for after he began to exhibit symptoms of pneumococcal disease. [Doc. 1 at 10] Thus, Plaintiff contends that, due to Defendants' alleged medical malpractice, he lost an opportunity to avoid contracting pneumococcal disease and to avoid the severity of the injuries he ultimately suffered. Because the lost opportunity for a better result is the essence of a loss of chance

claim, the Court will analyze Plaintiffs' malpractice claim under the loss of chance doctrine.

"The basic test for establishing loss of chance is no different from the elements required in other medical malpractice actions, or in negligence suits in general:  duty, breach, loss or damage, and causation."  Alberts, 975 P.2d at 1284.  "*Loss of chance differs from other medical malpractice actions only in the nature of the harm for which relief is sought*."  Id. (emphasis in original).  In the present case, Defendants concede for the purpose of their motion for summary judgment, that "the failure to administer Pneumovax to Jaramillo creates an issue of fact for trial on whether the standard of care was breached." [Doc. 129 at 7]  However, Defendants contend that "[t]he glaring defect in Plaintiff's failure-to-vaccinate theory is medical causation."  [Id.]  Specifically, Defendants  contend that Plaintiff's medical malpractice claim must fail because of "the absence of any evidence that Jaramillo's infection was one of the strains covered by Pneumovax—rather than one of the 57 for which it offers no protection whatsoever." [Doc. 129 at 10]

"In order to prove proximate cause, the plaintiff must show by a preponderance of the evidence that the defendant's negligence resulted in the lost chance for a better result."  Alberts, 975 P.2d at 1286.  "The standard in New Mexico is proof to a reasonable degree of medical probability."  Id.  "The principle behind this terminology, is that, in proving causation, the plaintiff must introduce evidence that the injury more likely than not was proximately caused by the act of negligence."  Id.

> [T]he plaintiff does not have to demonstrate absolute certainty of causation, because the physician's malpractice has made it impossible to know how the patient would have fared in the absence of any negligence.  [T]he physician should not be able to avoid liability on the ground that is uncertain what the outcome would have been.

Id. (internal quotation marks and citation omitted) (second alteration in original).

To support their causation argument, Defendants rely on certain facts deemed admitted and "conclusively established" under Fed. R. Civ. P. 36(a)(3) by virtue of Plaintiff's failure to timely respond to requests for admission.  However, on September 19, 2013, the Court filed a *Memorandum Opinion and Order* granting in part Plaintiff's motion to amend his requests for admission.  [Doc. 212]  The Court permitted Plaintiff to withdraw the following requests for admission: (1) that "the Pneumovax 23 Vaccination, manufactured by Merck and available in 2007-2008, is a vaccine for pneumococcal disease caused by the 23 serotypes contained in the vaccine"; (2) that "the Pneumovax 23 Vaccination is not effective against serotypes other than the 23 serotypes"; (3) that "as of 2007-2008, the Pneumovax 23 Vaccination did not vaccinate against all serotypes of pneumococcal disease"; and (4) that "vaccination with Pneumovax 23 vaccination does not guarantee protection against contracting pneumococcal disease caused by the 23 serotypes contained within the vaccination." [Doc. 212 at 4]  In doing so, the Court noted that Plaintiff's expert witness, Dr. David Martin, testified in his deposition that "the 23-valent pneumococcal vaccine is 60 to 70 percent efficacious to prevent invasive pneumococcal disease, or in other words, bacteremic pneumococcal disease." [Doc. 135-2 at 2]  When asked whether "invasive pneumococcal disease" referred to "meningitis," Dr. Martin responded, "Yes." [Doc. 135-2 at 3]  Dr. Martin further testified that:

Well, we talked about serotyping of the organism and how there are a large number of serotypes and how relatively few of those serotypes cause serious disease. We talked about the fact that the 23-valent vaccine covers specifically 80 percent–88 percent of the serotypes that cause serious disease and another 8 percent are related to those serotypes. So the individuals have what we call cross-reactive protection against those.

