IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**F. MICHAEL HART, ESQ.,** Guardian ad Litem
For **JOSE JARAMILLO,** an incapacitated person,

    Plaintiff,

    vs.                                  No. 2:11-CV-00267 MCA/WPL

**CORRECTIONS CORPORATION OF AMERICA,**
a foreign corporation, **CIBOLA COUNTRY
CORRECTIONAL CENTER, WALT WELLS,
WARDEN,** and **RODDIE RUSHING, WARDEN**,

    Defendants.

## ORDER

**THIS MATTER** comes before the Court on *Defendants' Motion To Exclude Opinions of Dr. David Martin and Dr. Peter Crum* [Doc. 130], filed May 15, 2013. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants in part and denies in part Defendants' Motion.

## I.    BACKGROUND

The background of this case was thoroughly set forth in the Court's *Memorandum Opinion and Order* [Doc. 281], dated May 6, 2014. The Court hereby adopts the background section in that *Memorandum Opinion and Order* [Doc. 281] and will supplement with additional facts as necessary.

In support of his medical malpractice claim, Plaintiff has disclosed Drs. Peter B. Crum and David H. Martin as expert witnesses on the elements of standard of care and causation. Defendants object to the admission of this expert testimony under Fed. R.

Evid. 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Defendants contend that Dr. Crum's expert testimony should be excluded because Dr. Crum "has no specialized training that qualifies him to offer any standard of care or causation opinions" and his expert opinion is not supported by a scientifically valid methodology.  [Doc. 130 at 6-8]  Defendants further contend that Dr. Martin's expert testimony should be excluded because of "the absence of control-group studies documenting the efficacy of the [Pneumovax] vaccine in diabetic adults" and Dr. Martin's "inability to trace and identify the serotype as one of the 23 for which Pneumovax is even partially effective."  [Doc. 130 at 11]  Plaintiff responds that Dr. Crum's nineteen years of practicing institutional medicine provide "a firm experiential and practical foundation for his opinions."  [Doc. 136 at 8]  Plaintiff further responds that Dr. Martin's expert opinion is supported by the "lengthy literature that is attached to and referenced in his written report."  [Doc. 136 at 16]

On September 3, 2013, this Court held a pretrial conference, at which time it heard oral argument from the parties on their *Daubert* motion.  [Doc. 178]  Defendants assured the Court that a *Daubert* hearing with respect to Drs. Crum and Martin was not necessary and that the Court could resolve the issue on the basis of the briefs.  [Rough Draft Transcript 9-3-13 at 20:9-20:19]  Plaintiff asked for an opportunity to submit supplemental exhibits in support of her expert witnesses and the Court granted Plaintiff's request.  [See Doc. 180]

## II.     STANDARD

Federal Rule of Evidence 702 imposes a special gatekeeping obligation on this

Court to ensure that expert testimony is not admitted at trial unless it is both relevant and reliable.  See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999); Daubert, 509 U.S. at 592-93. The relevance of such testimony must be weighed against the danger of unfair prejudice, confusion of the issues, or misleading the jury as well as considerations of undue delay, waste of time, or needless presentation of cumulative evidence.  See Fed. R. Evid. 403.  While the Court is not required to consider any particular set of factors or utilize a particular procedure in making such determinations with respect to expert testimony, the Court must make some kind of determination on the record in order to demonstrate that it has performed its gatekeeping function.  See United States v. Velarde, 214 F.3d 1204, 1209 (10th Cir. 2000); Goebel v. Denver and Rio Grande Western R. Co., 346 F.3d 987, 991-92 (10th Cir. 2003).

Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Id. The first requirement of this rule is that the expert's specialized knowledge must "help the trier of fact understand the evidence" or "determine a fact in issue." Id.  "Rule 702 thus dictates a common-sense inquiry of whether a juror would be able to understand

the evidence without specialized knowledge concerning the subject." United States v. Muldrow, 19 F.3d 1332, 1338 (10th Cir. 1994).

Rule 702 requires that expert opinions, to be admissible in federal court, must have not only a reliable methodology but also a sufficient factual basis and a reliable application of the methodology to the facts. See Johnson v. Manitowoc Boom Trucks, Inc., 484 F.3d 426, 429 (6th Cir. 2007); United States v. Mamah, 332 F.3d 475, 477-78 (7th Cir. 2003). A "sufficient factual basis" under Fed. R. Evid. 702 does not necessarily require the facts or data upon which an expert bases his or her opinion to be independently admissible, so long as they are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject. Fed. R. Evid. 703.