Therefore, you have about 96 percent coverage of the vaccine for the serotypes of the pneumococcal bacteria that cause serious invasive disease. And then we related that to the efficaciousness. We talked about the issue that no vaccines are 100 percent. 100 percent is probably best understood by the general population through the influenza vaccine where it's well-recognized that the vaccine is recommended to prevent serious events; but often people still get the infection.

And the pneumococcal vaccine is pretty much similar to that. So people still get the pneumonia caused by the pneumococcus but by virtue of having been vaccinated they have a very significant degree of protection against the more serious consequences of the vaccine.

[Id.] Therefore, in Dr. Martin's opinion, to a reasonable degree of medical probability, if Mr. Jaramillo had been given the pneumovax vaccine, he would not have ended up with pneumococcal meningitis and "if he had developed pneumococcal meningitis, it would not have been as severe." [Doc. 166-2 at 2]

In light of Dr. Martin's testimony, the Court finds that genuine issues of material fact exist regarding causation. The facts in Alberts are distinguishable from the present case. In Alberts, the Court held that the evidence of causation was insufficient because the plaintiffs had "not demonstrated, to a reasonable degree of medical probability, that the alleged negligence of Dr. Schultz and Dr. Reddy proximately caused Dee to lose the chance of saving his leg." Id. at 1287. Notably, the plaintiffs did not have any expert medical testimony to "demonstrate that there was a window of time during which measures could have been taken to foreclose the need to amputate Dee's leg." Id. at 1288. Plaintiff's expert witness testified "*if* Dee's leg had exhibited a 'good saphenous

vein'" and "*if* he had available 'better arteriograms'" then bypass surgery probably would have been successful, id., but the medical records were incomplete so "he could not state to a reasonable degree of medical probability that immediate use of motor and sensory exams, the arteriogram, and the bypass would have increased the chances of saving Dee's leg," id. at 1281.  In contrast, in the present case, Dr. Martin is able to state, to a reasonable degree of medical probability, that if Mr. Jaramillo had been given the pneumovax vaccine, he would not have ended up with pneumococcal meningitis and, if he had developed pneumococcal meningitis, it would not have been as severe.

Matthews v. Aganad, 914 N.E.2d 1233 (Ill. App. 2009) is also distinguishable.  In Matthews, plaintiffs filed a medical malpractice suit alleging that the failure to timely administer the Pneumovax 23 vaccine resulted in endocarditis.  Id. at 1236.  The Appellate Court of Illinois held that the evidence was insufficient to establish a breach of the standard of care, since there was no "published text, treatise or article to support plaintiffs' assertion that African-Americans or those who have had prior infections are indicated to receive the vaccine."  Id. at 1240.  Additionally "all witnesses agreed that giving the vaccine was actually contraindicated in plaintiffs' [sic] case given the presence of his fever and ongoing active infection."  Id. at 1241.  Therefore, the Court held that the evidence was insufficient to establish a breach of the standard of care.  Although the Court did not need to reach the issue of causation, it nonetheless proceeded to conclude that the plaintiffs had failed to establish proximate cause because

> there was no linking causal evidence to show that plaintiff's subsequent
> 2002 infection and resulting endocarditis was more probably than not
> caused by the defendants' decision to not administer the vaccine in 2000.

> There was no lost chance because the vaccine was contraindicated in plaintiff's case at the time of his treatment. . . .
>
> Further, all witnesses agreed that the vaccine is not 100% effective. Thus, even if plaintiff had been immunized with the vaccine, he still could have gotten the 2002 infection.  More significant, we find there was no evidence that plaintiff's 2002 infection was one of the 23 strains for which the vaccine offers some protection.  Thus, even assuming *arguendo* that plaintiffs could have made a showing on breach of the duty of care, . . . this dearth of critical evidence of a causal link is fatal to the element of proximate cause.

Id. at 1242 (citation omitted).