The Federal Rules of Evidence require that, in order to yield an admissible opinion, expert witnesses must first apply a reliable methodology to the facts or data they have considered. Factors to be considered in assessing the reliability of an expert opinion include, but are not limited to: "(1) whether the opinion has been subjected to testing or is susceptible of such testing; (2) whether the opinion has been subjected to publication and peer review; (3) whether the methodology used has standards controlling its use and known rate of error; (4) whether the theory has been accepted in the scientific community." Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1210 (10th Cir. 2004) (citing Daubert, 509 U.S. at 590). This list is neither exhaustive nor applicable in every case, as ultimately the purpose of the reliability requirement is to "make certain an expert, whether basing testimony upon professional studies or personal experience, employs in

the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the field." Kumho Tire Co., 526 U.S. at 152.

Even where a witness is qualified as an expert and has both a sufficient factual basis and a reliable methodology, the Court's inquiry is not yet at an end.  The Court also must determine whether or to what extent the witness reliably applied that methodology to the facts at issue in the present case and whether or to what extent the resulting opinions will assist the trier of fact.  Our Circuit has interpreted Rule 702 as requiring "a common-sense inquiry of whether a juror would be able to understand the evidence without specialized knowledge concerning the subject." Muldrow, 19 F.3d at 1338.  So long as these criteria are satisfied, an expert may testify and provide "brief, crisp answers to the . . . questions" about "discrete topics" which are "beyond the ken of the average juror." United States v. Tapia-Ortiz, 23 F.3d 738, 740-41 (2d Cir. 1994).

### III.    DISCUSSION

Under New Mexico law, expert testimony ordinarily "is essential to support an action for malpractice against a physician or surgeon." Toppino v. Herhahn, 673 P.2d 1297, 1301 (N.M. 1983).  Generally, without expert medical testimony on the elements of standard of care and causation, summary judgment is appropriate. See Cervantes v. Forbis, 389 P.2d 210, 213 (N.M. 1964); Chavarria v. Williams, 2013 WL 4537840, at *1 (N.M. App. 2013).

*A.*     *Dr. Peter Crum*

Dr. Peter Crum is a licensed physician who has been practicing medicine within correctional care facilities for the past nineteen years.  [Doc. 136-2 at 3 (Ex. 2)]

Currently, he practices internal medicine at the Denver County Jail, in Denver, Colorado. [Id.]  As stated above, Plaintiff seeks to have Dr. Crum testify as an expert witness on the elements of standard of care and causation. The Court will evaluate whether Dr. Crum is qualified to provide expert witness testimony regarding the applicable standard of care and causation in turn.

    *1.    Standard of Care*

Dr. Crum testified in his deposition that the following policies, procedures, and guidelines controlled the care that Mr. Jaramillo received at CCCC: (1) the Federal Bureau of Prisons (BOP) Clinical Care Guidelines; (2) JCA chronic care and disease management; (3) ACA [American Correctional Association] standards; (3) NCCHC [National Commission on Correctional Health Care] standards; and (4) CDC [Centers for Disease Control] recommendations.  [Doc. 136-2 at 3-4 (Ex.2)]  Based on these standards, Dr. Crum offered the following expert opinion regarding Mr. Jaramillo:

> My ultimate opinion is that he was diagnosed with diabetes at the Cibola County Correctional Facility and the recommendation is by standard of care and by the Bur – Federal Bureau of Prisons is that he receive a pneumococcal vaccination as a high-risk patient that has been recommended that he receive this vaccination, he was not offered it and did not receive it.  And following that, he was diagnosed with pneumococcal meningitis and hospitalized.
>
> Q.    Was it a breach of the standard of care not to vaccinate Jose Jaramillo on or about June 20, 2007, when he was diagnosed with a new onset of diabetes per the nurse practitioner, June Kershner, at CCCC?
>
>                               * * *
>
> A.    It is a breach of standard of care and of policy and procedure, in my opinion.

[Id.]

The Court finds that in light of Dr. Crum's nineteen years of experience practicing correctional medicine, Dr. Crum has sufficient "knowledge, skill, experience, training, [and] education" to offer an expert opinion on the standard of care. The Court further finds that Dr. Crum's methodology is sound. To arrive at his opinion regarding the standard of care, Dr. Crum relied on the BOP, JCA, ACA, NCCHC, and CDC guidelines, all of which recommend that diabetic patients receive the pneumococcal vaccine. Dr. Crum did not merely "parrot" these guidelines, but explained that these professional guidelines inform the standard of care for the practice of medicine in a correctional setting.