In contrast to Matthews, it is undisputed in the present case, at least for the purpose of *Defendants' Motion for Summary Judgment*, that genuine issues of material fact exist with respect to whether Defendants breached the standard of care. Furthermore, in Matthews, the plaintiffs' expert medical witness testified that the Pneumovax vaccine only protects "against the 23 strains of the disease."  Id. at 1238.  In contrast, Plaintiff's expert medical witness, Dr. Martin, testified that the Pneumovax vaccine

> covers specifically 80 percent–88 percent of the serotypes that cause serious disease and another 8 percent are related to those serotypes.  So the individuals have what we call cross-reactive protection against those.  Therefore, you have about 96 percent coverage of the vaccine for the serotypes of the pneumococcal bacteria that cause serious invasive disease.

[Doc. 135-2 at 3]  Because Mr. Jaramillo contracted serious invasive pneumococcal disease, and because the Pneumovax vaccine has "about 96 percent coverage . . . for the serotypes of the pneumococcal bacteria that cause serious invasive disease," the failure to identify the precise serotype contracted by Mr. Jaramillo is not fatal to Plaintiff's claim. Lastly, in the present case, as in Matthews, the evidence indicates that the Pneumovax

vaccine is not 100% effective and that Mr. Jaramillo may have contracted pneumococcal disease even if he had been vaccinated.  However, Plaintiff's inability to establish, with 100% certainty, that he would not have contracted pneumococcal disease is not fatal to his lost-chance claim.  First, Dr. Martin testified that, even if Mr. Jaramillo had contracted pneumococcal disease, the Pneumovax vaccine would have given him a very significant degree of protection against the more serious consequences of the disease. [Doc. 135-2 at 3] Thus, Mr. Jaramillo lost the chance to reduce the severity of his extensive injuries.  Second, pursuant to Alberts, Plaintiff "does not have to demonstrate absolute certainty of causation. . . ."  975 P.2d at 1287.  Accordingly, Plaintiff's inability to establish, with 100% certainty, that he would not have contracted pneumococcal disease in the absence of Defendants' alleged breach of the standard of care is not fatal to his medical malpractice claim.

For the foregoing reasons, the Court concludes that the evidence is sufficient to establish that genuine issues of material fact exist regarding causation and *Defendants' Motion for Summary Judgment* on this basis will be denied.

C.   <u>Sufficiency of the Evidence Regarding Delay in Diagnosis or Treatment</u>

Defendants next contend that they are entitled to summary judgment on Plaintiff's claim regarding delayed diagnosis or treatment of pneumococcal meningitis, because this claim is unsupported by expert medical testimony.  [Doc. 129 at 11-12]  In response, Plaintiff points to the summary of Mr. Jaramillo's taped phone calls, which indicate that Mr. Jaramillo began feeling ill as early as May 7, 2008.  [Doc. 148 (Ex. 25)]  Plaintiff also relies on the expert testimony of Dr. Peter Crum, who was disclosed as an expert

witness on the practice of medicine in an institutional setting.  [Doc. 139 (Ex. 80)].

Plaintiff contends that, based on the foregoing, the evidence supports a theory that

inadequate staffing at CCCC led to a delay in diagnosis and treatment of Mr. Jaramillo's

pneumococcal disease.

Prior to May 22, 2008, the day on which Mr. Jaramillo was rushed to the hospital,

the only evidence indicating that Mr. Jaramillo sought medical treatment for illness is

contained in Plaintiff's Exhibit 25, which is a summary of Mr. Jaramillo's recorded

telephone conversations on May 7, 10, 15, and 18, 2008.  [Doc. 148-1]  Defendants

object to the admission of these summaries, contending that they are "not proper

evidence" because they are not authenticated, they are not full transcripts of the

conversations, it is unclear who summarized the conversations, and it is unclear who

translated the conversations from Spanish into English.  [Doc. 153 at 9 n.9]  Even if the

summaries are proper evidence, Defendants contend that there is no expert medical

evidence in the record to indicate that Mr. Jaramillo's complaints were symptomatic of

pneumococcal disease or that Mr. Jaramillo sought medical treatment from Defendants

for his ailment prior to May 22, 2008.  [Doc. 153 at 9]

The summaries provide as follows.  On May 7, 2008, Mr. Jaramillo told an

unidentified female that he "feel[s] bad today" and that "the flu, . . .just started."  [Doc.