Nonetheless, Defendants contend that Dr. Crum's expert opinion on the standard of care is unreliable because he did "not have any opinion on how recent Jaramillo's diagnosis was and whether the infancy of the manifestations of diabetes may factor into his suitability for the Pneumovax vaccine" and he was "unaware of any medical literature noting that someone with diabetes falls into the high risk profile not because of the diabetes itself, but because of the likely correlation between diabetes and other high-risk conditions—such as heart disease." [Doc. 130 at 3] However, Dr. Crum explained that, pursuant to the CDC guidelines, it is the diagnosis of diabetes itself, regardless of the date of onset, the level of control, or the correlation with other high risk conditions, that triggers the necessity for the Pneumovax vaccine. [Doc. 130-1 at 7] Defendants also contend that Dr. Crum's expert opinion on the standard of care is unreliable because "Dr. Crum is not aware of and did not research the potential adverse side effects of the

pneumococcal vaccination." [Doc. 130 at 3]  However, Dr. Crum was aware that "the Federal Bureau of Prisons, . . . had issued, as of September of 2003, a proclamation on their own consent form that the PPV is a very safe vaccination" and testified that he "agree[d]" with that assessment.  [Doc. 136-2 at 5]  Although Dr. Crum "did not know whether Mr. Jaramillo has had pneumonia or the vaccine since the incident," [Doc. 130 at 3] this lack of knowledge is not relevant to the standard of care governing vaccination of diabetic inmates in June of 2007.  Accordingly, Defendants' Motion to exclude the expert testimony of Dr. Crum on the standard of care will be denied.

2.     *Causation*

Dr. Crum stated in his expert report that "[b]y a reasonable medical probability I believe that had Mr. Jose Jaramillo-Frias been administered the pneumococcal vaccine per the Clinical Practice Guidelines of the Federal Bureau of Prisons, he would not have developed pneumococcal meningitis."  [Doc. 138-1 at 11 (Ex. 6)].  In his deposition, Dr. Crum explained that his expert opinion on causation was "[b]ased on my understanding of the standard of care regarding pneumococcal vaccination being recommended for patients at high risk for pneumococcal disease, and based on my understanding that it is recommended to be given in order to prevent development of pneumococcal infection."  [Doc. 130-1 at 6 (Ex. A)]

Defendants challenge Dr. Crum's proposed expert testimony on causation, pointing out that Dr. Crum did not consider the fact that the serotype contracted by Mr. Jaramillo was unknown, "he did not review any research or scientific articles relative to whether the pneumococcal vaccination is even effective in populations with chronic

conditions, including diabetes specifically," and "he did not review any scientific literature relative to the vaccination at issue in this litigation, Pneumovax 23." [Doc. 130 at 3]  Plaintiff did not address Defendants' causation argument in his response.

The sole basis for Dr. Crum's causation opinion is his "understanding of the standard of care regarding pneumococcal vaccination being recommended for patients at high risk for pneumococcal disease" and his "understanding that it is recommended to be given in order to prevent development of pneumococcal infection." [Doc. 130-1 at 6]  Thus, Dr. Crum's causation opinion is not based on scientific or experiential evidence; rather, it is based on his opinion that Defendants breached the standard of care.  Given Dr. Crum's failure to articulate a reasonable methodology supporting his causation opinion, the Court finds that his opinion is unsound.  Therefore, Defendants' Motion to exclude Dr. Crum's causation opinion will be granted.

### *B.*     *Dr. Martin*

Dr. Martin is the Chief of the Department of Medicine and Microbiology, Section of Infectious Diseases, at the Louisiana State University Medical School and Center. [Doc. 138-1 at 12 (Ex. 7)]  In his expert report, Dr. Martin provides the following expert medical opinion:  "It is my medical opinion as an expert in infectious diseases that it is more likely that [sic] not that had Mr. Jaramillo-Frias received the 23 valent pneumococcal vaccine at the time he was incarcerated the level of severe neurological damage he suffered would have been significantly reduced if not avoided altogether." [Doc. 138-1 at 17]  Dr. Martin based his opinion on data from the "medical literature concerning the utility of the pneumococcal vaccine." [Id.]  Specifically, Dr. Martin relied

on a field study of South African miners, as well as a study conducted on civilians and members of the armed forces in the 1930s and 1940s, which demonstrated that "the reduction on pneumococcal diseases was thought to be about 60%." [Id.] Dr. Martin noted that "[i]n several case controlled studies the efficacy of the vaccine was shown to be 60% to 70%, about the same as shown in prospective field trials." [Id.] "In patients who do develop pneumonia despite prior vaccination the incidence of involvement of the blood stream is significantly decreased." [Doc. 138-1 at 18] Dr. Martin quoted Ake Ortqvist, one of the world's leading experts on the prevention of pneumococcal pneumonia, as stating that: "studies have clearly shown that in young healthy adults the vaccine prevents against bacteremic pneumococcal pneumonia (70-80% effective) but also against presumptive pneumococcal pneumonia and against death in pneumonia overall." [Id.] Dr. Martin opined that "[t]hese data strongly support the role of vaccination in prevention of blood stream infection and, by inference, distant organ infection." [Id.]