148-1 at 1]  He also stated that "[y]esterday morning I started feeling bad," that he was

taking "[o]nly home remedies," and "better that I visit the doctor early tomorrow

morning."  [Doc. 148-1 at 1]  On May 10, 2008, Mr. Jaramillo informed an unidentified

female that he had a bad cold, blaming it on "crazy weather."  [Id.]  On May 15, 2008,

Mr. Jaramillo told an unidentified female "I feel like I have a cold, I have a little of everything.  My ear drum burst last night." [Doc. 148-1 at 2]  He stated that he tried to go see the doctor "early in the morning, but there wasn't anyone there" so he went back to sleep again.  [Id.]  On May 18, 2008, Mr. Jaramillo informed an unidentified female that he "the other day [he] started to get better" and that:

> [T]here were days where they would give me medicine and I didn't want to go, I got better on my own.  Sometimes there are long lines to get to the doctor here.  You go at 5:30 pm and they don't see you till 8:00 pm or 10:00 pm.  It's a pure waste of time.  That is why it's better for me to deal with it on my own, and use home remedies.  Oranges, apples and tea.

[Doc. 148-1 at 2]

Assuming, without deciding, that the foregoing summaries are admissible evidence, they nonetheless fail to establish that Mr. Jaramillo received medical treatment from Defendants for his symptoms.  Even if Mr. Jaramillo had received medical treatment for his symptoms, there is no expert medical evidence proffered linking these symptoms with the pneumococcal disease that Mr. Jaramillo eventually developed on May 22, 2008.  Indeed, Plaintiff's own expert witness on causation, Dr. Martin, opined in his expert report that "the progression from blood stream infection to subsequent infection of the brain was extremely rapid.  So rapid that despite appropriate and timely medical intervention the patient was left with severe irreversible brain damage."  [Doc. 138-1 at 17]

Dr. Crum's testimony is not inconsistent with this conclusion.  Although Dr. Crum testified that, in his expert medical opinion Defendants were understaffed during the time period that Mr. Jaramillo was incarcerated at CCCC, he did not offer any expert opinion

testimony regarding delay in the diagnosis or treatment of Mr. Jaramillo's pneumococcal

disease. Consequently, he did not offer any expert opinion testimony causatively linking

Defendants' understaffing with a delay in the diagnosis or treatment of Mr. Jaramillo's

pneumococcal disease. [See Doc. 139 at 4-5 (Ex. 8)]

> To support his claim to the contrary, Plaintiff relies upon the following exchange:
>
> Q (BY MS. LUCERO) Is it your ultimate opinion, Dr. Crum, that based on the breach of the standard of care by the medical staff at Cibola County Correctional Center and their failure to offer and vaccinate Mr. Jaramillo when he was diagnosed with a new onset of diabetes in June of 2007 that that contributed to cause his ultimate – hang on one second – diagnosis of pneumococcal meningitis and his hospitalization and continuing medical care?
>
> A.     Yes.

[Id.] However, by its express terms, the foregoing question and the subsequent opinion

elicited is limited to Defendants' alleged "failure to offer and vaccinate Mr. Jaramillo

when he was diagnosed with a new onset of diabetes in June 2007." Dr. Crum did not

express an opinion regarding any alleged delay in the diagnosis or treatment of Mr.

Jaramillo's pneumococcal disease in May of 2008.

For the foregoing reasons, the Court concludes that the evidence is insufficient to

support Plaintiff's medical malpractice claim regarding a delay in diagnosis and

treatment.[1] Accordingly, *Defendants' Motion for Summary Judgment* on this claim will

be granted.