>In his deposition, Dr. Martin clarified that:

>the 23-valent vaccine covers specifically 80 percent – 88 percent of the serotypes that cause serious disease and another 8 percent are related to those serotypes. So the individuals have what we call cross-reactive protection against those.

>Therefore, you have about 96 percent coverage of the vaccine for the serotypes of the pneumococcal bacteria that cause serious invasive disease. And then we related that to the efficaciousness. We talked about the issue that no vaccines are 100 percent. 100 percent is probably best understood by the general population through the influenza vaccine where it's well-recognized that the vaccine is recommended to prevent serious events; but often people still get infection.

> And the pneumococcal vaccine is pretty much similar to that. So people still get the pneumonia caused by the pneumococcus but by virtue of having been vaccinated they have very significant degree of protection against the more serious consequences of the vaccine.

[Doc. 130-1 at 17]  When asked whether meningitis is included within the definition of "invasive pneumococcal disease," Dr. Martin responded "yes."  [Id.]

Defendants contend that the methodology underlying Dr. Martin's medical opinion is flawed because he did not rely on any studies involving diabetic patients. [Doc. 130 at 9]  Indeed, Defendants point out that "there have been no studies that specifically deal with the efficacy of the Pneumovax vaccine as related to diabetics."  [Id. (internal quotation marks omitted; emphasis in original).  Although there have been no studies with respect to diabetic patients in particular, Dr. Martin testified in his deposition that the South African study involved "an unselected population," such that "there were undoubtedly diabetics in the population, and there were undoubtedly people who had lung disease."  [Doc. 130-1 at 24]  Thus, in an unselected population involving both diabetic and non-diabetic patients, the medical data supports Dr. Martin's opinion that the pneumococcal vaccine protects against pneumococcal disease about 60-70% of the time.

Defendants further contend that Dr. Martin's opinion is flawed due to the "inability to trace the pneumonia infection to one of the 23 serotypes contained in Pneumovax."  [Doc. 130 at 11]  In his deposition, Dr. Martin explained that the twenty-three valents included within the Pneumovax vaccine are "[t]he types that have been identified as causing increased invasive disease," such as meningitis.  [Doc. 130-1 at 19]  Indeed, the vaccine covers "88 percent of the serotypes that cause serious disease" and

provides cross reactive protection against an additional eight percent of related serotypes. [Doc. 130-1 at 17] Therefore, the Pneumovax vaccine has "96 percent coverage . . . for the serotypes of the pneumococcal bacteria that cause serious invasive disease." [Id.] Dr. Martin's testimony was supported by Defendants' own expert witness, Dr. Lowell Young, who testified that the medical data indicates that the Pneumovax vaccine covers 80 to 90 percent of all serotypes that cause invasive pneumococcal disease. [Doc. 139-1 at 11 (Ex. 13)]. Because Mr. Jaramillo contracted a strain of pneumococcus that caused serious invasive disease, namely meningitis, Dr. Martin reasonably concluded, to a reasonable degree of medical probability, that had Mr. Jaramillo received the vaccine he would not have developed pneumococcal disease and, if he had, it would not have been as severe. Accordingly, the Court finds that Dr. Martin's methodology is sound and Defendant's Motion to exclude his expert testimony will be denied.

## IV. CONCLUSION

For the foregoing reasons, *Defendants' Motion to Exclude Opinions of Dr. David Martin and Dr. Peter Crum* [Doc. 130] will be granted in part and denied in part. Specifically, Defendants' motion will be granted with respect to Dr. Crum's expert testimony on causation, and denied with respect to Dr. Crum's expert testimony on the standard of care and Dr. Martin's expert testimony. However, the Court's ruling on all issues addressed above is subject to reconsideration if unforeseen circumstances or a change in context should arise during the trial. If such circumstances should arise, the parties must seek a ruling from the Court outside the presence of the jury regarding the admissibility of such testimony.

**IT IS, THEREFORE, ORDERED** that *Defendants' Motion to Exclude Opinions of Dr. David Martin and Dr. Peter Crum* [Doc. 130] is **GRANTED IN PART AND DENIED IN PART**.

**SO ORDERED** this 9th day of May, 2014, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
Chief United States District Judge