D.     *Wardens Wells and Rushing*

---

[1] In light of this conclusion, the Court need not reach Defendants' argument that Plaintiff's delayed diagnosis/inadequate staffing claim was not timely disclosed in violation of Fed. R. Civ. P. 26(a)(2)(B).

Defendants next contend that summary judgment should be entered in favor of Defendants Wells and Rushing on Plaintiff's medical malpractice claim, because there is no evidence indicating that they were "personally involved in making medical decisions concerning Jaramillo's treatment or candidacy for vaccination, and further because Plaintiff has failed to present any expert evidence of either individual Defendant's alleged misconduct."  [Doc. 129 at 13-14]  Plaintiff responds that Defendants Wells and Rushing "are not healthcare providers for which expert medical testimony on standard of care and causation are required" and that the Defendants breached the standard of ordinary care when they failed to ensure "contract compliance as well as adherence to FBOP policies and procedures."  [Doc. 137 at 23-24]

To support their contention that Defendants Wells and Rushing are not liable absent personal involvement in the decision to vaccinate Mr. Jaramillo, Defendants rely exclusively on Section 1983 cases.  See, e.g., Foote v. Spiegel, 118 F.3d 1416, 1423 (10th Cir. 1997) ("Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation.").  However, Plaintiff has not raised his medical malpractice claim under Section 1983, but rather under the common law of New Mexico. [See Doc. 1]  The law governing a civil rights violation under Section 1983 is different from the law governing tortious conduct under New Mexico common law.  See generally Becker v. Kroll, 494 F.3d 904, 913 (10th Cir. 2007) ("Claims under § 1983 are often analytically similar to—although still distinct from—common law torts . . . .").  Because Defendants fail to cite any New Mexico case law to support their argument, this particular argument is rejected summarily.

Defendants also contend that Wardens Wells and Rushing are entitled to summary judgment because there is no expert medical testimony regarding "what the proper role of a prison warden should be in the oversight of medical care for inmates." [Doc. 129 at 13] Again, Defendants fail to cite any New Mexico case law in support of their contention. In New Mexico expert evidence "[o]rdinarily . . . is essential to support an action for malpractice against a physician or surgeon." Toppino v. Herhahn, 673 P.2d 1297, 1300 (N.M. 1983). This is because of the "technical and specialized subject matter" of medicine. Lopez v. Southwest Cmty. Health Servs., 833 P.2d 1183, 1188 (N.M. App. 1992). However, neither Warden Wells nor Warden Rushing is a physician, a surgeon, or a health care provider. See NMSA 1978, Section 41-5-3(A) (defining a "health care provider" as "a person, corporation, organization, facility or institution licensed or certified by this state to provide health care or professional services as a doctor of medicine, hospital, outpatient health care facility, doctor of osteopathy, chiropractor, podiatrist, nurse anesthetist or physician's assistant"). Given that they are not health care providers who provided medical care to Mr. Jaramillo, it is unclear whether Wardens Wells and Rushing exercised the type of technical and specialized judgment that necessitates expert testimony. Cf. Richter v. Presbyterian Healthcare Servs., 2014 WL 880319, at *5 (N.M. App. Feb. 26, 2014) (adopting a "functional test" to determine whether professional services rendered by health care providers require specialized knowledge or skill and holding that "[i]f the act involves the use of specialized knowledge or skill to make to make a judgment call as to the appropriate thing to do or not do, expert testimony will likely be needed to assess the resultant act or failure to act.

If not, expert testimony is not required.").  Defendants have not briefed this issue and, therefore, they have not met their burden of demonstrating that they are entitled to summary judgment as a matter of law.  Accordingly, *Defendants' Motion for Summary Judgment* will be denied with respect to Wardens Wells and Rushing.

E.      *Punitive Damages*

Lastly, Defendants contend that they are entitled to summary judgment on Plaintiff's claim for punitive damages.  Specifically, Defendants contend that the evidence is insufficient to establish that the failure to vaccinate Mr. Jaramillo against pneumococcal disease constituted willful, wanton, malicious, reckless, or oppressive conduct.  [Doc. 129 at 14-17]

"To be liable for punitive damages, a wrongdoer must have some culpable mental state . . . and the wrongdoer's conduct must rise to a willful, wanton, malicious, reckless, oppressive, or fraudulent level."  Clay v. Ferrellgas, Inc., 881 P.2d 11, 14 (N.M. 1994) (internal quotation marks and citation omitted).

> Malicious conduct is the intentional doing of a wrongful act with knowledge that the act was wrongful.
>
> Willful conduct is the intentional doing of an act with knowledge that harm may result.
>
> Reckless conduct is the intentional doing of an act with utter indifference to the consequences.  When there is a high risk of danger, conduct that breaches the duty of care is more likely to demonstrate recklessness.
>
> Wanton conduct is the doing of an act with utter indifference to or conscious disregard for a person's [rights] [safety].

UJI 13-1827 NMRA.

Plaintiff's Complaint seeks punitive damages against Defendant CCA, alleging

that CCA "is vicariously liable for all damages, including punitive damages attributed to its employees." [Doc. 1-1 at 12] "A corporation may be held liable for punitive damages for the misconduct of its employees if: (1) corporate employees possessing managerial capacity engage in conduct warranting punitive damages; (2) the corporation authorizes, ratifies, or participates in conduct that warrants punitive damages; or (3) under certain circumstances, the cumulative effects of the conduct of corporate employees demonstrate a culpable mental state warranting punitive damages," Chavarria v. Fleetwood Retail Corp., 143 P.3d 717, 725 (N.M. 2006) (internal citations omitted).

In Clay, the New Mexico Supreme Court held that punitive damages may be awarded, even though "the conduct of no individual employee demonstrate[s] the requisite culpable mental state," if the "actions of the employees in the aggregate" demonstrate that the corporation "had the requisite culpable mental state because of the cumulative conduct of the employees." 881 P.2d at 15. In that case, the plaintiffs asked the corporate defendant, Ferrellgas, Inc. (Ferrellgas), to convert their car to run on liquid propane, as well as gasoline. Safety regulations required the propane tank to be mounted in a gastight area "with respect to driver or passenger compartments and to any space containing . . . spark-producing equipment. Id. at 12 (alteration in original). Additionally, the area must be vented to the outside of the vehicle. Despite these safety requirements, Ferrellgas mounted the propane tank without first constructing a sealed vapor barrier between the passenger compartment or an outside vent. Ferrellgas did not have the requisite parts to complete the conversion and the plaintiffs picked up their vehicle. On September 20, 1987, the vehicle exploded because a spark from the ignition

ignited propane gas that had leaked from a faulty valve on the tank and migrated into the passenger compartment of the car.  Id. at 13.

The Court found that the evidence was sufficient to support an award of punitive damages, even though no single employee had acted with a culpable mental state.  To conclude otherwise would permit Ferrellgas to evade responsibility because its employees had failed to communicate with each other.  Id. at 16.  Examining the evidence cumulatively, the Court noted that: (1) Ferrellgas knew that state law required them to install a vapor barrier and to properly vent the trunk before the tank was installed; (2) Ferrellgas filled the tank with propane for a leak test, but failed to purge the tank with an inert gas and, therefore, knew or should have known that the tank contained propane; (3) Ferrellgas released the car with the tank installed and did not warn plaintiffs of the risk of harm; and (4) Ferrellgas exhibited a cavalier attitude toward safety regulations in light of its failure to ever complete a state required inspection certificate, despite completing over 100 propane conversions.  The Court held that the high risk of harm posed by propane gas, combined with the negligence of Ferrellgas's employees and regular violation of safety regulations, "amounts to corporate indifference and reckless conduct."  Id. at 17.

Plaintiff here contends that, viewing the evidence cumulatively, there is sufficient evidence to support an award of punitive damages because CCA employees cavalierly disregarded the high risk of danger posed by pneumococcal disease.  As the New Mexico Supreme Court observed in Clay:

> The circumstances define the conduct; a cavalier attitude toward the lawful
> management of a dangerous product may raise the wrongdoer's conduct to
> recklessness, whereas a cavalier attitude toward the lawful management of
> a nondangerous product may be mere negligence.  In measuring punitive
> damages, the enormity and nature of the wrong must be assessed.

Id. at 14 (internal quotation marks omitted).  In this case, there is evidence that CCA

employees breached the standard of care by failing to vaccinate Mr. Jaramillo against

pneumococcal disease.  Plaintiff's expert witnesses, Drs. Martin and Crum, both testified

that the failure to vaccinate diabetic inmate constituted a breach of the standard of care.

[See Docs. 138-1 at 6-19 (Exs. 6-7)]

Thus, the question remains:   Does the alleged breach of the standard of care

support an inference of recklessness?  Stated another way, is the risk posed by

pneumococcal disease so high for diabetic inmates that the failure to vaccinate Mr.

Jaramillo can be deemed reckless?

Although it is a close call, the Court concludes that there is insufficient evidence

proffered that would allow a jury to reasonably infer that the risk posed by pneumococcal

disease to diabetic inmates was so high that CCA employees were reckless when they

failed to vaccinate Mr. Jaramillo.  See, e.g., Atler v. Murphy Enter., Inc., 104 P.3d 1092,

1099 (N.M. App. 2005) (upholding an award of punitive damages because the

"Defendants demonstrated an utter indifference to the consequences or a conscious

disregard for public safety when they failed to conduct the required inspections and

abdicated their responsibility to operate the Cliff Hanger in a safe manner"); J. Torres v.

El Paso Electric Co., 987 P.2d 386, 398-401 (N.M. 1999) (holding that the evidence was

sufficient to support an award of punitive damages because the "design, installation, and

maintenance of the power pole and conductors" is "an inherently dangerous activity" and the defendant cavalierly ignored national safety requirements, its own internal policies, failed to follow good engineering practices, and disregarded multiple warnings regarding the safety of the power pole at issue), overruled on other grounds by Herrera v. Quality Pontiac, 73 P.3d 181, 192 n.3 (N.M. 2003).  Moreover, Defendants' lack of a culpable mental state is evidenced from Defendants' management of Mr. Jaramillo's diabetic condition, which as Plaintiff's concede, was properly managed and under control. Therefore, because this is not a situation where a jury can reasonably infer that the Defendants acted with utter indifference to the consequences of its actions, or with a conscious disregard for Mr. Jaramillo's safety, when it failed to vaccinate Mr. Jaramillo, the Court concludes that *Defendants' Motion for Summary Judgment* is granted with respect to Plaintiff's claim for punitive damages.  See Couch v. Astec Indus., Inc., 53 P.3d 398, 411 (N.M. App. 2002) (providing that because the purpose of punitive damages is to punish a wrongdoer, a wrongdoer must have a culpable mental state in order to be liable for punitive damages).

## IV.     CONCLUSION

For the foregoing reasons, *Defendants' Motion for Summary Judgment* [Doc. 129] is granted in part and denied in part.  Specifically, the motion is granted with respect to Plaintiff's delay in treatment claim and punitive damages claim, and is denied with respect to Plaintiff's failure to vaccinate claim, and claims against Wardens Wells and Rushing.

**IT IS THEREFORE HEREBY ORDERED** that *Defendants' Motion for Summary Judgment* [Doc. 129] is **GRANTED IN PART AND DENIED IN PART.**

**SO ORDERED** this 6th day of May, 2014 in Albuquerque, New Mexico.


_____
**M. CHRISTINA ARMIJO**
Chief United States District Judge